John Robertelli, Esq.
Gene Y. Kang, Esq.
Christopher Casa, Esq.
Max Gershenoff, Esq. (admitted *pro hac vice*)
Barry I. Levy, Esq. (to be admitted *pro hac vice*)
Steven T. Henesy, Esq. (to be admitted *pro hac vice*)
RIVKIN RADLER LLP
21 Main Street, Suite 158
Court Plaza South, West Wing
Hackensack, New Jersey 07601
(201) 287-2460
john.robertelli@rivkin.com
*Counsel for Plaintiffs Government Employees Insurance*
*Co., GEICO Indemnity Co., GEICO General Insurance*
*Company and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO.,<br><br>                        Plaintiffs,<br><br>    -against-<br><br>J.D. D'AGOSTINI, D.C., P.C. d/b/a ALLIED HEALTH CENTER, BOUND BROOK FAMILY CHIROPRACTIC CENTER, P.C., JOSEPH D. D'AGOSTINI, D.C., JORDAN GREENE, D.C., MICHAEL FOGARTY, D.C., GACCIONE CHIROPRACTIC CENTER, P.A. d/b/a CLINTON STREET CHIROPRACTIC CENTER, MICHAEL GACCIONE, D.C., STEPHEN M. JOHNSON, D.C., MITCHELL HOLSTEN, D.C., and THOMAS D. NETTIS, III, D.C.,<br><br>                        Defendants. | Docket No.: 2:17-cv-06620 (MCA) (MAH)<br><br>**Plaintiffs Demand a Trial by Jury** |

## AMENDED COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Amended Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

1.      This action seeks to recover more than $3,380,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges through J.D. D'Agostini, D.C., P.C. d/b/a Allied Health Center, Inc. ("Allied Health"), Bound Brook Family Chiropractic Center, P.C. ("Bound Brook"), and Gaccione Chiropractic Center, P.A. d/b/a Clinton Street Chiropractic Center ("Clinton Street") for purported patient examinations, biofeedback therapy services, chiropractic services, and manipulation under anesthesia ("MUA") services  (the purported patient examinations, biofeedback therapy services, chiropractic services, and MUA services collectively are referred to hereinafter as the "Fraudulent Services").

2.      The Fraudulent Services purportedly were provided to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for insurance coverage under GEICO no-fault insurance policies.

3.      The Defendants fall into the following categories:

(i)      Defendants Allied Health and Bound Brook are New Jersey chiropractic professional corporations, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

(ii)      Defendant Joseph D. D'Agostini, D.C. ("D'Agostini") is a chiropractor licensed to practice chiropractic in New Jersey, owned and controlled Allied Health and Bound Brook, and purported to perform many of the Fraudulent Services at Allied Health and Bound Brook.

2

(iii)    Defendant Jordan Greene, D.C. ("Greene") is a chiropractor licensed to practice chiropractic in New Jersey, and purported to perform many of the Fraudulent Services at Allied Health and Bound Brook.

(iv)    Defendant Michael Fogarty, D.C. ("Fogarty") is a chiropractor licensed to practice chiropractic in New Jersey, and purported to perform many of the Fraudulent Services at Bound Brook.

(v)    Defendant Clinton Street is a New Jersey chiropractic professional corporation, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

(vi)    Defendant Michael Gaccione, D.C. ("Gaccione") is a chiropractor licensed to practice chiropractic in New Jersey, owned and controlled Clinton Street, and purported to provide many of the Fraudulent Services at Clinton Street.

(vii)    Defendants Stephen M. Johnson, D.C. ("Johnson"), Mitchell Holsten, D.C. ("Holsten"), and Thomas D. Nettis, III, D.C. ("Nettis") are chiropractors licensed to practice chiropractic in New Jersey, and purported to perform many of the Fraudulent Services at Clinton Street.

4.    As discussed below, the Defendants at all relevant times have known that:

(i)    the Defendants were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey and, as a result, were not eligible to receive no-fault insurance reimbursement in the first instance;

(ii)    the Fraudulent Services were not provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey and, as a result, were not eligible for no-fault insurance reimbursement in the first instance;

(iii)    the Fraudulent Services were not medically necessary, and were provided - to the extent that they were provided at all - pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)    in many cases, the Fraudulent Services never were provided in the first instance; and

(v)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

5.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO by the Defendants.

6.      The charts annexed hereto as Exhibits "1" - "3" set forth large representative samples of the fraudulent claims that have been identified to date that the Defendants have submitted, or caused to be submitted, to GEICO.

7.      The Defendants' fraudulent scheme began as early as 2012 and has continued uninterrupted since that time. As a result of the Defendants' scheme, GEICO has incurred damages of more than $3,380,000.00.

<u>**THE PARTIES**</u>

**I.      <u>Plaintiffs</u>**

8.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New Jersey.

**II.      <u>Defendants</u>**

9.      Defendant Allied Health is a New Jersey chiropractic professional corporation with its principal place of business in New Jersey. Allied Health was incorporated in New Jersey on or about January 16, 2001, was owned and controlled by D'Agostini, and was used by the Defendants as a vehicle to submit fraudulent billing to GEICO and other insurers.

10.      Defendant Bound Brook is a New Jersey chiropractic professional corporation with its principal place of business in New Jersey. Bound Brook was incorporated in New Jersey on or about June 30, 2005, was owned and controlled by D'Agostini, and was used by the Defendants as a vehicle to submit fraudulent billing to GEICO and other insurers.

11.      Defendant D'Agostini resides in and is a citizen of New Jersey. D'Agostini was licensed to practice chiropractic in New Jersey on or about October 21, 1988, owned and controlled Allied Health and Bound Brook, and purported to perform many of the Fraudulent Services at Allied Health and Bound Brook.

12.      Defendant Greene resides in and is a citizen of New Jersey. Greene was licensed to practice chiropractic in New Jersey on or about November 21, 1991, was employed by or associated with Allied Health and Bound Brook, and purported to perform many of the Fraudulent Services at Allied Health and Bound Brook.

13.      Defendant Fogarty resides in and is a citizen of New Jersey. Fogarty was licensed to practice chiropractic in New Jersey on or about October 1, 1986, was employed by or associated with Bound Brook, and purported to perform many of the Fraudulent Services at Bound Brook.

14.      Defendant Clinton Street is a New Jersey chiropractic professional corporation with its principal place of business in New Jersey. Clinton Street was incorporated in New Jersey on or about June 18, 1999, was owned and controlled by Gaccione, and was used by the Defendants as a vehicle to submit fraudulent billing to GEICO.

15.      Defendant Gaccione resides in and is a citizen of New Jersey. Gaccione was licensed to practice chiropractic in New Jersey on or about February 22, 1995, owned and controlled Clinton Street, and purported to perform many of the Fraudulent Services.

16.      Defendant Johnson resides in and is a citizen of New Jersey. Johnson was licensed to practice chiropractic in New Jersey on or about February 24, 1978, was employed by or associated with Clinton Street, and purported to perform many of the Fraudulent Services.

17.     Johnson has a history of professional misconduct that has resulted in discipline by the New Jersey Board of Chiropractic Examiners (the "Chiropractic Board").

18.     On April 6, 1990, Johnson was formally accused by the New Jersey Attorney General of inappropriate conduct with respect to two adolescent male patients.

19.     In their May 5, 1992 Final Decision and Order regarding the professional disciplinary proceedings that followed the accusations, the Chiropractic Board issued Johnson a public reprimand, assessed a $2,500.00 civil penalty, and declined to seal case records containing factual allegations and findings regarding Johnson's insensitivity to the modesty and privacy requirements of two adolescent patients. A copy of the Chiropractic Board's Final Decision and Order is attached as Exhibit "4".

20.     Upon information and belief, Johnson's  public history of professional discipline and the nature of  the charges that resulted in the discipline - which can be located by prospective employers through a simple internet search - has made it virtually impossible for Johnson to obtain legitimate employment, and made him amenable to participation in the Defendants' fraudulent scheme.

21.     Defendant Holsten resides in and is a citizen of New Jersey. Holsten was licensed to practice chiropractic in New Jersey on or about March 11, 1993, was employed by or associated with Clinton Street, and purported to perform many of the Fraudulent Services.

22.     Defendant Nettis resides in and is a citizen of New Jersey. Nettis was licensed to practice chiropractic in New Jersey on or about March 14, 1994, was employed by or associated with Clinton Street, and purported to perform many of the Fraudulent Services.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

24.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

25.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

26.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the District of New Jersey is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.      An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

**A.      The New Jersey No-Fault Laws**

27.     New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B-1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A-1 et seq.)(collectively referred to as the "No Fault Laws"), which require automobile insurers to provide Personal Injury Protection Benefits ("PIP Benefits") to Insureds.

28.     Under the No Fault Laws, an Insured can assign his or her right to PIP Benefits to healthcare services providers in exchange for those services. Pursuant to a duly executed

assignment, a healthcare services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form").

**B.      No-Fault Reimbursement and Compliance with New Jersey Law Governing Healthcare Practice**

29.     In order for a healthcare services provider to be eligible to receive PIP Benefits, it must comply with all relevant laws and regulations governing healthcare practice in New Jersey.

30.     Thus, a healthcare services provider is not entitled to receive PIP Benefits where it has failed to comply with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, whether or not the underlying services were medically necessary. See, e.g., Liberty Mut. Ins. Co. v. Healthcare Integrated Servs., 2009 N.J. Super. Unpub. LEXIS 2416 at * 4 - * 5 (App. Div. 2009)("This court has held that a provider of such services is not entitled to reimbursement for services covered by PIP unless the provider and the services are in compliance with relevant laws and regulations."); Varano, Damian & Finkel, L.L.C. v. Allstate Ins. Co., 366 N.J. Super. 1, 6 (App. Div. 2004)(healthcare services provider operated in violation of pertinent regulatory standards "is not eligible to receive PIP benefits."); Allstate Ins. Co. v. Orthopedic Evaluations, Inc., 300 N.J. Super. 510, 515-519 (App. Div. 1997)(healthcare services provider's lack of compliance with pertinent regulatory standards rendered it ineligible to collect PIP Benefits, whether or not the underlying services were medically necessary); Allstate Ins. Co. v. Greenberg, 376 N.J. Super. 623, 632 (Law Div. 2004)("A medical services provider's failure to comply with the standards promulgated by the Board of Medical Examiners make it ineligible to receive PIP reimbursement."); Allstate Ins. Co. v. Schick, 328 N.J. Super. 611, 620 (1999)("[A]n insurer may properly deny PIP benefits under

the No Fault Law based upon a healthcare provider's failure to comply with the administrative regulations governing the practice of healthcare in this State.")

31.    Moreover, in order for a specific healthcare service to be eligible for PIP reimbursement, the service itself must be provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey. See, e.g., Healthcare Integrated Servs., supra; Orthopedic Evaluations, Inc., supra.

32.    By extension, insurers such as GEICO are not obligated to make any payments of PIP Benefits to healthcare services providers that are not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.

33.    Furthermore, insurers such as GEICO are not obligated to make any payments of PIP Benefits for healthcare services that are not rendered in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.

**C.    No-Fault Reimbursement, Medical Necessity, and the New Jersey No-Fault Care Paths**

34.    Pursuant to N.J.S.A. 39:6A-4, an insurer such as GEICO is only required to pay PIP Benefits for reasonable, necessary, and appropriate treatment. Concomitantly, a healthcare services provider is only eligible to receive PIP Benefits for medically necessary services.

35.    Pursuant to N.J.S.A. 39:6A-2(m):

"Medically necessary" means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury

(i)    is not primarily for the convenience of the injured person or provider;

(ii)    is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer

9

Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization; and

(iii)    does not involve unnecessary diagnostic testing.

36.    Pursuant to the No-Fault Laws, the New Jersey Commissioner of Banking and Insurance (the "Commissioner") has designated specific care paths (the "Care Paths") as the standard course of medically necessary treatment for certain types of neck and back soft tissue injuries that commonly are sustained in automobile accidents. See N.J.A.C. 11:3-4.6.

37.    Specifically, the Commissioner has promulgated Care Paths for the following types of injuries:

(i)    cervical spine strains, sprains, and contusions;

(ii)    cervical herniated disks or radiculopathies;

(iii)    thoracic spine strains, sprains, and contusions;

(iv)    thoracic herniated disks or radiculopathies;

(v)    lumbar-sacral spine strains, sprains, and contusions; and

(vi)    lumbar-sacral herniated disks or radiculopathies.

38.    The Care Paths generally provide for an initial, four-week course of conservative treatment including chiropractic services, physical therapy, medication, and exercise.

39.    Should a healthcare services provider wish to provide additional treatment to an Insured beyond the initial four weeks of conservative treatment, the Care Paths generally require the provider to demonstrate at the four week mark, the eight week mark, and the 13 week mark that continued treatment is warranted based on the Insured's individual circumstances. See New Jersey Department of Banking and Insurance Comments, 30 N.J.R. 4401(a).

40.    The guidelines established by the Commissioner in the Care Paths are designed to avoid the continuation of treatment and therapy, week after week, over many months and years,

without any observable improvement. See 30 N.J.R. 4401(a).

**D.      The Fee Schedule and Current Procedural Terminology Codes**

41.      New Jersey has established a medical fee schedule (the "Fee Schedule") that is applicable to claims for PIP Benefits.

42.      When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

43.      The No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6.

44.      The New Jersey Administrative Code provides that the Fee Schedule shall be interpreted in accordance with the Medicare Claims Processing Manual ("MCPM"), the National Correct Coding Initiative ("NCCI") Policy Manual, and the American Medical Association's CPT Assistant (the "CPT Assistant").

45.      Additionally, no-fault providers and insurers are directed to use the NCCI "Edits" in determining whether or not CPT codes must be bundled or can be billed separately, i.e., unbundled. The NCCI Edits define when two CPT codes should not be reported together either in all situations or most situations.

46.    The MCPM, NCCI Policy Manual, NCCI Edits, and CPT Assistant are all incorporated by reference into the New Jersey no-fault insurance regulations. See N.J.A.C. 11:3-29.4.

47.    With respect to unbundling, N.J.A.C. 11:3-29.4 provides that:

Artificially separating or partitioning what is inherently one total procedure into subparts that are integral to the whole for the purpose of increasing medical fees is prohibited.

48.    Chapter 1 of the NCCI Policy manual provides that:

Procedures should be reported with the most comprehensive CPT code that describes the services performed. Physicians must not unbundle the services described by a HCPCS/CPT code.

49.    Chapter 12 of the MCPM provides that:

The narrative for many CPT codes includes a parenthetical statement that the procedure represents a 'separate procedure.' The inclusion of this statement indicates that the procedure, while possible to perform separately, is generally included in a more comprehensive procedure, and the service is not to be billed when a related, more comprehensive, service is performed.

50.    With respect to billing for MUA services, N.J.A.C. 11:3-29.4(g)(13) provides that:

CPT 22505, "Manipulation of spine requiring anesthesia, any region," if medically necessary, can only be reported once for any and all regions manipulated on that date.

**E.    New Jersey Law Prohibiting Self-Referrals**

51.    In New Jersey, "practitioners" generally may not refer patients to a "healthcare service" in which they have a "significant beneficial interest". Specifically, N.J.S.A. 45:9-22.5 (the "Codey Law") provides – in pertinent part – that:

A practitioner shall not refer a patient or direct an employee of the practitioner to refer a patient to a healthcare service in which the practitioner, or the practitioner's immediate family, or the practitioner in combination with the practitioner's immediate family has a significant beneficial interest . . . .

52.     Pursuant to N.J.S.A. 45:9-22.4:

"Healthcare service" means a business entity which provides on an inpatient or outpatient basis: testing for or diagnosis or treatment of human disease or dysfunction; or dispensing of drugs or medical devices for the treatment of human disease or dysfunction. Healthcare service includes, but is not limited to, a bioanalytical laboratory, pharmacy, home healthcare agency, rehabilitation facility, nursing home, hospital, or a facility which provides radiological or other diagnostic imagery services, physical therapy, ambulatory surgery, or ophthalmic services.

"Practitioner" means a physician, chiropractor or podiatrist licensed pursuant to Title 45 of the Revised Statutes.

"Significant beneficial interest" means any financial interest; but does not include ownership of a building wherein the space is leased to a person at the prevailing rate under a straight lease agreement, or any interest held in publicly traded securities.

53.     Pursuant to N.J.S.A. 45:9-22-5(c)(1), the Codey Law's restrictions on patient referrals do not apply to:

medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office … .

54.     Pursuant to N.J.S.A. 45:9-22-5(c)(3), the Codey Law's restrictions on patient referrals also do not apply to referrals for certain procedures performed at an ambulatory care facility, such as an ambulatory surgery center, so long as certain conditions are met (the "ASC Exception").

55.     In particular, and as set forth in N.J.S.A. 45:9-22-5(c)(3), the Codey Law's restrictions do not apply to:

ambulatory surgery or procedures requiring anesthesia performed at a surgical practice registered with the Department of Health . . . or at an ambulatory care facility licensed by the Department of Health to perform surgical and related services or lithotripsy services, if the following conditions are met:

(a)     the practitioner who provided the referral personally performs the procedure;

13

        (b)     the practitioner's remuneration as an owner of or investor in the practice or facility is directly proportional to the practitioner's ownership interest and not to the volume of patients the practitioner refers to the practice or facility;

        (c)     all clinically-related decisions at a facility owned in part by non-practitioners are made by practitioners and are in the best interests of the patient; and

        (d)     disclosure of the referring practitioner's significant beneficial interest in the practice or facility is made to the patient in writing, at or prior to the time that the referral is made, consistent with the provisions of section 3 of P.L. 1989, c. 19 (C.45:9-22.6).

56.     Thus, if a chiropractor refers patients to an ambulatory care facility for "ambulatory surgery or procedures requiring anesthesia", the referrals will not qualify for the ASC Exception and therefore violate the Codey Law unless – among other things – the chiropractor who makes the referral personally performs the resulting procedure.

57.     Healthcare providers that operate in violation of the Codey Law are not eligible to receive PIP Benefits.

**F.**    **The New Jersey Insurance Fraud Prevention Act**

58.     New Jersey has a strong public policy against insurance fraud. This policy is manifested in a series of statutes, including the Insurance Fraud Prevention Act, N.J.S.A. 17:33A-1 et seq.

59.     A healthcare services provider violates the Insurance Fraud Prevention Act if, among other things, it:

Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or in opposition to any claims for payment or other benefit pursuant to an insurance policy,

knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

Conceals or knowing fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefits or payment or (b) the amount of any benefit or payment to which the person is entitled.

See N.J.S.A. 17:33A-4.

60.    A healthcare services provider also violates the Insurance Fraud Prevention Act if it either: (i) "knowingly assists, conspires with or urges any person or practitioner to violate any of provisions of this act"; or (ii) "knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act." Id.

61.    Violators of the IFPA are liable to the insurer for restitution, attorney's fees, and the reasonable costs of the insurer's investigation. See N.J.S.A 17:33A-7(a).

62.    A person that engages in a pattern of fraudulent behavior under the IFPA is liable to the insurer for treble damages. See N.J.S.A. 17:33A-7(b).

63.    The IFPA defines a pattern as five or more "related violations". See N.J.S.A. 17:33A-3. Violations are related if they involve either the same victim, or same or similar actions on the part of the person or practitioner charged with violating the IFPA. See N.J.S.A.17:33A-3.

**II.     The Defendants' Fraudulent Scheme**

64.    Beginning in 2012, and continuing through the present day, the Defendants masterminded and implemented a massive fraudulent scheme in which they billed GEICO millions of dollars for medically unnecessary, illusory, and otherwise unreimbursable services.

**A.      The Defendants' Fraudulent Treatment and Billing Protocol**

65.      The vast majority of the Insureds in the claims identified in Exhibits "1" – "3" whom the Defendants purported to treat were involved in relatively minor accidents, to the extent that they were involved in any actual accidents at all.

66.      In keeping with the fact that the vast majority of the Insureds in the claims identified in Exhibits "1" - "3" were involved in only relatively minor accidents, in most of the claims identified in Exhibits "1" - "3" the Insureds did not seek treatment at any hospital as the result of their relatively minor accidents.

67.      To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

68.      Furthermore, in most cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, that the Insureds drove their vehicles away from the scenes of the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

69.      Concomitantly, virtually none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

70.      Even so, the Defendants purported to subject virtually every Insured in the claims identified in Exhibits "1" - "3" to a medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that the Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

71.     The Defendants purported to provide their pre-determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentment, or – in most cases – the total absence of any actual medical problems arising from any actual automobile accidents.

72.     Each step in the Defendants' fraudulent treatment and billing protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

73.     No legitimate chiropractor, chiropractic practice, or other healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

74.     The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to profit from their fraudulent scheme.

**B.      The Fraudulent Charges for Initial Examinations at Allied Health, Bound Brook, and Clinton Street**

75.     As an initial step in the Defendants' fraudulent scheme, Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis purported to provide virtually every Insured in the claims identified in Exhibits "1" - "3" with an initial examination.

76.     Either D'Agostini or Greene purported to perform virtually all of the putative initial examinations at Allied Health, which were then billed to GEICO under CPT code 99203, resulting in a charge of $109.29 for each purported initial examination.

77.     Similarly, D'Agostini, Greene, or Fogarty purported to perform virtually all of the

putative initial examinations at Bound Brook, which were then billed to GEICO under CPT code 99203, resulting in a charge of either $109.29 or $126.87 for each purported initial examination.

78.     Gaccione, Johnson, Holsten, or Nettis purported to perform virtually all of the putative initial examinations at Clinton Street, which were then billed to GEICO under CPT code 99203, resulting in a charge of $127.00 for each purported initial examination.

79.     In the claims for initial examinations identified in Exhibits "1" - "3", the charges for the initial examinations were fraudulent in that they misrepresented Allied Health, Bound Brook, and Clinton Street's eligibility to collect PIP Benefits in the first instance.

80.     In fact, Allied Health, Bound Brook, and Clinton Street never were eligible to collect PIP Benefits in connection with the claims identified in Exhibits "1" - "3", because – as a result of the fraudulent scheme described herein – neither they nor the examinations were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

**1.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

81.     Furthermore, in the claims for initial examinations under CPT code 99203 identified in Exhibits "1" - "3", Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis routinely misrepresented the severity of the Insureds' presenting problems.

82.     Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT code 99203 to bill for an initial patient examination typically requires that the Insured present with problems of moderate severity.

83.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill

18

for an initial patient examination.

84.     For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)     Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)     Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)     Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

85.     Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

86.     By contrast, to the extent that the Insureds in the claims identified in Exhibits "1" - "3" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as acute sprains and strains.

87.     For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibits "1" - "3" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low severity, in most of the claims identified in

Exhibits "1" - "3" the contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

88.     What is more, and again in keeping with the fact that the Insureds in the claims identified in Exhibits "1" - "3" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low severity, in most of the claims identified in Exhibits "1" - "3" the Insureds did not seek treatment at any hospital as the result of their accidents.

89.     To the limited extent that the Insureds <u>did</u> report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

90.     Even so, in the claims for initial examinations identified in Exhibits "1" - "3", Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis billed for their putative initial examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

91.     For example:

(i)     On March 16, 2013, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and did not complain of any pain at the scene. In keeping with the fact that CM was not seriously injured, he did not visit any hospital following the minor accident. To the extent that CM experienced any health issues at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination by Gaccione on March 19, 2013, Gaccione and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ii)    On May 28, 2013, an Insured named PM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed,

20

low-impact collision, and that PM's vehicle was drivable following the accident. The police report further indicated that PM was not injured and did not complain of any pain at the scene. In keeping with the fact that PM was not seriously injured, he did not visit any hospital following the minor accident. To the extent that PM experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of PM by Gaccione on June 20, 2013, Gaccione and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iii)    On August 30, 2013, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured and did not complain of any pain at the scene. In keeping with the fact that MH was not seriously injured, she did not visit any hospital following the minor accident. To the extent that MH experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination by Gaccione on September 6, 2013, Gaccione and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iv)    On August 30, 2013, an Insured named JY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JY's vehicle was drivable following the accident. The police report further indicated that JY was not injured and did not complain of any pain at the scene. In keeping with the fact that JY was not seriously injured, she did not visit any hospital following the minor accident. To the extent that JY experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination by Gaccione on September 6, 2013, Gaccione and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(v)    On August 30, 2013, an Insured named SY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SY's vehicle was drivable following the accident. The police report further indicated that SY was not injured and did not complain of any pain at the scene. In keeping with the fact that SY was not seriously injured, she did not visit any hospital following the minor accident. To the extent that SY experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination by Gaccione on September 6, 2013, Gaccione and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby

falsely represented that the examination involved moderately severe presenting problems.

(vi)    On October 7, 2013, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured, he did not visit any hospital following the minor accident. To the extent that AR experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of AR by Gaccione on November 21, 2013, Gaccione and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vii)    On October 24, 2013, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not seriously injured, he did not visit any hospital following the accident. To the extent that JR experienced any health issues at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination by Gaccione on October 31, 2013, Gaccione and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(viii)    On November 1, 2013, an Insured named LB was involved in an automobile accident. The contemporaneous police report indicated that LB's vehicle was drivable following the accident. The police report further indicated that LB was not injured and did not complain of any pain at the scene. Four days later, on November 4, 2013, LB traveled on her own to Saint Peter's Hospital. The contemporaneous hospital records indicated that LB informed the hospital staff that her vehicle had sustained only minor damage and had been struck by another vehicle traveling less than ten miles per hour. The hospital records further indicated that LB had full range of motion in all her extremities. The hospital records further indicated that LB was observed on an outpatient basis, and was discharged later that same night with a routine backache and wrist and foot pain diagnosis. To the extent that LB experienced any health issues at all as the result of the accident, they were of low severity. Even so, following a purported initial examination by Greene on January 20, 2014, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ix)     On November 27, 2013, an Insured named GH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that GH was not injured and did not complain of any pain. In keeping with the fact that GH was not seriously injured, he did not visit any hospital following the accident. To the extent that GH experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of GH by Greene on December 2, 2013, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(x)      On December 29, 2013, an Insured named CW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CW's vehicle was drivable following the accident. The police report further indicted that CW was not injured and did not complain of any pain at the scene. In keeping with the fact that CW was not seriously injured, CW did not visit any hospital emergency room following the accident. To the extent that CW experienced any health issues at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination by Gaccione on January 10, 2014, Gaccione and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xi)     On May 20, 2014, an Insured named HR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HR's vehicle was drivable following the accident. The police report further indicated that HR was not injured and did not complain of any pain. In keeping with the fact that HR was not seriously injured, he did not visit any hospital following the minor accident. To the extent that HR experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of HR by Greene on May 30, 2014, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xii)    On June 4, 2014, an Insured named PP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PP's vehicle was drivable following the accident. The police report further indicated that PP was not injured and did not complain of any pain at the scene. To the extent that PP experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of PP by Gaccione on July 1, 2014, Gaccione and Clinton Street billed GEICO for the initial examination using CPT

23

code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xiii)  On August 15, 2014, an Insured named CR was involved in an automobile accident. The contemporaneous police report indicated that CR's vehicle was drivable following the accident. The police report further indicated that CR was not injured and did not complain of any pain at the scene. In keeping with the fact that CR was not seriously injured, he did not visit any hospital following the accident. To the extent that CR experienced any health issues at all as the result of his accident, they were of low severity. Even so, following a purported initial examination by Johnson on September 16, 2014, Johnson, Gaccione, and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xiv)  On August 29, 2014, an Insured named DC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DC's vehicle was drivable following the accident. The police report further indicated that DC was not injured and did not complain of any pain at the scene. In keeping with the fact that DC was not seriously injured, he did not visit any hospital following the minor accident. To the extent that DC experienced any health issues at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination by Johnson on September 18, 2014, Johnson, Gaccione, and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xv)  On October 14, 2014, an Insured named LD was involved in an automobile accident. The contemporaneous police report indicated that LD's vehicle was drivable following the accident. The police report further indicated that LD was not injured and did not complain of any pain at the scene. In keeping with the fact the LD was not seriously injured, she did not visit any hospital following the accident. To the extent that LD experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of LD by Greene on November 19, 2014, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xvi)  On November 25, 2014, an Insured named VG was involved in an automobile accident. The contemporaneous police report indicated that, although VG complained of back pain, he refused medical attention at the scene. In keeping with the fact that VG was not seriously injured, he did not visit any hospital following the accident. To the extent that VG experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a

purported initial examination of VG by Greene on December 18, 2014, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xvii)  On December 4, 2014, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that LP's vehicle was drivable following the accident. The police report further indicated that LP was not injured and did not complain of any pain. In keeping with the fact that LP was not seriously injured, he did not visit any hospital following the minor accident. To the extent that LP experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of LP by Greene on December 17, 2014, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xviii)  On January 10, 2015, an Insured named AV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AV's vehicle was drivable following the accident. The police report further indicated that AV was not injured and did not complain of any pain at the scene. In keeping with the fact that AV was not seriously injured, she did not visit any hospital following the accident. To the extent that AV experienced any health issues at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination by Fogarty on January 12, 2015, Fogarty, D'Agostini, and Bound Brook billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xix)  On January 10, 2015, an Insured named GV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GV's vehicle was drivable following the accident. The police report further indicated that GV was not injured and did not complain of any pain at the scene. In keeping with the fact that GV was not seriously injured, she did not visit any hospital following the accident. To the extent that GV experienced any health issues at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination by Fogarty on January 12, 2015, Fogarty, D'Agostini, and Bound Brook billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xx)  On July 18, 2015, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that JL's vehicle was drivable following the accident. The police report further indicated that, although JL

complained of neck pain, he refused medical attention at the scene. In keeping with the fact that JL was not seriously injured, he did not visit any hospital following the accident. To the extent that JL experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of JL by Greene on July 20, 2015, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xxi)    On January 15, 2016, an Insured named OI was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that OI's vehicle was drivable following the accident. The police report further indicated that OI was not injured and did not complain of any pain. In keeping with the fact that OI was not seriously injured, he did not visit any hospital following the minor accident. To the extent that OI experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of OI by Greene on February 2, 2016, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xxii)   On January 22, 2016, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and did not complain of any pain at the scene. In keeping with the fact that CM was not seriously injured, she did not visit any hospital emergency room following the minor accident. To the extent that CM experienced any health issues at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination by Fogarty on March 9, 2016, Fogarty, D'Agostini, and Bound Brook billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xxiii)  On February 2, 2016, an Insured named LA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that LA's vehicle was drivable following the accident. The police report further indicated that LA was not injured and did not complain of any pain at the scene. In keeping with the fact that LA was not seriously injured, she did not visit any hospital following the accident. To the extent that LA experienced any health issues at all as the result of her accident, they were of low severity. Even so, following a purported initial examination by Fogarty on February 8, 2016, Fogarty, D'Agostini, and Bound Brook billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xxiv) On February 14, 2016, an Insured named IL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that IL's vehicle was drivable following the accident. The police report further indicated that IL was not injured and did not complain of any pain at the scene. In keeping with the fact that IL was not seriously injured, IL did not visit any hospital emergency room following the accident. To the extent that IL experienced any health issues at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination by Greene on February 23, 2016, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xxv) On February 14, 2016, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured and did not complain of any pain at the scene. In keeping with the fact that JP was not seriously injured, JP did not visit any hospital emergency room following the accident. To the extent that JP experienced any health issues at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination by Greene on February 24, 2016, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xxvi) On February 14, 2016, an Insured named EY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EY's vehicle was drivable following the accident. The police report further indicated that EY was not injured and did not complain of any pain at the scene. In keeping with the fact that EY was not seriously injured, EY did not visit any hospital emergency room following the accident. To the extent that EY experienced any health issues at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination by Greene on February 24, 2016, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xxvii) On February 23, 2016, an Insured named DN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that DN's vehicle was drivable following the accident. The police report further indicated that DN was not injured and did not complain of any pain at the scene. In keeping with the fact that DN was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that DN experienced any health problems at all as the result of his

minor accident, they were of low severity. Even so, following a purported initial examination of DN by Greene on March 21, 2016, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xxviii) On February 26, 2016, an Insured named NF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact rear-end collision, and that NF's vehicle was drivable following the accident. The police report further indicated that NF was not injured and did not complain of any pain at the scene. To the extent that NF experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of NF by Greene on March 9, 2016, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xxix) On May 20, 2016, an Insured named ML was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that ML's vehicle was drivable following the accident. The police report further indicated that ML was not injured and did not complain of any pain at the scene. In keeping with the fact that ML was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that ML experienced any health issues at all as the result of the accident, they were of low severity. Even so, following a purported initial examination by Greene on May 24, 2016, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xxx) On September 12, 2016, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JD's vehicle was drivable following the accident. The police report further indicated that JD was not injured and did not complain of any pain at the scene. In keeping with the fact that JD was not seriously injured, she did not visit any hospital following the accident. To the extent that JD experienced any health issues at all as the result of her accident, they were of low severity. Even so, following a purported initial examination by Fogarty on September 30, 2016, Fogarty, D'Agostini, and Bound Brook billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xxxi) On October 11, 2016, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that, although MA complained of neck pain at the scene, she was evaluated by emergency personnel at the scene and sent home without being taken to the emergency room.

In keeping with the fact that MA was not seriously injured, she did not visit any hospital emergency room on her own following the minor accident. To the extent that MA experienced any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of MA by Greene on October 12, 2016, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xxxii) On November 30, 2016, an Insured named YM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YM's vehicle was drivable following the accident. The police report further indicated that YM was not injured and did not complain of any pain at the scene. In keeping with the fact that YM was not seriously injured, he did not visit any hospital following the minor accident. To the extent that YM experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of YM by Greene on January 3, 2017, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xxxiii) On April 22, 2017, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain at the scene. In keeping with the fact that AM was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that AM experienced any health issues at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination by Gaccione on May 4, 2017, Gaccione and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

92.     These are only representative examples. In virtually all of the claims for initial examinations identified in Exhibits "1" – "3", Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all.

93.     In the claims for initial examinations identified in Exhibits "1" – "3", Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

94.     In the claims for initial examinations identified in Exhibits "1" – "3", Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including follow-up examinations, biofeedback therapy services, chiropractic services, and MUA services.

## 2.     Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations

95.     Pursuant to the Fee Schedule, the use of CPT code 99203 to bill for an initial examination represents that the chiropractor who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

96.     As set forth in Exhibits "1" – "3", Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis submitted virtually all of their billing for initial examinations under CPT code 99203, and thereby represented that the chiropractor who purported to perform the initial examinations spent either at least 30 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

97.     In fact, in the claims for initial examinations identified in Exhibits "1" – "3", none of the Defendants ever spent 30 minutes of face-to-face time with the Insureds or their families

30

when conducting the examinations.

98.    Rather, in the claims for initial examinations identified in Exhibits "1" – "3", the initial examinations did not entail more than 15 minutes of face-to-face time between D'Agostini, Greene, Fogarty, Gaccione, Johnson, Holsten, and Nettis and the Insureds or their families, to the extent that the examinations actually were performed in the first instance.

99.    For instance, and in keeping with the fact that the initial examinations allegedly provided by D'Agostini, Greene, Fogarty, Gaccione, Johnson, Holsten, and Nettis through Allied Health, Bound Brook, and Clinton Street did not entail more than 15 minutes of face-to-face time with the Insureds or their families, D'Agostini, Greene, Fogarty, Gaccione, Johnson, Holsten, and Nettis used a template in purporting to conduct the initial examinations.

100.    The template that Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis used in purporting to conduct the initial examinations set forth a very limited range of examination parameters.

101.    The only face-to-face time between D'Agostini, Greene, Fogarty, Gaccione, Johnson, Holsten, and Nettis, and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews, limited examinations of the Insureds' musculoskeletal systems, and a perfunctory check of a few of the Insureds' other systems.

102.    These brief interviews and limited examinations did not require D'Agostini, Greene, Fogarty, Gaccione, Johnson, Holsten, Nettis, or any other chiropractor associated with Allied Health, Bound Brook, or Clinton Street to spend more than 15 minutes of face-to-face time with the Insureds or their families.

103.    In the claims for initial examinations identified in Exhibits "1" – "3", Allied

Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis falsely represented that the examinations involved at least 30 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at a higher rate than examinations that require less time to perform.

### 3.  Misrepresentations Regarding the Performance of "Detailed" Physical Examinations

104.    Pursuant to the Fee Schedule, the use of CPT code 99203 to bill for a patient examination represents that the chiropractor who performed the examination conducted a "detailed" physical examination.

105.  Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the chiropractor conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

106.    To the extent that the Insureds in the claims identified in Exhibits "1" – "3" had any actual complaints at all as the result of their relatively minor automobile accidents, the complaints were limited to musculoskeletal complaints.

107.    Pursuant to the CPT Assistant, in the context of patient examinations, a chiropractor has not conducted an extended examination of a patient's musculoskeletal organ system unless the chiropractor has documented findings with respect to the following:

(i)      measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

32

(iv) palpation of lymph nodes in neck, axillae, groin and/or other location;

(v) brief assessment of mental status;

(vi) examination of gait and station;

(vii) inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii) coordination;

(ix) examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x) examination of sensation.

108. In the claims identified in Exhibits "1" – "3", when Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis billed for the initial examinations under CPT code 99203, they falsely represented that the chiropractors who purported to perform the examinations performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

109. In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibits "1" – "3", neither D'Agostini, Greene, Fogarty, Gaccione, Johnson, Holsten, Nettis, nor any other chiropractor associated with Allied Health, Bound Brook, or Clinton Street, ever conducted an extended examination of the Insureds' musculoskeletal systems.

110. For instance, in each of the claims under CPT code 99203 identified in Exhibits "1" – "3", neither D'Agostini, Greene, Fogarty, Gaccione, Johnson, Holsten, Nettis, nor any other physician or chiropractor associated with Allied Health, Bound Brook, or Clinton Street

ever conducted an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)     examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)     examination of gait and station;

(vii)     inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)     coordination;

(ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)     examination of sensation.

111.     For example:

(i)     On January 2, 2013, D'Agostini, Greene, and Allied Health billed GEICO under CPT code 99203 for an initial examination that Greene purported to perform on an Insured named NL, and thereby represented that they had provided a "detailed" physical examination to NL. However, Greene did not document an extended examination of NL's musculoskeletal system, despite the fact that – to the extent NL had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(ii)     On January 11, 2013, D'Agostini, Greene, and Bound Brook billed GEICO under CPT code 99203 for an initial examination that Greene purported to perform on an Insured named JV, and thereby represented that they had provided a "detailed" physical examination to JV. However, Greene did not document an extended

examination of JV's musculoskeletal system, despite the fact that – to the extent JV had any complaints at all as the result of her automobile accident, they were limited to musculoskeletal complaints.

(iii)      On February 18, 2013, D'Agostini, Fogarty, and Bound Brook billed GEICO under CPT code 99203 for an initial examination that Fogarty purported to perform on an Insured named MG, and thereby represented that they had provided a "detailed" physical examination to MG. However, Fogarty did not document an extended examination of MG's musculoskeletal system, despite the fact that – to the extent MG had any complaints at all as the result of her automobile accident, they were limited to musculoskeletal complaints.

(iv)      On March 28, 2013, D'Agostini, Greene, and Allied Health billed GEICO under CPT code 99203 for a initial examination that Greene purported to perform on an Insured named RH, and thereby represented that they had provided a "detailed" physical examination to RH. However, Greene did not document an extended examination of RH's musculoskeletal system, despite the fact that – to the extent RH had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(v)      On May 7, 2013, Gaccione and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Gaccione purported to perform on an Insured named JN, and thereby represented that they had provided a "detailed" physical examination to JN. However, Gaccione did not document an extended examination of JN's musculoskeletal system, despite the fact that – to the extent JN had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(vi)      On May 14, 2013, D'Agostini, Greene, and Allied Health billed GEICO under CPT code 99203 for an initial examination that Greene purported to perform on an Insured named GT, and thereby represented that they had provided a "detailed" physical examination to GT. However, Greene did not document an extended examination of GT's musculoskeletal system, despite the fact that – to the extent GT had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(vii)      On June 3, 2013, Gaccione and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Gaccione purported to perform on an Insured named AC, and thereby represented that they had provided a "detailed" physical examination to AC. However, Gaccione did not document an extended examination of AC's musculoskeletal system, despite the fact that – to the extent AC had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(viii)      On July 1, 2013, D'Agostini, Greene, and Allied Health billed GEICO under CPT code 99203 for an initial examination that Greene purported to perform on an

Insured named JJ, and thereby represented that they had provided a "detailed" physical examination to JJ. However, Greene did not document an extended examination of JJ's musculoskeletal system, despite the fact that – to the extent JJ had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(ix)     On September 6, 2013, Gaccione and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Gaccione purported to perform on an Insured named JY, and thereby represented that they had provided a "detailed" physical examination to JY. However, Gaccione did not document an extended examination of JY's musculoskeletal system, despite the fact that – to the extent JY had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(x)      On September 12, 2013, Gaccione and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Gaccione purported to perform on an Insured named SW, and thereby represented that they had provided a "detailed" physical examination to SW. However, Gaccione did not document an extended examination of SW's musculoskeletal system, despite the fact that – to the extent SW had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xi)     On October 24, 2013, Gaccione and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Gaccione purported to perform on an Insured named RJ, and thereby represented that they had provided a "detailed" physical examination to RJ. However, Gaccione did not document an extended examination of RJ's musculoskeletal system, despite the fact that – to the extent RJ had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xii)    On October 28, 2013, D'Agostini, Greene, and Allied Health billed GEICO under CPT code 99203 for an initial examination that Greene purported to perform on an Insured named MH, and thereby represented that they had provided a "detailed" physical examination to MH. However, Greene did not document an extended examination of MH's musculoskeletal system, despite the fact that – to the extent MH had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(xiii)   On October 31, 2013, Gaccione and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Gaccione purported to perform on an Insured named JR, and thereby represented that they had provided a "detailed" physical examination to JR. However, Gaccione did not document an extended examination of JR's musculoskeletal system, despite the fact that – to the extent JR had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xiv)    On November 4, 2013, D'Agostini, Fogarty, and Bound Brook billed GEICO under CPT code 99203 for an initial examination that Fogarty purported to perform on an Insured named SS, and thereby represented that they had provided a "detailed" physical examination to SS. However, Fogarty did not document an extended examination of SS's musculoskeletal system, despite the fact that – to the extent SS had any complaints at all as the result of her automobile accident, they were limited to musculoskeletal complaints.

(xv)    On November 13, 2013, D'Agostini, Fogarty, and Bound Brook billed GEICO under CPT code 99203 for an initial examination that Fogarty purported to perform on an Insured named AD, and thereby represented that they had provided a "detailed" physical examination to AD. However, Fogarty did not document an extended examination of AD's musculoskeletal system, despite the fact that – to the extent AD had any complaints at all as the result of her automobile accident, they were limited to musculoskeletal complaints.

(xvi)    On November 13, 2013, D'Agostini, Fogarty, and Bound Brook billed GEICO under CPT code 99203 for an initial examination that Fogarty purported to perform on an Insured named AR, and thereby represented that they had provided a "detailed" physical examination to AR. However, Fogarty did not document an extended examination of AR's musculoskeletal system, despite the fact that – to the extent AR had any complaints at all as the result of her automobile accident, they were limited to musculoskeletal complaints.

(xvii)    On November 21, 2013, Gaccione and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Gaccione purported to perform on an Insured named AR, and thereby represented that they had provided a "detailed" physical examination to AR. However, Gaccione did not document an extended examination of AR's musculoskeletal system, despite the fact that – to the extent AR had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xviii)    On December 18, 2013, D'Agostini, Fogarty, and Bound Brook billed GEICO under CPT code 99203 for an initial examination that Fogarty purported to perform on an Insured named ND, and thereby represented that they had provided a "detailed" physical examination to ND. However, Fogarty did not document an extended examination of ND's musculoskeletal system, despite the fact that – to the extent ND had any complaints at all as the result of her automobile accident, they were limited to musculoskeletal complaints.

(xix)    On February 27, 2014, D'Agostini, Greene, and Allied Health billed GEICO under CPT code 99203 for an initial examination that Greene purported to perform on an Insured named AB, and thereby represented that they had provided a "detailed" physical examination to AB. However, Greene did not document an extended examination of AB's musculoskeletal system, despite the fact that – to the extent AB had any complaints at all as the result of her automobile accident –

they were limited to musculoskeletal complaints.

(xx)    On May 5, 2014, D'Agostini, Greene, and Allied Health billed GEICO under CPT code 99203 for an initial examination that Greene purported to perform on an Insured named AM, and thereby represented that they had provided a "detailed" physical examination to AM. However, Greene did not document an extended examination of AM's musculoskeletal system, despite the fact that – to the extent AM had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(xxi)    On July 29, 2014, D'Agostini, Greene, and Allied Health billed GEICO under CPT code 99203 for an initial examination that Greene purported to perform on an Insured named AB, and thereby represented that they had provided a "detailed" physical examination to AB. However, Greene did not document an extended examination of AB's musculoskeletal system, despite the fact that – to the extent AB had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(xxii)    On September 16, 2014, Johnson, Gaccione, and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Johnson purported to perform on an Insured named CR, and thereby represented that they had provided a "detailed" physical examination to CR. However, Johnson did not document an extended examination of CR's musculoskeletal system, despite the fact that – to the extent CR had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xxiii)    On September 18, 2014, Johnson, Gaccione, and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Johnson purported to perform on an Insured named DC, and thereby represented that they had provided a "detailed" physical examination to DC. However, Johnson did not document an extended examination of DC's musculoskeletal system, despite the fact that – to the extent DC had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xxiv)    On November 25, 2014, Johnson, Gaccione, and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Johnson purported to perform on an Insured named DL, and thereby represented that they had provided a "detailed" physical examination to DL. However, Johnson did not document an extended examination of DL's musculoskeletal system, despite the fact that – to the extent DL had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xxv)    On December 4, 2014, Johnson, Gaccione, and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Johnson purported to perform on an Insured named JB, and thereby represented that they had provided a "detailed" physical examination to JB. However, Johnson did not document an

extended examination of JB's musculoskeletal system, despite the fact that – to the extent JB had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xxvi) On December 5, 2014, Johnson, Gaccione, and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Johnson purported to perform on an Insured named AU, and thereby represented that they had provided a "detailed" physical examination to AU. However, Johnson did not document an extended examination of AU's musculoskeletal system, despite the fact that – to the extent AU had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xxvii) On January 9, 2015, Johnson, Gaccione, and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Johnson purported to perform on an Insured named OC, and thereby represented that they had provided a "detailed" physical examination to OC. However, Johnson did not document an extended examination of OC's musculoskeletal system, despite the fact that – to the extent OC had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xxviii) On January 9, 2015, Holsten, Gaccione, and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Holsten purported to perform on an Insured named ND, and thereby represented that they had provided a "detailed" physical examination to ND. However, Holsten did not document an extended examination of ND's musculoskeletal system, despite the fact that – to the extent ND had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xxix) On January 12, 2015, D'Agostini, Fogarty, and Bound Brook billed GEICO under CPT code 99203 for an initial examination that Fogarty purported to perform on an Insured named AV, and thereby represented that they had provided a "detailed" physical examination to AV. However, Fogarty did not document an extended examination of AV's musculoskeletal system, despite the fact that – to the extent AV had any complaints at all as the result of her automobile accident, they were limited to musculoskeletal complaints.

(xxx) On January 12, 2015, D'Agostini, Fogarty, and Bound Brook billed GEICO under CPT code 99203 for an initial examination that Fogarty purported to perform on an Insured named GV, and thereby represented that they had provided a "detailed" physical examination to GV. However, Fogarty did not document an extended examination of GV's musculoskeletal system, despite the fact that – to the extent GV had any complaints at all as the result of her automobile accident, they were limited to musculoskeletal complaints.

(xxxi) On February 3, 2015, Johnson, Gaccione, and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Johnson purported to perform on

an Insured named MJ, and thereby represented that they had provided a "detailed" physical examination to MJ. However, Johnson did not document an extended examination of MJ's musculoskeletal system, despite the fact that – to the extent MJ had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xxxii) On February 16, 2015, Nettis, Gaccione, and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Nettis purported to perform on an Insured named CB, and thereby represented that they had provided a "detailed" physical examination to CB. However, Nettis did not document an extended examination of CB's musculoskeletal system, despite the fact that – to the extent CB had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xxxiii) On February 16, 2015, Nettis, Gaccione, and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Nettis purported to perform on an Insured named SB, and thereby represented that they had provided a "detailed" physical examination to SB. However, Nettis did not document an extended examination of SB's musculoskeletal system, despite the fact that – to the extent SB had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xxxiv) On March 16, 2015, Nettis, Gaccione, and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Nettis purported to perform on an Insured named ES, and thereby represented that they had provided a "detailed" physical examination to ES. However, Nettis did not document an extended examination of ES's musculoskeletal system, despite the fact that – to the extent ES had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xxxv) On March 23, 2015, D'Agostini, Greene, and Allied Health billed GEICO under CPT code 99203 for an initial examination that Greene purported to perform on an Insured named SR, and thereby represented that they had provided a "detailed" physical examination to SR. However, Greene did not document an extended examination of SR's musculoskeletal system, despite the fact that – to the extent SR had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(xxxvi) On July 15, 2015, D'Agostini, Greene, and Allied Health billed GEICO under CPT code 99203 for an initial examination that Greene purported to perform on an Insured named RG, and thereby represented that they had provided a "detailed" physical examination to RG. However, Greene did not document an extended examination of RG's musculoskeletal system, despite the fact that – to the extent RG had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(xxxvii)    On July 23, 2015, Holsten, Gaccione, and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Holsten purported to perform on an Insured named JP, and thereby represented that they had provided a "detailed" physical examination to JP. However, Holsten did not document an extended examination of JP's musculoskeletal system, despite the fact that – to the extent JP had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xxxviii)    On October 27, 2015, Holsten, Gaccione, and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Holsten purported to perform on an Insured named DT, and thereby represented that they had provided a "detailed" physical examination to DT. However, Holsten did not document an extended examination of DT's musculoskeletal system, despite the fact that – to the extent DT had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xxxix)    On November 4, 2015, D'Agostini, Greene, and Allied Health billed GEICO under CPT code 99203 for an initial examination that Greene purported to perform on an Insured named MF, and thereby represented that they had provided a "detailed" physical examination to MF. However, Greene did not document an extended examination of MF's musculoskeletal system, despite the fact that – to the extent MF had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(xl)    On December 18, 2015, Holsten, Gaccione, and Clinton Street billed GEICO under CPT code 99203 for an initial examination that Holsten purported to perform on an Insured named GA, and thereby represented that they had provided a "detailed" physical examination to GA. However, Holsten did not document an extended examination of GA's musculoskeletal system, despite the fact that – to the extent GA had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xli)    On January 11, 2016, D'Agostini, Greene, and Allied Health billed GEICO under CPT code 99203 for an initial examination that Greene purported to perform on an Insured named BR, and thereby represented that they had provided a "detailed" physical examination to BR. However, Greene did not document an extended examination of BR's musculoskeletal system, despite the fact that – to the extent BR had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(xlii)    On March 15, 2016, D'Agostini, Greene, and Allied Health billed GEICO under CPT code 99203 for an initial examination that Greene purported to perform on an Insured named MR, and thereby represented that they had provided a "detailed" physical examination to MR. However, Greene did not document an extended examination of MR's musculoskeletal system, despite the fact that – to the extent MR had any complaints at all as the result of her automobile accident –

they were limited to musculoskeletal complaints.

(xliii) On May 2, 2016, D'Agostini, Fogarty, and Bound Brook billed GEICO under CPT code 99203 for an initial examination that Fogarty purported to perform on an Insured named MG, and thereby represented that they had provided a "detailed" physical examination to MG. However, Fogarty did not document an extended examination of MG's musculoskeletal system, despite the fact that – to the extent MG had any complaints at all as the result of her automobile accident, they were limited to musculoskeletal complaints.

(xliv) On May 31, 2016, D'Agostini, Greene, and Allied Health billed GEICO under CPT code 99203 for an initial examination that Greene purported to perform on an Insured named TD, and thereby represented that they had provided a "detailed" physical examination to TD. However, Greene did not document an extended examination of TD's musculoskeletal system, despite the fact that – to the extent TD had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(xlv) On July 5, 2016, D'Agostini, Greene, and Allied Health billed GEICO under CPT code 99203 for an initial examination that Greene purported to perform on an Insured named CJ, and thereby represented that they had provided a "detailed" physical examination to CJ. However, Greene did not document an extended examination of CJ's musculoskeletal system, despite the fact that – to the extent CJ had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(xlvi) On September 21, 2016, D'Agostini, Fogarty, and Bound Brook billed GEICO under CPT code 99203 for an initial examination that Fogarty purported to perform on an Insured named CS, and thereby represented that they had provided a "detailed" physical examination to CS. However, Fogarty did not document an extended examination of CS's musculoskeletal system, despite the fact that – to the extent CS had any complaints at all as the result of her automobile accident, they were limited to musculoskeletal complaints.

(xlvii) On December 3, 2016, D'Agostini, Greene, and Allied Health billed GEICO under CPT code 99203 for an initial examination that Greene purported to perform on an Insured named CP, and thereby represented that they had provided a "detailed" physical examination to CP. However, Greene did not document an extended examination of CP's musculoskeletal system, despite the fact that – to the extent CP had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(xlviii) On December 29, 2016, D'Agostini, Greene, and Allied Health billed GEICO under CPT code 99203 for an initial examination that Greene purported to perform on an Insured named LA, and thereby represented that they had provided a "detailed" physical examination to LA. However, Greene did not document an

extended examination of LA's musculoskeletal system, despite the fact that – to the extent LA had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xlix)    On January 4, 2017, D'Agostini, Greene, and Allied Health billed GEICO under CPT code 99203 for an initial examination that Greene purported to perform on an Insured named AV, and thereby represented that they had provided a "detailed" physical examination to AV. However, Greene did not document an extended examination of AV's musculoskeletal system, despite the fact that – to the extent AV had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(l)    On January 19, 2017, D'Agostini, Greene, and Allied Health billed GEICO under CPT code 99203 for an initial examination that Greene purported to perform on an Insured named SR, and thereby represented that they had provided a "detailed" physical examination to SR. However, Greene did not document an extended examination of SR's musculoskeletal system, despite the fact that – to the extent SR had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

112.    These are only representative examples. In virtually all of the claims for initial examinations under CPT code 99203 that are identified in Exhibits "1" – "3", Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided detailed physical examinations because they had not conducted an extended examination of the affected body areas and other symptomatic or related organ systems.

113.    In the claims for initial examinations under CPT code 99203 that are identified in Exhibits "1" – "3", Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require the examining physician or chiropractor to provide "detailed" physical examinations.

### 4.   Misrepresentations Regarding the Extent of Medical Decision-Making

114.   Pursuant to the Fee Schedule, the use of CPT code 99203 to bill for a patient examination represents that the chiropractor who performed the examination engaged in medical decision-making of "low complexity".

115.   Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

116.   Though Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis routinely billed for their putative initial examinations using CPT code 99203, and thereby falsely represented that the initial examinations involved "low complexity" medical decision-making, in fact the initial examinations did not involve any legitimate medical decision-making at all.

117.   First, in Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis's claims for initial examinations identified in Exhibits "1" – "3", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

118.   When the Insureds in the claims identified in Exhibits "1" – "3" presented to Allied Health, Bound Brook, and Clinton Street for "treatment", they did not arrive with any medical records.

44

119. Furthermore, prior to the initial examinations, Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis neither requested any medical records from any other providers, nor conducted any diagnostic tests.

120. Second, in the claims for initial examinations identified in Exhibits "1" – "3", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

121. Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the procedures or treatment options provided by Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis – to the extent that Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis provided any such procedures or treatment options in the first instance.

122. In almost every instance, any diagnostic procedures and "treatments" that Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis actually provided were limited to a series of medically unnecessary biofeedback and chiropractic services, none of which was health- or life-threatening if properly administered.

123. Third, in Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis's claims for initial examinations identified in Exhibits "1" – "3", Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

124. Rather, to the extent that the initial examinations were conducted in the first instance, Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis provided a nearly identical, pre-determined laundry-list of phony "diagnoses" for every Insured, and prescribed a virtually identical course of treatment for every Insured.

125. Specifically, in most of the instances in the claims identified in Exhibits "1" – "3", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

126. Even so, Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis prepared initial examination reports in which they provided phony, boilerplate neck and/or back sprain/strain and related "diagnoses" to virtually every Insured.

127. Then, based upon these phony "diagnoses", Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis directed virtually every Insured to return to Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis for follow-up examinations and/or medically unnecessary chiropractic and biofeedback services, regardless of the Insureds' true circumstances or presentment.

128. For example:

(i) On March 16, 2013, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and did not complain of any pain at the scene. In keeping with the fact that CM was not seriously injured, he did not visit any hospital following the minor accident. To the extent that CM experienced any health issues at all as the result of his minor accident, they were of low severity. On March 19, 2013, Gaccione purported to conduct an

initial examination of CM at Clinton Street. Gaccione did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gaccione did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gaccione provided CM with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither CM's presenting problems, nor the treatment plan provided to CM by Gaccione and Clinton Street, presented any risk of significant complications, morbidity, or mortality. To the contrary, CM did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Gaccione and Clinton Street consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to CM. Even so, Gaccione and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gaccione engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)     On May 28, 2013, an Insured named PM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PM's vehicle was drivable following the accident. The police report further indicated that PM was not injured and did not complain of any pain at the scene. In keeping with the fact that PM was not seriously injured, he did not visit any hospital following the minor accident. To the extent that PM experienced any health problems at all as the result of his minor accident, they were of low severity. On June 20, 2013, Gaccione purported to conduct an initial examination of PM at Clinton Street. Gaccione did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gaccione did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gaccione provided PM with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither PM's presenting problems, nor the treatment plan provided to PM by Gaccione and Clinton Street, presented any risk of significant complications, morbidity, or mortality. To the contrary, PM did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Gaccione and Clinton Street consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to PM. Even so, Gaccione and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gaccione engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)    On August 30, 2013, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured and did

not complain of any pain at the scene. In keeping with the fact that MH was not seriously injured, she did not visit any hospital following the minor accident. To the extent that MH experienced any health problems at all as the result of the minor accident, they were of low severity. On September 6, 2013, Gaccione purported to conduct an initial examination of MH at Clinton Street. Gaccione did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gaccione did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gaccione provided MH with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither MH's presenting problems, nor the treatment plan provided to MH by Gaccione and Clinton Street, presented any risk of significant complications, morbidity, or mortality. To the contrary, MH did not need any extensive treatment at all as the result of her minor accident, and the treatment plan provided by Gaccione and Clinton Street consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to MH. Even so, Gaccione and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gaccione engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)     On August 30, 2013, an Insured named JY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JY's vehicle was drivable following the accident. The police report further indicated that JY was not injured and did not complain of any pain at the scene. In keeping with the fact that JY was not seriously injured, she did not visit any hospital following the minor accident. To the extent that JY experienced any health problems at all as the result of the minor accident, they were of low severity. On September 6, 2013, Gaccione purported to conduct an initial examination of JY at Clinton Street. Gaccione did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gaccione did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gaccione provided JY with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither JY's presenting problems, nor the treatment plan provided to MH by Gaccione and Clinton Street, presented any risk of significant complications, morbidity, or mortality. To the contrary, JY did not need any extensive treatment at all as the result of her minor accident, and the treatment plan provided by Gaccione and Clinton Street consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to JY. Even so, Gaccione and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gaccione engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)     On August 30, 2013, an Insured named SY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SY's vehicle was drivable following the accident. The police report further indicated that SY was not injured and did not complain of any pain at the scene. In keeping with the fact that SY was not seriously injured, she did not visit any hospital following the minor accident. To the extent that SY experienced any health problems at all as the result of the minor accident, they were of low severity. On September 6, 2013, Gaccione purported to conduct an initial examination of SY at Clinton Street. Gaccione did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gaccione did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gaccione provided SY with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither SY's presenting problems, nor the treatment plan provided to SY by Gaccione and Clinton Street, presented any risk of significant complications, morbidity, or mortality. To the contrary, SY did not need any extensive treatment at all as the result of her minor accident, and the treatment plan provided by Gaccione and Clinton Street consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to SY. Even so, Gaccione and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gaccione engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)    On October 7, 2013, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured, he did not visit any hospital following the minor accident. To the extent that AR experienced any health problems at all as the result of his minor accident, they were of low severity. On November 21, 2013, Gaccione purported to conduct an initial examination of AR at Clinton Street. Gaccione did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gaccione did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gaccione provided AR with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither AR's presenting problems, nor the treatment plan provided to AR by Gaccione and Clinton Street, presented any risk of significant complications, morbidity, or mortality. To the contrary, AR did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Gaccione and Clinton Street consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to AR. Even so, Gaccione and

Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gaccione engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii)    On October 24, 2013, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not seriously injured, he did not visit any hospital following the accident. To the extent that JR experienced any health issues at all as the result of his minor accident, they were of low severity. On October 31, 2013, Gaccione purported to conduct an initial examination of JR at Clinton Street. Gaccione did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gaccione did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gaccione provided JR with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither JR's presenting problems, nor the treatment plan provided to JR by Gaccione and Clinton Street, presented any risk of significant complications, morbidity, or mortality. To the contrary, JR did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Gaccione and Clinton Street consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to JR. Even so, Gaccione and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gaccione engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii)    On November 27, 2013, an Insured named GH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that GH was not injured and did not complain of any pain. In keeping with the fact that GH was not seriously injured, he did not visit any hospital following the accident. To the extent that GH experienced any health problems at all as the result of his accident, they were of low severity. On December 2, 2013, Greene purported to conduct an initial examination of GH at Allied Health. Greene did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Greene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Greene provided GH with the same, phony, boilerplate back sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither GH's presenting problems, nor the treatment plan provided to GH by Greene, D'Agostini, and Allied Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, GH did not need any extensive treatment at all as the result of his minor

50

accident, and the treatment plan provided by Greene, D'Agostini, and Allied Health consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to GH. Even so, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Greene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)   On December 29, 2013, an Insured named CW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CW's vehicle was drivable following the accident. The police report further indicted that CW was not injured and did not complain of any pain at the scene. In keeping with the fact that CW did not visit any hospital emergency room following the accident. To the extent that CW experienced any health issues at all as the result of her minor accident, they were of low severity. On January 10, 2014, Gaccione purported to conduct an initial examination of CW at Clinton Street. Gaccione did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gaccione did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gaccione provided CW with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither CW's presenting problems, nor the treatment plan provided to CW by Gaccione and Clinton Street, presented any risk of significant complications, morbidity, or mortality. To the contrary, CW did not need any extensive treatment at all as the result of her minor accident, and the treatment plan provided by Gaccione and Clinton Street consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to CW. Even so, Gaccione and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gaccione engaged in some legitimate, low complexity medical decision-making during the purported examination.

(x)    On May 20, 2014, an Insured named HR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HR's vehicle was drivable following the accident. The police report further indicated that HR was not injured and did not complain of any pain. In keeping with the fact that HR was not seriously injured, he did not visit any hospital following the minor accident. To the extent that HR experienced any health problems at all as the result of his minor accident, they were of low severity. On May 30, 2014, Greene purported to conduct an initial examination of HR at Allied Health. Greene did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Greene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Greene provided HR with the same, phony, boilerplate back and neck pain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither

51

HR's presenting problems, nor the treatment plan provided to HR by Greene, D'Agostini, and Allied Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, HR did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Greene, D'Agostini, and Allied Health consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to HR. Even so, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Greene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xi)     On June 4, 2014, an Insured named PP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PP's vehicle was drivable following the accident. The police report further indicated that PP was not injured and did not complain of any pain at the scene. To the extent that PP experienced any health problems at all as the result of his minor accident, they were of low severity. On July 1, 2014, Gaccione purported to conduct an initial examination of PP at Clinton Street. Gaccione did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gaccione did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gaccione provided PP with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither PP's presenting problems, nor the treatment plan provided to PP by Gaccione and Clinton Street, presented any risk of significant complications, morbidity, or mortality. To the contrary, PP did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Gaccione and Clinton Street consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to PP. Even so, Gaccione and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gaccione engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xii)    On August 15, 2014, an Insured named CR was involved in an automobile accident. The contemporaneous police report indicated that CR's vehicle was drivable following the accident. The police report further indicated that CR was not injured and did not complain of any pain at the scene. In keeping with the fact that CR was not seriously injured, he did not visit any hospital following the accident. To the extent that CR experienced any health issues at all as the result of his accident, they were of low severity. On September 16, 2014, Johnson purported to conduct an initial examination of CR at Clinton Street. Johnson did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Johnson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Johnson

provided CR with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither CR's presenting problems, nor the treatment plan provided to CR by Johnson, Gaccione, and Clinton Street, presented any risk of significant complications, morbidity, or mortality. To the contrary, CR did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Johnson, Gaccione, and Clinton Street consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to CR. Even so, Johnson, Gaccione, and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Johnson engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiii)    On August 29, 2014, an Insured named DC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DC's vehicle was drivable following the accident. The police report further indicated that DC was not injured and did not complain of any pain at the scene. In keeping with the fact that DC was not seriously injured, he did not visit any hospital following the minor accident. To the extent that DC experienced any health issues at all as the result of his minor accident, they were of low severity. On September 18, 2014, Johnson purported to conduct an initial examination of DC at Clinton Street. Johnson did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Johnson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Johnson provided DC with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither DC's presenting problems, nor the treatment plan provided to DC by Johnson, Gaccione, and Clinton Street, presented any risk of significant complications, morbidity, or mortality. To the contrary, DC did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Johnson, Gaccione, and Clinton Street consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to DC. Even so, Johnson, Gaccione, and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Johnson engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiv)    On October 14, 2014, an Insured named LD was involved in an automobile accident. The contemporaneous police report indicated that LD's vehicle was drivable following the accident. The police report further indicated that LD was not injured and did not complain of any pain at the scene. In keeping with the fact the LD was not seriously injured, she did not visit any hospital following the accident. To the extent that LD experienced any health problems at all as the result of her accident, they were of low severity. On November 19, 2014, Greene purported to conduct an initial examination of LD at Allied Health. Greene did

53

not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Greene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Greene provided LD with the same, phony, boilerplate back and neck pain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither LD's presenting problems, nor the treatment plan provided to LD by Greene, D'Agostini, and Allied Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, LD did not need any extensive treatment at all as the result of her accident, and the treatment plan provided by Greene, D'Agostini, and Allied Health consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to LD. Even so, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Greene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xv)    On November 25, 2014, an Insured named VG was involved in an automobile accident. The contemporaneous police report indicated that, although VG complained of back pain, he refused medical attention at the scene. In keeping with the fact that VG was not seriously injured, he did not visit any hospital following the accident. To the extent that VG experienced any health problems at all as the result of his accident, they were of low severity. On December 18, 2014, Greene purported to conduct an initial examination of VG at Allied Health. Greene did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Greene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Greene provided VG with the same, phony, boilerplate back and neck pain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither VG's presenting problems, nor the treatment plan provided to VG by Greene, D'Agostini, and Allied Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, VG did not need any extensive treatment at all as the result of his accident, and the treatment plan provided by Greene, D'Agostini, and Allied Health consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to VG. Even so, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Greene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xvi)   On December 4, 2014, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that LP's vehicle was drivable following the accident. The police report further indicated that LP was not injured and did not complain of any pain. In keeping with the fact that LP was not seriously injured, he did not

visit any hospital following the minor accident. To the extent that LP experienced any health problems at all as the result of his minor accident, they were of low severity. On December 17, 2014, Greene purported to conduct an initial examination of LP at Allied Health. Greene did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Greene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Greene provided LP with the same, phony, boilerplate back and neck pain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither LP's presenting problems, nor the treatment plan provided to LP by Greene, D'Agostini, and Allied Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, LP did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Greene, D'Agostini, and Allied Health consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to LP. Even so, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Greene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xvii) On January 10, 2015, an Insured named GV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GV's vehicle was drivable following the accident. The police report further indicated that GV was not injured and did not complain of any pain at the scene. In keeping with the fact that GV was not seriously injured, she did not visit any hospital following the accident. To the extent that GV experienced any health issues at all as the result of her minor accident, they were of low severity. On January 12, 2015, Fogarty purported to conduct an initial examination of GV at Bound Brook. Fogarty did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fogarty did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fogarty provided GV with the same, phony, boilerplate back sprain/pain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither GV's presenting problems, nor the treatment plan provided to GV by Fogarty, D'Agostini, and Bound Brook, presented any risk of significant complications, morbidity, or mortality. To the contrary, GV did not need any extensive treatment at all as the result of her minor accident, and the treatment plan provided by Fogarty, D'Agostini, and Bound Brook consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to GV. Even so, Fogarty, D'Agostini, and Bound Brook billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Fogarty engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xviii) On January 10, 2015, an Insured named AV was involved in an automobile

accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AV's vehicle was drivable following the accident. The police report further indicated that AV was not injured and did not complain of any pain at the scene. In keeping with the fact that AV was not seriously injured, she did not visit any hospital following the accident. To the extent that AV experienced any health issues at all as the result of her minor accident, they were of low severity. On January 12, 2015, Fogarty purported to conduct an initial examination of AV at Bound Brook. Fogarty did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fogarty did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fogarty provided AV with the same, phony, boilerplate back sprain/pain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither AV's presenting problems, nor the treatment plan provided to AV by Fogarty, D'Agostini, and Bound Brook, presented any risk of significant complications, morbidity, or mortality. To the contrary, AV did not need any extensive treatment at all as the result of her minor accident, and the treatment plan provided by Fogarty, D'Agostini, and Bound Brook consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to AV. Even so, Fogarty, D'Agostini, and Bound Brook billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Fogarty engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xix) On July 18, 2015, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that JL's vehicle was drivable following the accident. The police report further indicated that, although JL complained of neck pain, he refused medical attention at the scene. In keeping with the fact that JL was not seriously injured, he did not visit any hospital following the accident. To the extent that JL experienced any health problems at all as the result of his accident, they were of low severity. On July 20, 2015, Greene purported to conduct an initial examination of JL at Allied Health. Greene did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Greene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Greene provided JL with the same, phony, boilerplate back and neck pain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither JL's presenting problems, nor the treatment plan provided to JL by Greene, D'Agostini, and Allied Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, JL did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Greene, D'Agostini, and Allied Health consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to JL. Even so, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Greene engaged in

some legitimate, low complexity medical decision-making during the purported examination.

(xx)    On January 15, 2016, an Insured named OI was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that OI's vehicle was drivable following the accident. The police report further indicated that OI was not injured and did not complain of any pain. In keeping with the fact that OI was not seriously injured, he did not visit any hospital following the minor accident. To the extent that OI experienced any health problems at all as the result of his minor accident, they were of low severity. On February 2, 2016, Greene purported to conduct an initial examination of OI at Allied Health. Greene did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Greene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Greene provided OI with the same, phony, boilerplate back and neck sprain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither OI's presenting problems, nor the treatment plan provided to OI by Greene, D'Agostini, and Allied Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, OI did not need any extensive treatment at all as the result of her minor accident, and the treatment plan provided by Greene, D'Agostini, and Allied Health consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to OI. Even so, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Greene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxi)    On January 22, 2016, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and did not complain of any pain at the scene. In keeping with the fact that CM was not seriously injured, she did not visit any hospital following the minor accident. To the extent that CM experienced any health issues at all as the result of her minor accident, they were of low severity. On March 9, 2016, Fogarty purported to conduct an initial examination of CM at Bound Brook. Fogarty did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fogarty did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fogarty provided CM with the same, phony, boilerplate back and neck sprain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither CM's presenting problems, nor the treatment plan provided to CM by Fogarty, D'Agostini, and Bound Brook, presented any risk of significant complications, morbidity, or mortality. To the contrary, CM did not need any extensive treatment at all as the result of her minor

accident, and the treatment plan provided by Fogarty, D'Agostini, and Bound Brook consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to CM. Even so, Fogarty, D'Agostini, and Bound Brook billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Fogarty engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxii) On February 2, 2016, an Insured named LA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that LA's vehicle was drivable following the accident. The police report further indicated that LA was not injured and did not complain of any pain at the scene. In keeping with the fact that LA was not seriously injured, she did not visit any hospital following the accident. To the extent that LA experienced any health issues at all as the result of her accident, they were of low severity. On February 8, 2016, Fogarty purported to conduct an initial examination of LA at Bound Brook. Fogarty did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fogarty did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fogarty provided LA with the same, phony, boilerplate back and neck sprain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither LA's presenting problems, nor the treatment plan provided to LA by Fogarty, D'Agostini, and Bound Brook, presented any risk of significant complications, morbidity, or mortality. To the contrary, LA did not need any extensive treatment at all as the result of her accident, and the treatment plan provided by Fogarty, D'Agostini, and Bound Brook consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to LA. Even so, Fogarty, D'Agostini, and Bound Brook billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Fogarty engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxiii) On February 14, 2016, an Insured named IL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that IL's vehicle was drivable following the accident. The police report further indicated that IL was not injured and did not complain of any pain at the scene. In keeping with the fact that IL was not seriously injured, IL did not visit any hospital emergency room following the accident. To the extent that IL experienced any health issues at all as the result of her minor accident, they were of low severity. On February 23, 2016, Greene purported to conduct an initial examination of IL at Allied Health. Greene did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Greene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Greene provided IL with the same, phony, boilerplate back and neck sprain/pain "diagnosis" that he provided to

58

virtually every other Insured. Furthermore, neither IL's presenting problems, nor the treatment plan provided to IL by Greene, D'Agostini, and Allied Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, IL did not need any extensive treatment at all as the result of her minor accident, and the treatment plan provided by Greene, D'Agostini, and Allied Health consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to IL. Even so, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Fogarty engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxiv) On February 14, 2016, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured and did not complain of any pain at the scene. In keeping with the fact that JP was not seriously injured, JP did not visit any hospital emergency room following the accident. To the extent that JP experienced any health issues at all as the result of her minor accident, they were of low severity. On February 24, 2016, Greene purported to conduct an initial examination of JP at Allied Health. Greene did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Greene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Greene provided JP with the same, phony, boilerplate back and neck sprain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither JP's presenting problems, nor the treatment plan provided to JP by Greene, D'Agostini, and Allied Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, JP did not need any extensive treatment at all as the result of her minor accident, and the treatment plan provided by Greene, D'Agostini, and Allied Health consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to JP. Even so, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Fogarty engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxv) On February 14, 2016, an Insured named EY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EY's vehicle was drivable following the accident. The police report further indicated that EY was not injured and did not complain of any pain at the scene. In keeping with the fact that EY was not seriously injured, EY did not visit any hospital emergency room following the accident. To the extent that EY experienced any health issues at all as the result of his minor accident, they were of low severity. On February 24, 2016, Greene purported to conduct an initial examination of EY at Allied Health. Greene did not retrieve, review, or analyze any significant amount of medical records,

diagnostic tests, or other information in connection with the examination. Moreover, Greene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Greene provided EY with the same, phony, boilerplate back and neck sprain/pain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither EY's presenting problems, nor the treatment plan provided to EY by Greene, D'Agostini, and Allied Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, EY did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Greene, D'Agostini, and Allied Health consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to EY. Even so, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Greene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxvi) On February 23, 2016, an Insured named DN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that DN's vehicle was drivable following the accident. The police report further indicated that DN was not injured and did not complain of any pain at the scene. In keeping with the fact that DN was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that DN experienced any health problems at all as the result of his minor accident, they were of low severity. On March 21, 2016, Greene purported to conduct an initial examination of DN at Allied Health. Greene did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Greene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Greene provided DN with substantially the same, phony, boilerplate back and neck pain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither DN's presenting problems, nor the treatment plan provided to DN by Greene, D'Agostini, and Allied Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, DN did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Greene, D'Agostini, and Allied Health consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to DN. Even so, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Greene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxvii) On February 26, 2016, an Insured named NF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact rear-end collision, and that NF's vehicle was drivable following the accident. The police report further indicated that NF was not injured and did not complain of any pain at the scene. To the extent that NF experienced

any health problems at all as the result of his accident, they were of low severity. On March 9, 2016, Greene purported to conduct an initial examination of NF at Allied Health. Greene did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Greene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Greene provided NF with the same, phony, boilerplate neck sprain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither NF's presenting problems, nor the treatment plan provided to NF by Greene, D'Agostini, and Allied Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, NF did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Greene, D'Agostini, and Allied Health consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to NF. Even so, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Greene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxviii) On May 20, 2016, an Insured named ML was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that ML's vehicle was drivable following the accident. The police report further indicated that ML was not injured and did not complain of any pain at the scene. In keeping with the fact that ML was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that ML experienced any health issues at all as the result of the accident, they were of low severity. On May 24, 2016, Greene purported to conduct an initial examination of ML at Allied Health. Greene did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Greene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Greene provided ML with the same, phony, boilerplate neck sprain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither ML's presenting problems, nor the treatment plan provided to ML by Greene, D'Agostini, and Allied Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, ML did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Greene, D'Agostini, and Allied Health consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to ML. Even so, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Greene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxix) On September 12, 2016, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a

low-impact collision and that JD's vehicle was drivable following the accident. The police report further indicated that JD was not injured and did not complain of any pain at the scene. In keeping with the fact that JD was not seriously injured, she did not visit any hospital following the accident. To the extent that JD experienced any health issues at all as the result of her accident, they were of low severity. On September 30, 2016, Fogarty purported to conduct an initial examination of JD at Bound Brook. Fogarty did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fogarty did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fogarty provided JD with the same, phony, boilerplate back and neck sprain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither JD's presenting problems, nor the treatment plan provided to JD by Fogarty, D'Agostini, and Bound Brook, presented any risk of significant complications, morbidity, or mortality. To the contrary, JD did not need any extensive treatment at all as the result of her accident, and the treatment plan provided by Fogarty, D'Agostini, and Bound Brook consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to JD. Even so, Fogarty, D'Agostini, and Bound Brook billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Fogarty engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxx) On October 11, 2016, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that, although MA complained of neck pain at the scene, she was evaluated and sent home without being taken to the emergency room. In keeping with the fact that MA was not seriously injured, she did not visit any hospital following the minor accident. To the extent that MA experienced any health problems at all as the result of her minor accident, they were of low severity. On October 12, 2016, Greene purported to conduct an initial examination of MA at Allied Health. Greene did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Greene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Greene provided MA with the same, phony, boilerplate back and neck sprain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither MA's presenting problems, nor the treatment plan provided to MA by Greene, D'Agostini, and Allied Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, MA did not need any extensive treatment at all as the result of her minor accident, and the treatment plan provided by Greene, D'Agostini, and Allied Health consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to MA. Even so, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Greene

engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxxi)  On November 30, 2016, an Insured named YM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YM's vehicle was drivable following the accident. The police report further indicated that YM was not injured and did not complain of any pain at the scene. In keeping with the fact the YM was not seriously injured, he did not visit any hospital following the minor accident. To the extent that YM experienced any health problems at all as the result of his minor accident, they were of low severity. On January 3, 2017, Greene purported to conduct an initial examination of YM at Allied Health. Greene did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Greene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Greene provided YM with the same, phony, boilerplate back and neck sprain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither YM's presenting problems, nor the treatment plan provided to YM by Greene, D'Agostini, and Allied Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, YM did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Greene, D'Agostini, and Allied Health consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to YM. Even so, Greene, D'Agostini, and Allied Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Greene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxxii)  On April 22, 2017, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain at the scene. In keeping with the fact that AM was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that AM experienced any health issues at all as the result of his minor accident, they were of low severity. On May 4, 2017, Gaccione purported to conduct an initial examination of AM at Clinton Street. Gaccione did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gaccione did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gaccione provided AM with the same, phony, boilerplate back and neck sprain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither AM's presenting problems, nor the treatment plan provided to AM by Gaccione and Clinton Street, presented any risk of significant complications, morbidity, or mortality. To the contrary, AM did not need any extensive treatment at all as the

result of his minor accident, and the treatment plan provided by Gaccione and Clinton Street consisted of medically unnecessary chiropractic and biofeedback services, none of which posed the least bit of risk to AM. Even so, Gaccione and Clinton Street billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gaccione engaged in some legitimate, low complexity medical decision-making during the purported examination.

129.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

130.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

131.    As set forth above, in the claims identified in Exhibits "1" – "3", all of the Insureds whom Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis purported to treat purported to have been involved in automobile accidents.

132.    It is extremely improbable that any two or more Insureds involved in any one of the automobile accidents in the claims identified in Exhibits "1" – "3" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

133.    It is even more improbable – to the point of impossibility – that this would occur over and over again.

134.    It likewise is improbable – to the point of impossibility – that any two or more Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibits "1" - "3" would present for an initial examination with substantially identical symptoms, and receive substantially identical diagnoses, on the exact same date several days, weeks, or even months after their underlying automobile accident.

135.     Even so, in keeping with the fact that Allied Health, Bound Brook, D'Agostini, Greene, and Fogarty's putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Allied Health, Bound Brook, D'Agostini, Greene, and Fogarty frequently issued substantially identical, phony "diagnoses", on the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

136.     For example:

(i)     On October 3, 2012, two Insureds – EC and DG – were involved in the same automobile accident. Incredibly, on October 17, 2012, EC and DG both presented to Allied Health on the exact same date for initial examinations by D'Agostini. EC and DG were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, D'Agostini provided EC and DG with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(ii)    On November 6, 2012, two Insureds – DH and RH – were involved in the same automobile accident. On March 28, 2013, RH presented to Allied Health for an initial examination by D'Agostini. One week later, on April 5, 2013, DH too presented to Allied Health for an initial examination by D'Agostini. DH and RH were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, D'Agostini provided DH and RH with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(iii)   On November 11, 2013, six Insureds – DM, JC, AD, LH, PN, and AR – were involved in the same automobile accident. On November 12, 2013, DM presented to Bound Brook for an initial examination by Fogarty, Then, incredibly, the next day, November 13, 2013, JC, AD, LH, PN, and AR all presented to Bound Brook for initial examinations by D'Agostini and Fogarty. DM, JC, AD, LH, PN, and AR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, D'Agostini and Fogarty provided DM, JC, AD, LH, PN, and AR with

substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for all <u>six</u> of them.

(iv)    On March 29, 2014, two Insureds – TL and KS – were involved in the same automobile accident. Incredibly, two days later, on March 31, 2014, TL and KS both presented to Allied Health on the exact same date for initial examinations by Greene. TL and KS were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Greene provided TL and KS with substantially identical, phony neck and back pain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(v)    On June 7, 2014, two Insureds – AF and JZ – were involved in the same automobile accident. Incredibly, on June 9, 2014, AF and JZ both presented to Allied Health on the exact same date for initial examinations by Greene. AF and JZ were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Greene provided AF and JZ with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(vi)    On June 22, 2014, two Insureds – RM and RP – were involved in the same automobile accident. Incredibly, on October 22, 2014, RM and RP both presented to Allied Health on the exact same date for initial examinations by Greene. RM and RP were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Greene provided RM and RP with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(vii)    On July 16, 2014, two Insureds – AB and MP – were involved in the same automobile accident. Incredibly, on July 29, 2014, AB and MP both presented to Allied Health for initial examinations by Greene. AB and MP were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Greene provided AB and MP with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(viii)    On September 5, 2014, <u>four</u> Insureds – CG, YM, RO, and KS – were involved in the same automobile accident. Incredibly, on September 26, 2014, YM, RO, and KS all presented to Allied Health on the exact same date for initial examinations by Greene. Then, on October 10, 2014, CG too presented to Allied Health for an

initial examination by Greene. CG, YM, RO, and KS were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Greene provided CG, YM, RO, and KS with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for all of them.

(ix)     On December 31, 2014, three Insureds – VE, LN, and RP – were involved in the same automobile accident. Incredibly, that same day, VE and RP both presented to Allied Health for initial examinations by Greene. Then, on January 8, 2015, LN too presented to Allied Health for an initial examination by Greene. VE, LN, and RP were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Greene provided VE, LN, and RP with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for all of them.

(x)      On January 10, 2015, two Insureds – AV and GV – were involved in the same automobile accident. Incredibly, on January 12, 2015, AV and GV both presented to Bound Brook on the exact same date for initial examinations by Fogarty. AV and GV were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Fogarty provided AV and GV with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xi)     On February 8, 2015, two Insureds – LO and MU – were involved in the same automobile accident. On February 16, 2015, LO presented to Allied Health for an initial examination by Greene. Then, on February 26, 2015, MU too presented to Allied Health for an initial examination by Greene. LO and MU were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Greene provided LO and MU with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xii)    On March 19, 2015, two Insureds – EJ and JR – were involved in the same automobile accident. Incredibly, the next day, on March 20, 2015, EJ and JR both presented to Allied Health for initial examinations by Greene. EJ and JR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Greene provided EJ and JR with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xiii)    On March 22, 2015, two Insureds – MM and MH – were involved in the same automobile accident. On April 13, 2015, MH presented to Bound Brook for an initial examination by Fogarty. Then, on April 24, 2015, MM too presented to Bound Brook for an initial examination by Fogarty. MM and MH were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Fogarty provided MM and MH with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xiv)    On April 7, 2015, two Insureds – LA and FM – were involved in the same automobile accident. Incredibly, on April 17, 2015, LA and FM both presented to Allied Health on the exact same date for initial examinations by Greene. LA and FM were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Greene provided LA and FM with substantially identical, phony neck and back pain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xv)    On July 24, 2015, two Insureds – JL and ES – were involved in the same automobile accident. Incredibly, on July 29, 2015, JL and ES both presented to Allied Health on the exact same date for initial examinations by Greene. JL and ES were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Greene provided JL and ES with substantially identical, phony neck and back pain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xvi)    On October 1, 2015, two Insureds – CC and JC – were involved in the same automobile accident. Incredibly, on October 5, 2015, CC and JC both presented to Bound Brook on the exact same date for initial examinations by Fogarty. CC and JC were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Fogarty provided CC and JC with substantially identical, phony neck and back pain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xvii)    On October 3, 2015, two Insureds – JH and SH – were involved in the same automobile accident. Incredibly, on October 19, 2015, JH and SH both presented to Allied Health on the exact same date for initial examinations by Greene. JH and SH were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the

vehicle. Even so, at the conclusion of the putative initial examinations, Greene provided JH and SH with substantially identical, phony neck and back pain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xviii)   On October 6, 2015, three Insureds – NM, MQ, and PQ – were involved in the same automobile accident. Incredibly, the next day, October 7, 2015, NM, MQ, and PQ all presented to Allied Health for initial examinations by Greene. NM, MQ, and PQ were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Greene provided NM, MQ, and PQ with substantially identical, phony neck and back pain "diagnoses", and recommended a substantially identical course of treatment for all of them.

(xix)   On January 25, 2016, three Insureds – DC, NC, and RC – were involved in the same automobile accident. Incredibly, the next day, January 26, 2016, DC, NC, and RC all presented to Allied Health for initial examinations by Greene. DC, NC, and RC were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Greene provided DC, NC, and RC with substantially identical, phony neck and back pain "diagnoses", and recommended a substantially identical course of treatment for all of them.

(xx)   On April 2, 2016, two Insureds – EG and FM – were involved in the same automobile accident. Incredibly, two days later, on April 4, 2016, EG and FM both presented to Allied Health for initial examinations by Greene. EG and FM were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Greene provided EG and FM with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xxi)   On May 16, 2016, three Insureds – ED, JH, and LM – were involved in the same automobile accident. Incredibly, the next day, May 17, 2016, ED, JH, and LM all presented to Allied Health for initial examinations by Greene. ED, JH, and LM were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Greene provided ED, JH, and LM with substantially identical, phony neck and back pain "diagnoses", and recommended a substantially identical course of treatment for all of them.

(xxii)   On May 18, 2016, two Insureds – AF and AF – were involved in the same automobile accident. Incredibly, on June 16, 2016, AF and AF both presented to

Allied Health on the exact same date for initial examinations by Greene. AF and AF were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Greene provided AF and AF with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xxiii)   On May 20, 2016, two Insureds – BG and ML – were involved in the same automobile accident. Incredibly, on May 24, 2016, BG and ML both presented to Allied Health on the exact same date for initial examinations by Greene. BG and ML were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Greene provided BG and ML with substantially identical, phony neck sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xxiv)   On July 16, 2016, two Insureds – AM and DT – were involved in the same automobile accident. Incredibly, on July 19, 2016, AM and DT both presented to Bound Brook on the exact same date for initial examinations by Fogarty. AM and DT were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Fogarty provided AM and DT with substantially identical, phony neck sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xxv)   On February 26, 2016, two Insureds – NF and MF – were involved in the same automobile accident. Incredibly, on March 9, 2016, both NF and MF presented to Allied Health on the exact same date for initial examinations by Greene. NF and MF were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Fogarty provided NF and MF with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xxvi)   On August 14, 2016, five Insureds – JO, SP, CS, CS, and DS – were involved in the same automobile accident. Incredibly, on August 15, 2016, JO, SP, and CS all presented to Bound Brook on the exact same date for initial examinations by Fogarty, Then, on September 21, 2016, CS too presented to Bound Brook for an initial examination by Fogarty. Then, incredibly, on September 23, 2016, DS too presented to Bound Brook for an initial examination by Fogarty. JO, SP, CS, CS, and DS were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Fogarty provided JO, SP, CS, CS, and DS with substantially

70

identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for all <u>five</u> of them.

(xxvii) On September 12, 2016, two Insureds – JP and JP – were involved in the same automobile accident. Incredibly, on September 30, 2016, JP and JP both presented to Bound Brook on the exact same date for initial examinations by Fogarty. JP and JP were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Fogarty provided JP and JP with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xxviii) On September 19, 2016, two Insureds – CP and JF – were involved in the same automobile accident. On October 19, 2016, CP presented to Bound Brook for an initial examination by Fogarty. Then, on October 24, 2016, JF too presented to Bound Brook for an initial examination by Fogarty. CP and JF were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Fogarty provided CP and JF with substantially identical, phony neck and back pain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xxix) On November 21, 2016, two Insureds – CP and MR – were involved in the same automobile accident. Incredibly, on December 3, 2016, CP and MR both presented to Allied Health on the exact same date for initial examinations by Greene. CP and MR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Greene provided CP and MR with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xxx) On December 29, 2016, two Insureds – JS and VR – were involved in the same automobile accident. Incredibly, on January 9, 2017, JS and VR both presented to Bound Brook on the exact same date for initial examinations by Fogarty. JS and VR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Fogarty provided JS and VR with substantially identical, phony back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

137. Similarly, and in keeping with the fact that Clinton Street, Gaccione, Johnson, Holsten, and Nettis' putative "diagnoses" were phony, and in keeping with the fact that their

71

putative initial examinations involved no actual medical decision-making at all, Clinton Street, Gaccione, Johnson, and Nettis frequently issued substantially identical, phony "diagnoses", on the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

138.  For example:

(i)  On April 26, 2013, two Insureds – CA and JA – were involved in the same automobile accident. Incredibly, on May 14, 2013, CA and JA both presented at Clinton Street on the exact same date for initial examinations by Gaccione. CA and JA were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Gaccione provided CA and JA with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(ii)  On July 18, 2013, two Insureds – MB and MB – were involved in the same automobile accident. Incredibly, on July 22, 2013, MB and MB both presented at Clinton Street on the exact same date for initial examinations by Gaccione. MB and MB were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the impact different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Gaccione provided MB and MB with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(iii)  On August 30, 2013, two Insureds – MH and JY – were involved in the same automobile accident. Incredibly, on September 6, 2013, MH and JY both presented at Clinton Street on the exact same date for initial examinations by Gaccione. MH and JY were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Gaccione provided MH and JY with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(iv)  On December 26, 2013, two Insureds – LB and MG – were involved in the same automobile accident. Incredibly, on January 7, 2014, LB and MG both presented at Clinton Street on the exact same date for initial examinations by Gaccione. LB and MG were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Gaccione

provided LB and MG with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(v)     On February 28, 2014, two Insureds – CS and JW – were involved in the same automobile accident. On March 13, 2014, CS presented at Clinton Street for an initial examination by Gaccione. Then, on March 21, 2014, JW too presented at Clinton Street for an initial examination by Gaccione. CS and JW were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the impact different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Gaccione provided CS and JW with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(vi)    On December 2, 2014, two Insureds – KL and AU – were involved in the same automobile accident. Incredibly, on December 5, 2015, KL and AU both presented at Clinton Street on the exact same date for initial examinations by Johnson. KL and AU were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Johnson provided KL and AU with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(vii)   On January 11, 2015, three Insureds – CH, SM, and CW – were involved in the same automobile accident. Incredibly, on January 13, 2015, both CH and SM presented at Clinton Street on the exact same date for initial examinations by Johnson. Then, on January 15, 2015, CW too presented at Clinton Street for an initial examination by Johnson. CH, SM, and CW were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Johnson provided CH, SM, and CW with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for all of them.

(viii)  On January 23, 2015, <u>four</u> Insureds – CB, JB, SB, and ES – were involved in the same automobile accident. Incredibly, on February 16, 2015, CB, JB, and SB all presented at Clinton Street on the exact same date for initial examinations by Nettis. Then, on March 16, 2015, ES too presented at Clinton Street for an initial examination by Nettis. ES, CB, JB, and SB were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Nettis provided ES, CB, JB, and SB with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for all of them.

(ix)     On December 10, 2015, two Insureds – GA and AA – were involved in the same automobile accident. Incredibly, on December 18, 2015, GA and AA both presented at Clinton Street on the exact same date for initial examinations by Holsten. GA and AA were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the impact different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Holsten provided GA and AA with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(x)      On February 9, 2016, two Insureds – OA and AO – were involved in the same automobile accident. On February 25, 2016, AO presented at Clinton Street for an initial examination by Holsten. Then, on March 28, 2016, OA too presented at Clinton Street for an initial examination by Gaccione. AO and OA were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Holsten provided AO and OA with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

139.    Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis routinely inserted this false information in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including follow-up examinations, electrodiagnostic testing, chiropractic services, physical therapy services, and interventional pain management services.

140.    To the extent that the Insureds in the claims identified in Exhibits "1" - "3" ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary sprains or strains of the back and/or neck.

141.    The diagnosis and treatment of these ordinary sprains and strains did not require any "low complexity" medical decision-making on the part of Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis.

142. To the contrary, and as set forth above, Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis did not engage in any legitimate medical decision-making at all in connection with the initial examinations in the claims identified in Exhibits "1" - "3".

143. In the claims for initial examinations identified in Exhibits "1" - "3", Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis routinely falsely represented that the initial examinations involved medical decision-making of low complexity in order to provide a false basis to bill for the initial examinations under CPT code 99203, because CPT code 99203 is reimbursable at a higher rate than examinations that do not require low complexity medical decision-making.

## C. The Fraudulent Charges for Follow-Up Examinations at Allied Health, Bound Brook, and Clinton Street

144. In addition to their fraudulent initial examinations, Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis virtually always purported to subject the Insureds in the claims identified in Exhibits "1" - "3" to multiple, fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

145. Either D'Agostini or Greene purported to perform virtually all of the putative follow-up examinations at Allied Health, which were then typically billed to GEICO under CPT code 99212, resulting in a charge of $44.12 for each purported follow-up examination.

146. Either D'Agostini, Greene, or Fogarty purported to perform virtually all of the putative follow-up examinations at Bound Brook, which were then typically billed to GEICO under CPT code 99212, resulting in a charge of $32.36 for each purported follow-up examination.

147. Either Gaccione, Johnson, Holsten, or Nettis purported to perform virtually all of the putative follow-up examinations at Clinton Street, which were then typically billed to GEICO under CPT code 99213 or CPT code 99214, almost always resulting in a charge of either $125.71 or $126.00 per examination.

148. Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis's charges for the follow-up examinations identified in Exhibits "1" - "3" were fraudulent in that they misrepresented the nature, extent, and reimbursable amount of the follow-up examinations.

## 1. Misrepresentations Regarding the Severity of the Insureds' Presenting Problems at Clinton Street

149. Pursuant to the CPT Assistant, the use of CPT code 99214 typically requires that the Insured present with problems of moderate to high severity.

150. The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

151. For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

(i) Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii) Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii) Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

76

     (iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

     (v)    Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

     (vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

     (vii)    Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/ Internal Medicine/Family Medicine)

     (viii)    Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

152. Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for an follow-up patient examination typically are problems that pose a serious threat to a patient's health, or even the patient's life.

153. By contrast, and as set forth above, to the extent that the Insureds in the claims identified in Exhibit "2" suffered any injuries at all in their relatively minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains.

154. In keeping with the fact that the Insureds in the claims identified in Exhibit "2" almost never suffered any injuries more serious than garden-variety soft tissue injuries such as sprains and strains, in most of the claims identified in Exhibit "2" the Insureds did not seek treatment at any hospital as the result of their accidents.

155. To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

156. Furthermore, in most cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, and that no one was seriously injured in the underlying accidents, or injured at all.

157. As set forth above, strains and sprains virtually always resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to demonstrate why continued treatment is necessary beyond the four-week, eight-week, and 13-week marks.

158. By the time the Insureds in the claims identified in Exhibit "2" presented to Clinton Street, Gaccione, Johnson, Holsten, and Nettis for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents, or their presenting problems were minimal.

159. Even so, in the claims for follow-up examinations identified in Exhibit "2" Clinton Street, Gaccione, Johnson, Holsten, and Nettis routinely billed for their putative follow-up examinations under CPT code 99214, and thereby falsely represented that the Insureds continued to suffer from presenting problems of moderate to high severity.

160. For example:

(i)     On March 16, 2013, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and did not complain of any pain at the scene. In keeping with the fact that CM was not seriously injured, he did not visit any hospital following the accident. To the extent that CM experienced any health issues at all as the result of his accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following a purported follow-up examination of CM on June 20, 2013 – more than three months after the minor accident – Gaccione and Clinton Street billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that CM presented with problems of moderate to high severity.

(ii)     On August 30, 2013, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured and did not complain of any pain at the scene. In keeping with the fact that MH was not seriously injured, she did not visit any hospital following the minor accident. To the extent that MH experienced any health problems at all as the result of her minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following a purported follow-up examination of MH on February 4, 2014 – more than five months after the minor accident – Gaccione and Clinton Street billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that MH presented with problems of moderate to high severity.

(iii)    On August 30, 2013, an Insured named JY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JY's vehicle was drivable following the accident. The police report further indicated that JY was not injured and did not complain of any pain at the scene. In keeping with the fact that JY was not seriously injured, she did not visit any hospital following the minor accident. To the extent that JY experienced any health problems at all as the result of her minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following a purported follow-up examination of JY on December 5, 2014 – more than five months after the minor accident – Gaccione and Clinton Street billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that JY presented with problems of moderate to high severity.

(iv)    On October 7, 2013, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured, he did not visit any hospital following the minor accident. To the extent that AR experienced any health problems at all as the result of his minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following a purported follow-up examination of AR on January 28, 2014 – more than three months after the minor accident – Gaccione and Clinton Street billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that AR presented with problems of moderate to high severity.

(v)     On June 4, 2014, an Insured named PP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PP's vehicle was drivable following the accident. The police report further indicated that PP was not injured and did not complain

of any pain at the scene. To the extent that PP experienced any health problems at all as the result of his minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following a purported follow-up examination of PP on August 4, 2014 – two months after the minor accident – Gaccione and Clinton Street billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that PP presented with problems of moderate to high severity.

(vi)    On August 15, 2014, an Insured named CR was involved in an automobile accident. The contemporaneous police report indicated that CR's vehicle was drivable following the accident. The police report further indicated that CR was not injured and did not complain of any pain at the scene. In keeping with the fact that CR was not seriously injured, he did not visit any hospital following the accident. To the extent that CR experienced any health problems at all as the result of his accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following a purported follow-up examination of CR on January 2, 2015 – more than four months after the minor accident – Gaccione, Johnson, and Clinton Street billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that CR presented with problems of moderate to high severity.

(vii)   On August 29, 2014, an Insured named DC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DC's vehicle was drivable following the accident. The police report further indicated that DC was not injured and did not complain of any pain at the scene. In keeping with the fact that DC was not seriously injured, he did not visit any hospital following the minor accident. To the extent that DC experienced any health problems at all as the result of his minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following a purported follow-up examination of DC on January 23, 2015 – more than four months after the minor accident – Gaccione, Johnson, and Clinton Street billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that DC presented with problems of moderate to high severity.

161.    These are only representative examples. In virtually all of the claims for follow-up examinations billed under CPT code 99214 that are identified in Exhibit "2", Clinton Street, Gaccione, Johnson, Holsten, and Nettis falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

162.    In the claims for follow-up examinations billed under CPT code 99214 that are identified in Exhibit "2", Clinton Street, Gaccione, Johnson, Holsten, and Nettis routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the examinations under CPT code 99214, because follow-up examinations billable under CPT code 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

163.    In the claims for follow-up examinations identified in Exhibit "2", Clinton Street, Gaccione, Johnson, Holsten, and Nettis also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that Clinton Street, Gaccione, Johnson, Holsten, and Nettis purported to provide to the Insureds, including follow-up examinations, biofeedback, chiropractic, and MUA services.

## 2.    Misrepresentations Regarding the Results of the Follow-Up Examinations at Clinton Street

164.    What is more, pursuant to the Fee Schedule, when Clinton Street, Gaccione, Johnson, Holsten, and Nettis submitted charges for the follow-up examinations under CPT code 99214, they represented that they performed at least two of the following three components:  (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

165.    In actuality, however, in the claims for follow-up examinations identified in Exhibit "2", Clinton Street, Gaccione, Johnson, Holsten, and Nettis did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

166.    Rather, following their purported follow-up examinations, Clinton Street,

Gaccione, Johnson, Holsten, and Nettis simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; (ii) referred the Insureds to Clinton Street for even more chiropractic services, despite the fact that the Insureds already had received extensive chiropractic services from Clinton Street that supposedly had not been successful in remediating their purported pain symptoms; and (iii) referred the Insureds to Clinton Street for medically unnecessary biofeedback and MUA services.

167.    To the limited extent that the Insureds in the claims identified in Exhibit "2" experienced any injuries at all as the result of their generally-trivial automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains.

168.    As set forth above,  the vast majority of soft tissue injuries such as sprains and strains resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to demonstrate at regular intervals why continued treatment is necessary beyond the four-week mark.

169.    Even so, in keeping with the fact that the putative "results" of the follow-up examinations were phony, and were falsified to support continued, medically unnecessary treatment by the Defendants, and to provide a false justification for the medically unnecessary "treatments" the Defendants already had purported to provide, Clinton Street, Gaccione, Johnson, Holsten, and Nettis routinely falsely purported to diagnose continuing effects of soft tissue injuries in the Insureds long after the minor underlying automobile accidents occurred, and long after any attendant soft tissue injury pain or other symptoms attendant to the minor automobile accidents would have resolved.

170.    For example:

(i)    On March 16, 2013, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a

low-impact collision, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and did not complain of any pain at the scene. In keeping with the fact that CM was not seriously injured, he did not visit any hospital following the accident. To the extent that CM experienced any health issues at all as the result of his accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following a purported follow-up examination of CM on June 20, 2013 – more than three months after the minor accident – Gaccione and Clinton Street falsely reported that CM continued to suffer from high levels of pain and range of motion deficits as the result of his more than three month-old accident, and recommended that CM continue to receive medically unnecessary chiropractic and biofeedback services from Clinton Street, despite the fact that CM had been receiving such services at Clinton Street for more than three months and they supposedly had not resolved CM's purported symptoms.

(ii)     On August 30, 2013, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured and did not complain of any pain at the scene. In keeping with the fact that MH was not seriously injured, she did not visit any hospital following the minor accident. To the extent that MH experienced any health problems at all as the result of her minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following a purported follow-up examination of MH on February 4, 2014 – more than five months after the minor accident – Gaccione and Clinton Street falsely reported that MH continued to suffer from high levels of pain and range of motion deficits as the result of her minor, more than five month-old accident, and recommended that MH continue to receive medically unnecessary chiropractic and biofeedback services from Clinton Street, despite the fact that MH had been receiving such services at Clinton Street for more than four months and they supposedly had not resolved MH's purported symptoms.

(iii)    On October 7, 2013, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured, he did not visit any hospital following the minor accident. To the extent that AR experienced any health problems at all as the result of his minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following a putative follow-up examination of AR on January 28, 2014 – more than three months after the minor accident – Gaccione and Clinton Street falsely reported that AR continued to suffer from high levels of pain and range of motion deficits as the result of his minor, more than three month-old accident, and recommended that AR continue

to receive medically unnecessary chiropractic and biofeedback services from Clinton Street, despite the fact that AR had been receiving such services at Clinton Street for almost three months and they supposedly had not resolved AR's purported symptoms.

(iv)     On June 4, 2014, an Insured named PP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PP's vehicle was drivable following the accident. The police report further indicated that PP was not injured and did not complain of any pain at the scene. To the extent that PP experienced any health problems at all as the result of his minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following a purported follow-up examination of PP on October 9, 2014 – more than four months after the minor accident – Gaccione, Johnson, and Clinton Street falsely reported that PP continued to suffer from high levels of pain and range of motion deficits as the result of his minor, more than four month-old accident, and recommended that PP continue to receive medically unnecessary chiropractic and biofeedback services from Clinton Street, despite the fact that PP had been receiving such services at Clinton Street for more than three months and they supposedly had not resolved PP's purported symptoms.

(v)      On August 15, 2014, an Insured named CR was involved in an automobile accident. The contemporaneous police report indicated that CR's vehicle was drivable following the accident. The police report further indicated that CR was not injured and did not complain of any pain at the scene. In keeping with the fact that CR was not seriously injured, he did not visit any hospital following the accident. To the extent that CR experienced any health problems at all as the result of his accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following a purported follow-up examination of CR on January 2, 2015 – more than four months after the minor accident – Gaccione, Johnson, and Clinton Street falsely reported that CR continued to suffer from high levels of pain and range of motion deficits as the result of his minor, more than four month-old accident, and recommended that CR continue to receive medically unnecessary chiropractic and biofeedback services from Clinton Street, despite the fact that CR had been receiving such services at Clinton Street for more than three months and they supposedly had not resolved CR's purported symptoms.

171.    These are only representative examples. In  the claims for follow-up examinations identified in Exhibit "2", Clinton Street, Gaccione, Johnson, Holsten, and Nettis routinely falsely represented that the Insureds continued to suffer from pain and other symptoms as the result of their automobile accidents, long after the minor accidents occurred.

172.    In the claims for follow-up examinations identified in Exhibit "2", Clinton Street, Gaccione, Johnson, Holsten, and Nettis routinely falsely represented that the Insureds continued to suffer pain and other symptoms as the result of minor soft tissue injuries, long after the underlying accidents occurred, because these phony diagnoses provided a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including additional follow-up examinations, chiropractic, and biofeedback services.

**3.    Misrepresentations Regarding the Amount of Time Spent on the Follow-Up Examinations at Clinton Street**

173.    What is more, in the claims for follow-up examinations identified in Exhibit "2", Clinton Street, Gaccione, Johnson, Holsten, and Nettis misrepresented the amount of time that was spent on the follow-up examinations.

174.    Pursuant to the Fee Schedule, the use of CPT code 99214 to bill for a follow-up examination represents that the physician who conducted the examination spent at least 25 minutes of face-to-face time with the patient or the patient's family.

175.    In addition, pursuant to the Fee Schedule, the use of CPT code 99213 to bill for a follow-up examination represents that the physician who conducted the examination spent at least 15 minutes of face-to-face time with the patient or the patient's family.

176.    In fact, in the follow-up examinations identified in Exhibit "2", neither Gaccione, Johnson, Holsten, Nettis, nor any other chiropractor or physician associated with Clinton Street, ever spent 15 minutes of face-to-face time with the Insureds or their families when conducting the examinations, much less 25 minutes.

177.    Rather, in the follow-up examinations identified in Exhibit "2", the examinations rarely lasted more than 10 minutes, to the extent that they were provided at all.

178.    In keeping with the fact that the follow-up examinations in the claims identified in

Exhibit "2" rarely lasted more than 10 minutes, to the extent that they were conducted at all, Clinton Street, Gaccione, Johnson, Holsten, and Nettis used a template in conducting the examinations.

179.    The template that Clinton Street, Gaccione, Johnson, Holsten, and Nettis used in purporting to conduct the follow-up examinations set forth a very limited range of examination parameters.

180.    The only face-to-face time between Gaccione, Johnson, Holsten, Nettis, and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews, limited examinations of the Insureds' musculoskeletal systems, and a perfunctory check of a few of the Insureds' other systems.

181.    These brief interviews and limited examinations did not require Gaccione, Johnson, Holsten, Nettis, or any other chiropractor associated with Clinton Street to spend more than 10 minutes of face-to-face time with the Insureds or their families.

182.    In the claims for follow-up examinations identified in Exhibit "2", Clinton Street, Gaccione, Johnson, Holsten, and Nettis falsely represented that the examinations involved at least 15 minutes or 25 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT codes 99214 and 99213, because examinations billable under CPT codes 99214 and 99213 are reimbursable at a higher rate than examinations that require less time to perform.

**4.    Misrepresentations Regarding the Reimbursable Amounts for the Follow-Up Examinations**

183.    Not only did Clinton Street, Gaccione, Johnson, Holsten, and Nettis routinely falsely represent that their putative follow-up examinations involved presenting problems of moderate-to-high severity, or low-to-moderate severity, and not only did they misrepresent the

86

results of the follow-up examinations, but the Defendants also routinely misrepresented the reimbursable amount for the follow-up examinations.

184.    The No-Fault Laws provide that follow-up examinations may only be billed contemporaneously with chiropractic treatments if one of the following four circumstances is present:

> (i)    there is a definite measurable change in the patient's condition requiring significant change in the treatment plan;
>
> (ii)   the patient fails to respond to treatment, requiring a change in the treatment plan;
>
> (iii)  the patient's condition becomes permanent and stationary, or the patient is ready for discharge; or
>
> (iv)   it is medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

See N.J.A.C. 11:3-29.4(n).

185.    Even so, Allied Health, Bound Brook, D'Agostini, Greene, and Fogarty routinely billed for follow-up examinations contemporaneously with chiropractic treatments, despite: (i) the absence of a definite measurable change in the patient's condition requiring significant change in the treatment plan; (ii) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (iii) the absence of any situation in which the patient's condition became permanent, or a situation in which the patient was ready for discharge; and (iv) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

186.    For example:

> (i)    Allied Health, D'Agostini, and Greene billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named DP on January 24, 2013, February 20, 2013, February 22, 2013, March 26, 2013, May 1, 2013, May 8, 2013, May 22, 2013, June 19, 2013, June 20, 2013, and July 9, 2013,

despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Allied Health, D'Agostini, and Greene were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(ii)     Allied Health, D'Agostini, and Greene billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named MA on September 11, 2013, October 11, 2013, November 12, 2013, and December 16, 2013, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Allied Health, D'Agostini, and Greene were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(iii)    Bound Brook, D'Agostini, and Fogarty billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named AD on December 13, 2013, January 13, 2014, February 12, 2014, March 12, 2014, April 11, 2014, May 9, 2014, and June 9, 2014, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Bound Brook, D'Agostini, and Fogarty were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(iv)     Bound Brook, D'Agostini, and Fogarty billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named LH on December 13, 2013, January 15, 2014, February 14, 2014, March 14, 2014, April 14, 2014, and May 23, 2014, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Bound Brook, D'Agostini, and Fogarty were preparing to discharge the patient; and (d) the absence of any situation in

which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(v)     Allied Health, D'Agostini, and Greene billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named PR on May 8, 2014, June 11, 2014, July 24, 2014, August 25, 2014, September 22, 2014, October 21, 2014, and November 12, 2014, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Allied Health, D'Agostini, and Greene were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(vi)    Allied Health, D'Agostini, and Greene billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named HR on July 2, 2014, August 4, 2014, September 3, 2014, and September 29, 2014, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Allied Health, D'Agostini, and Greene were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(vii)   Allied Health, D'Agostini, and Greene billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named WB on August 11, 2014, September 8, 2014, October 8, 2014, November 5, 2014, April 8, 2015, May 6, 2015, June 3, 2015, June 30, 2015, and July 27, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Allied Health, D'Agostini, and Greene were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(viii)  Allied Health, D'Agostini, and Greene billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic

treatments and/or physical therapy services to an Insured named LC on August 15, 2014, September 15, 2014, October 23, 2014, and January 20, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Allied Health, D'Agostini, and Greene were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(ix)    Allied Health, D'Agostini, and Greene billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named LO on November 14, 2014, December 12, 2014, January 13, 2015, February 13, 2015, March 13, 2015, and April 13, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Allied Health, D'Agostini, and Greene were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(x)     Allied Health, D'Agostini, and Greene billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named CG on December 17, 2014, January 14, 2015, February 13, 2015, March 11, 2015, April 8, 2015, April 27, 2015, May 27, 2015, January 12, 2017, and February 10, 2017, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Allied Health, D'Agostini, and Greene were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xi)    Allied Health, D'Agostini, and Greene billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named JJ on April 22, 2015, May 26, 2015, June 24, 2015, July 22, 2015, August 17, 2015, and September 14, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the

90

treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Allied Health, D'Agostini, and Greene were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xii) Bound Brook, D'Agostini, and Fogarty billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named AR on May 20, 2015, June 19, 2015, July 16, 2015, and May 13, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Bound Brook, D'Agostini, and Fogarty were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xiii) Allied Health, D'Agostini, and Greene billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named TB on June 17, 2015, September 2, 2015, October 7, 2015, November 5, 2015, and December 2, 2015, , despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Allied Health, D'Agostini, and Greene were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xiv) Allied Health, D'Agostini, and Greene billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named MH on July 21, 2015, August 18, 2015, September 15, 2015, and October 14, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Allied Health, D'Agostini, and Greene were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xv) Allied Health, D'Agostini, and Greene billed GEICO for the follow-up

91

examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named CI on August 12, 2015, September 10, 2015, October 8, 2015, November 10, 2015, December 9, 2015, and January 21 ,2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Allied Health, D'Agostini, and Greene were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xvi)    Bound Brook, D'Agostini, and Fogarty billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named LM on September 16, 2015, October 16, 2015, November 16, 2015, December 17, 2015, January 20, 2016, February 24, 2016, April 8, 2016, and May 13, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Bound Brook, D'Agostini, and Fogarty were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xvii)   Bound Brook, D'Agostini, and Fogarty billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named EV on November 11, 2015, December 15, 2015., January 21, 2016, February 22, 2016, March 24, 2016, and April 25, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Bound Brook, D'Agostini, and Fogarty were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xviii)  Bound Brook, D'Agostini, and Fogarty billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named LH on December 3, 2015, December 31, 2015, January 29, 2016, March 1, 2016, April 1, 2016, May 9, 2016, and June 9, 2016, despite: (a) the absence of any definite

measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Bound Brook, D'Agostini, and Fogarty were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xix) Allied Health, D'Agostini, and Greene billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named OI on February 29, 2016, March 28, 2016, April 25, 2016, and May 25, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Allied Health, D'Agostini, and Greene were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xx) Bound Brook, D'Agostini, and Fogarty billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named LA on March 8, 2016, April 20, 2016, May 20, 2016, June 23, 2016, July 21, 2016, and August 22, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Bound Brook, D'Agostini, and Fogarty were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xxi) Allied Health, D'Agostini, and Greene billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named SH on April 4, 2016 and May 4, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Allied Health, D'Agostini, and Greene were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

93

(xxii)   Bound Brook, D'Agostini, and Fogarty billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named CM on April 7, 2016, May 11, 2016, June 14, 2016, July 15, 2016, September 23, 2016, and October 21, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Bound Brook, D'Agostini, and Fogarty were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xxiii)  Bound Brook, D'Agostini, and Fogarty billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named EH on February 17, 2016, March 16, 2016, April 13, 2016, May 11, 2016, June 23, 2016, and July 22, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Bound Brook, D'Agostini, and Fogarty were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xxiv)   Bound Brook, D'Agostini, and Fogarty billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named KA on June 8, 2016, July 8, 2016, August 8, 2016, September 12, 2016, and October 10, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Bound Brook, D'Agostini, and Fogarty were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xxv)    Allied Health, D'Agostini, and Greene billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named CJ on August 5, 2016, September 12, 2016, October 10, 2016, November 9, 2016, December 14, 2016, January 11, 2017, and February 15, 2017, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change

in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Allied Health, D'Agostini, and Greene were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

187.     These are only representative examples. In the claims for follow-up examinations identified in Exhibits "1" and "3", Allied Health, Bound Brook, D'Agostini, Fogarty, and Greene almost always billed for follow-up examinations that they purported to provide contemporaneously with chiropractic and/or physical therapy services, despite: (i) the absence of any definite measurable change in the patients' condition requiring significant change in the treatment plan; (ii) the absence of the patients' failure to respond to treatment, requiring a change in the treatment plan; (iii) the absence of any situation in which the patients' conditions became permanent, or a situation in which Allied Health, Bound Brook, D'Agostini, Fogarty, or Greene were preparing to discharge the patients; and (iv) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

188.     Similarly, Clinton Street, Gaccione, Johnson, Holsten, and Nettis routinely billed for follow-up examinations contemporaneously with chiropractic treatments, despite: (i) the absence of a definite measurable change in the patient's condition requiring significant change in the treatment plan; (ii) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (iii) the absence of any situation in which the patient's condition became permanent, or a situation in which the patient was ready for discharge; and (iv) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

189.    For example:

(i)     Clinton Street and Gaccione billed GEICO for the follow-up examinations they
        purported to provide contemporaneously with chiropractic treatments and/or
        physical therapy services to an Insured named SA on March 26, 2013, April 26,
        2013, and May 28, 2013, despite: (a) the absence of any definite measurable
        change in the patient's condition requiring significant change in the treatment
        plan; (b) the absence of the patient's failure to respond to treatment, requiring a
        change in the treatment plan; (c) the absence of any situation in which the
        patient's condition became permanent, or a situation in which Clinton Street and
        Gaccione were preparing to discharge the patient; and (d) the absence of any
        situation in which it was medically necessary to provide evaluation services over
        and above those normally provided during the therapeutic services.

(ii)    Clinton Street and Gaccione billed GEICO for the follow-up examinations they
        purported to provide contemporaneously with chiropractic treatments and/or
        physical therapy services to an Insured named JA on June 18, 2013, July 22,
        2013, and August 27, 2013, despite: (a) the absence of any definite measurable
        change in the patient's condition requiring significant change in the treatment
        plan; (b) the absence of the patient's failure to respond to treatment, requiring a
        change in the treatment plan; (c) the absence of any situation in which the
        patient's condition became permanent, or a situation in which Clinton Street and
        Gaccione were preparing to discharge the patient; and (d) the absence of any
        situation in which it was medically necessary to provide evaluation services over
        and above those normally provided during the therapeutic services.

(iii)   Clinton Street and Gaccione billed GEICO for the follow-up examinations they
        purported to provide contemporaneously with chiropractic treatments and/or
        physical therapy services to an Insured named CA on June 18, 2013, July 22,
        2013, and August 27, 2013, despite: (a) the absence of any definite measurable
        change in the patient's condition requiring significant change in the treatment
        plan; (b) the absence of the patient's failure to respond to treatment, requiring a
        change in the treatment plan; (c) the absence of any situation in which the
        patient's condition became permanent, or a situation in which Clinton Street and
        Gaccione were preparing to discharge the patient; and (d) the absence of any
        situation in which it was medically necessary to provide evaluation services over
        and above those normally provided during the therapeutic services.

(iv)    Clinton Street and Gaccione billed GEICO for the follow-up examinations they
        purported to provide contemporaneously with chiropractic treatments and/or
        physical therapy services to an Insured named JW on April 17, 2014, despite: (a)
        the absence of any definite measurable change in the patient's condition requiring
        significant change in the treatment plan; (b) the absence of the patient's failure to
        respond to treatment, requiring a change in the treatment plan; (c) the absence of
        any situation in which the patient's condition became permanent, or a situation in
        which Clinton Street and Gaccione were preparing to discharge the patient; and

96

      (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(v)      Clinton Street and Gaccione billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named MB on August 22, 2013, September 23, 2013, and October 22, 2013, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Clinton Street and Gaccione were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(vi)      Clinton Street, Gaccione, and Johnson billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named JB on January 8, 2015, February 19, 2015, March 12, 2015, and April 16, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Clinton Street, Gaccione, and Johnson were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(vii)      Clinton Street, Gaccione, and Nettis billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named PB on January 2, 2015, February 5, 2015, March 19, 2015, and April 24, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Clinton Street, Gaccione, and Nettis were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(viii)      Clinton Street, Gaccione, and Johnson billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named CH on February 13, 2015, March 17, 2015, May 19, 2015, and July 2, 2015, despite: (a) the

absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Clinton Street, Gaccione, and Johnson were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(ix) Clinton Street, Gaccione, and Nettis billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named OC on February 13, 2015, March 20, 2015, and May 28, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Clinton Street, Gaccione, and Nettis were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(x) Clinton Street, Gaccione, Holsten, and Nettis billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named CB on March 16, 2015, May 7, 2015, and June 15, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Clinton Street, Gaccione, Holsten, and Nettis were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xi) Clinton Street, Gaccione, and Holsten billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named AB on November 20, 2015, December 23, 2015, and February 1, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Clinton Street, Gaccione, and Holsten were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xii)    Clinton Street, Gaccione, and Holsten billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named JA on May 26, 2016, July 5, 2016, August 8, 2016, and September 6, 2016 despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Clinton Street, Gaccione, and Holsten were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xiii)    Clinton Street, Gaccione, and Holsten billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named GA on January 19, 2016, February 18, 2016, March 17, 2016, and April 14, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Clinton Street, Gaccione, and Holsten were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xiv)    Clinton Street, Gaccione, and Holsten billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named AA on January 19, 2016, February 18, 2016, March 17, 2016, and April 14, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Clinton Street, Gaccione, and Holsten were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xv)    Clinton Street, Gaccione, and Holsten billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named OA on May 2, 2016, June 6, 2016, and August 4, 2016 despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment,

requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Clinton Street, Gaccione, and Holsten were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

190. These are only representative examples. In the claims for follow-up examinations identified in Exhibit "2", Clinton Street, Gaccione, Johnson, Holsten, and Nettis almost always billed for follow-up examinations that they purported to provide contemporaneously with chiropractic services, despite: (i) the absence of any definite measurable change in the patients' condition requiring significant change in the treatment plan; (ii) the absence of the patients' failure to respond to treatment, requiring a change in the treatment plan; (iii) the absence of any situation in which the patients' conditions became permanent, or a situation in which Clinton Street, Gaccione, Johnson, Holsten, or Nettis were preparing to discharge the patients; and (iv) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

191. In the claims for follow-up examinations identified in Exhibits "1" – "3", Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis' charges for follow-up examinations routinely violated N.J.S.A. § 39:6A-4.6 and N.J.A.C. 11:3-29.6.

**D.    The Fraudulent Charges for Biofeedback Training**

192. In addition to their charges for the other Fraudulent Services, Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis also routinely billed GEICO for purported "biofeedback training" in many of the claims identified in Exhibits "1"-"3".

193. D'Agostini and Greene purported to provide virtually all of the biofeedback training services billed to GEICO through Allied Health, which were billed to GEICO under CPT code 90901, typically resulting in a charge of $114.92.

194. Similarly, D'Agostini, Greene, and Fogarty purported to provide virtually all of the biofeedback training services billed to GEICO through Bound Brook, which were billed to GEICO under CPT code 90901, typically resulting in a charge of $114.92.

195. Gaccione, Johnson, Holsten, and Nettis purported to provide virtually all of the biofeedback training services billed to GEICO through Clinton Street, which were billed to GEICO under CPT code 90901, typically resulting in a charge of $115.00.

196. The charges for biofeedback training submitted to GEICO through Allied Health, Bound Brook, and Clinton Street were fraudulent in that the biofeedback training was medically unnecessary and was provided – to the extent it was provided at all – in order to maximize the charges that the Defendants could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

197. Biofeedback training is a process that enables an individual to learn how to change physiological activity in order to improve health and performance.

198. In a legitimate biofeedback training session, patients are connected to precise instruments such as electromyographs, thermometers, electrodermographs, electroencephalographs, electrocardiographs, and the like, which are used to measure physiological activity such as brainwaves, heart function, breathing, muscle activity, and skin temperature. These instruments rapidly and accurately "feed back" information to the patient, who uses the information, and the treating physician's interpretation of the information, to learn how to control his or her own bodily functions – for instance, to relax a certain muscle group.

101

Over time, patients learn how to control these functions without the assistance of any equipment or healthcare provider.

199. The goal of any legitimate biofeedback training course is to teach patients how to control their own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

200. Therefore, any legitimate biofeedback training course must include meaningful documentation of, among other things:

(i)     the indication for biofeedback training within the overall treatment plan – in other words, the specific symptom or problem that the biofeedback training is intended to address;

(ii)    the type of biofeedback training that is being provided – for instance, the specific bodily functions that the patient is being trained to control;

(iii)   the specific instruments used to obtain feedback regarding each patient's bodily functions;

(iv)    the readings, or feedback, provided by the instruments during each training session, and the extent to which the readings or feedback vary from session-to-session; and

(v)     the progress of the patient, or lack thereof, through the course of training.

201. By contrast, in the claims for biofeedback training identified in Exhibits "1"-"3", Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis:

(i)     did not provide the Insureds who supposedly received the "biofeedback training" with any genuine interpretation of the test data regarding their bodily functions;

(ii)    did not document, in any meaningful way, the readings, or feedback, provided during each putative training session, or the extent to which the readings or feedback varied from session-to-session;

(iii)   did not document, in any meaningful way, any actual coaching or assistance that they provided to the Insureds with respect to controlling their bodily functions; and

(iv)   did not document, in any meaningful way, any Insured's progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching the Insureds how to control their own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

202.   For example:

(i)   Clinton Street and Gaccione billed GEICO more than $3,400.00 in connection with at least 30 putative "biofeedback training" sessions that they purported to provide an Insured named SA between February 2013 and July 2013. The charges for the putative biofeedback training sessions were fraudulent in that Clinton Street and Gaccione: (a) did not provide SA with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to SA with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, SA's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching SA how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(ii)   Clinton Street and Gaccione billed GEICO more than $4,900.00 in connection with at least 43 putative "biofeedback training" sessions that they purported to provide an Insured named MB between July 2013 and December 2013. The charges for the putative biofeedback training sessions were fraudulent in that Clinton Street and Gaccione: (a) did not provide MB with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to MB with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, MB's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching MB how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

103

(iii)   Clinton Street and Gaccione billed GEICO more than $7,000.00 in connection with at least 62 putative "biofeedback training" sessions that they purported to provide an Insured named AC between July 2013 and January 2014. The charges for the putative biofeedback training sessions were fraudulent in that Clinton Street and Gaccione: (a) did not provide AC with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to AC with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, AC's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching AC how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(iv)   Bound Brook, D'Agostini, and Fogarty billed GEICO more than $9,900.00 in connection with at least 73 putative "biofeedback training" sessions that they purported to provide an Insured named JC between February 2014 and June 2014. The charges for the putative biofeedback training sessions were fraudulent in that Bound Brook, D'Agostini, and Fogarty: (a) did not provide JC with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to JC with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, JC's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching JC how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(v)   Bound Brook, D'Agostini, and Fogarty billed GEICO more than $6,200.00 in connection with at least 51 putative "biofeedback training" sessions that they purported to provide an Insured named OF between March 2014 and July 2014. The charges for the putative biofeedback training sessions were fraudulent in that Bound Brook, D'Agostini, and Fogarty: (a) did not provide OF with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to OF with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, OF's supposed

progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching OF how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(vi)     Allied Health, D'Agostini, and Greene billed GEICO more than $8,000.00 in connection with at least 55 putative "biofeedback training" sessions that they purported to provide an Insured named BS between April 2014 and September 2014. The charges for the putative biofeedback training sessions were fraudulent in that Allied Health, D'Agostini, and Greene: (a) did not provide BS with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to BS with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, BS's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching BS how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(vii)    Allied Health, D'Agostini, and Greene billed GEICO more than $4,600.00 in connection with at least 31 putative "biofeedback training" sessions that they purported to provide an Insured named TF between May 2014 and July 2014. The charges for the putative biofeedback training sessions were fraudulent in that Allied Health, D'Agostini, and Greene: (a) did not provide TF with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to TF with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, TF's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching TF how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(viii)   Allied Health, D'Agostini, and Greene billed GEICO more than $7,100.00 in connection with at least 48 putative "biofeedback training" sessions that they purported to provide an Insured named JZ between June 2014 and November 2014. The charges for the putative biofeedback training sessions were fraudulent in that Allied Health, D'Agostini, and Greene: (a) did not provide JZ with any genuine interpretation of the test data regarding his bodily functions; (b) did not

document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to JZ with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, JZ's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching JZ how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(ix)    Clinton Street, Gaccione, and Johnson billed GEICO more than $2,700.00 in connection with at least 24 putative "biofeedback training" sessions that they purported to provide an Insured named CR between September 2014 and January 2015. The charges for the putative biofeedback training sessions were fraudulent in that Clinton Street, Gaccione, and Johnson: (a) did not provide CR with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to CR with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, CR's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching CR how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(x)    Bound Brook, D'Agostini, and Fogarty billed GEICO more than $5,200.00 in connection with at least 47 putative "biofeedback training" sessions that they purported to provide an Insured named OF between September 2014 and January 2015. The charges for the putative biofeedback training sessions were fraudulent in that Bound Brook, D'Agostini, and Fogarty: (a) did not provide OF with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to OF with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, OF's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching OF how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(xi)     Allied Health, D'Agostini, and Greene billed GEICO more than $3,300.00 in connection with at least 29 putative "biofeedback training" sessions that they purported to provide an Insured named JT between December 2014 and May 2015. The charges for the putative biofeedback training sessions were fraudulent in that Allied Health, D'Agostini, and Greene: (a) did not provide JT with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to JT with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, JT's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching JT how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(xii)    Clinton Street, Gaccione, Johnson, Nettis, and Holsten billed GEICO more than $2,700.00 in connection with at least 24 putative "biofeedback training" sessions that they purported to provide an Insured named MJ between February 2015 and June 2015. The charges for the putative biofeedback training sessions were fraudulent in that Clinton Street, Gaccione, Johnson, Nettis, and Holsten: (a) did not provide MJ with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to MJ with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, MJ's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching MJ how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(xiii)   Allied Health, D'Agostini, and Greene billed GEICO more than $11,000.00 in connection with at least 86 putative "biofeedback training" sessions that they purported to provide an Insured named WB between July 2015 and July 2016. The charges for the putative biofeedback training sessions were fraudulent in that Allied Health, D'Agostini, and Greene: (a) did not provide WB with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to WB with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, WB's supposed progress through the biofeedback training course, or make adjustments to the

107

training course, in order to achieve the ultimate goal of teaching WB how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(xiv)  Clinton Street, Gaccione, and Holsten billed GEICO more than $5,100.00 in connection with at least 45 putative "biofeedback training" sessions that they purported to provide an Insured named GA between December 2015 and June 2016. The charges for the putative biofeedback training sessions were fraudulent in that Clinton Street, Gaccione, and Holsten: (a) did not provide GA with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to GA with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, GA's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching GA how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(xv)  Bound Brook, D'Agostini, and Fogarty billed GEICO more than $6,000.00 in connection with at least 53 putative "biofeedback training" sessions that they purported to provide an Insured named JU between January 2016 and April 2016. The charges for the putative biofeedback training sessions were fraudulent in that Bound Brook, D'Agostini, and Fogarty: (a) did not provide JU with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to JU with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, JU's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching JU how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(xvi)  Clinton Street, Gaccione, and Holsten billed GEICO more than $3,700.00 in connection with at least 33 putative "biofeedback training" sessions that they purported to provide an Insured named JR between January 2016 and April 2016. The charges for the putative biofeedback training sessions were fraudulent in that Clinton Street, Gaccione, and Holsten: (a) did not provide JR with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training

session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to JR with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, JR's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching JR how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(xvii)  Allied Health, D'Agostini, and Greene billed GEICO more than $5,600.00 in connection with at least 49 putative "biofeedback training" sessions that they purported to provide an Insured named JC between March 2016 and August 2016. The charges for the putative biofeedback training sessions were fraudulent in that Allied Health, D'Agostini, and Greene: (a) did not provide JC with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to JC with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, JC's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching JC how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(xviii) Allied Health, D'Agostini, and Greene billed GEICO more than $8,500.00 in connection with at least 74 putative "biofeedback training" sessions that they purported to provide an Insured named MW between March 2016 and July 2016. The charges for the putative biofeedback training sessions were fraudulent in that Allied Health, D'Agostini, and Greene: (a) did not provide MW with any genuine interpretation of the test data regarding her bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to MW with respect to controlling her bodily functions; and (d) did not document, in any meaningful way, MW's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching MW how to control her own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(xix)   Clinton Street, Gaccione, and Holsten billed GEICO more than $5,100.00 in connection with at least 23 putative "biofeedback training" sessions that they

purported to provide an Insured named OA between April 2016 and October 2016. The charges for the putative biofeedback training sessions were fraudulent in that Clinton Street, Gaccione, and Holsten: (a) did not provide OA with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to OA with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, OA's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching OA how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(xx)     Bound Brook, D'Agostini, and Fogarty billed GEICO more than $7,400.00 in connection with at least 65 putative "biofeedback training" sessions that they purported to provide an Insured named JD between April 2016 and August 2016. The charges for the putative biofeedback training sessions were fraudulent in that Bound Brook, D'Agostini, and Fogarty: (a) did not provide JD with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to JD with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, JD's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching JD how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(xxi)    Allied Health, D'Agostini, and Greene billed GEICO more than $6,000.00 in connection with at least 53 putative "biofeedback training" sessions that they purported to provide an Insured named DC between May 2016 and August 2016. The charges for the putative biofeedback training sessions were fraudulent in that Allied Health, D'Agostini, and Greene: (a) did not provide DC with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to DC with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, DC's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching DC how to control his own bodily functions without using any instruments to provide

feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(xxii) Allied Health, D'Agostini, and Greene billed GEICO more than $3,000.00 in connection with at least 27 putative "biofeedback training" sessions that they purported to provide an Insured named NF between May 2016 and August 2016. The charges for the putative biofeedback training sessions were fraudulent in that Allied Health, D'Agostini, and Greene: (a) did not provide NF with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to NF with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, NF's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching NF how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(xxiii) Bound Brook, D'Agostini, and Fogarty billed GEICO more than $9,400.00 in connection with at least 42 putative "biofeedback training" sessions that they purported to provide an Insured named KA between June 2016 and October 2016. The charges for the putative biofeedback training sessions were fraudulent in that Bound Brook, D'Agostini, and Fogarty: (a) did not provide KA with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to KA with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, KA's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching KA how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(xxiv) Bound Brook, D'Agostini, and Fogarty billed GEICO more than $8,900.00 in connection with at least 78 putative "biofeedback training" sessions that they purported to provide an Insured named SP between September 2016 and January 2017. The charges for the putative biofeedback training sessions were fraudulent in that Bound Brook, D'Agostini, and Fogarty: (a) did not provide SP with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual

coaching or assistance that they provided to SP with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, SP's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching SP how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

(xxv) Allied Health, D'Agostini, and Greene billed GEICO more than $3,400.00 in connection with at least 30 putative "biofeedback training" sessions that they purported to provide an Insured named GA between September 2016 and January 2017. The charges for the putative biofeedback training sessions were fraudulent in that Allied Health, D'Agostini, and Greene: (a) did not provide GA with any genuine interpretation of the test data regarding his bodily functions; (b) did not document, in any meaningful way, the readings, or feedback, provided during each training session, or the extent to which the readings or feedback varied from session-to-session; (c) did not document, in any meaningful way, any actual coaching or assistance that they provided to GA with respect to controlling his bodily functions; and (d) did not document, in any meaningful way, GA's supposed progress through the biofeedback training course, or make adjustments to the training course, in order to achieve the ultimate goal of teaching GA how to control his own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

203.    Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis's pre-determined treatment protocol, including subjecting many Insured to medically useless "biofeedback training" was designed an employed by Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis to maximize their potential charges that they could submit, and cause to be submitted to GEICO, rather than to treat or otherwise benefit the Insureds.

## E.    The Fraudulent Charges for Chiropractic Services

204.    Pursuant to the phony, fabricated "diagnoses" that the Defendants provided during their fraudulent initial and follow-up examinations, Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis purported to subject virtually every Insured to months of medically-unnecessary chiropractic services,

comprised primarily of chiropractic manipulation, massage, therapeutic exercise, and electrical stimulation services, which they then billed to GEICO.

205.    Either D'Agostini or Greene purported to perform virtually all of the chiropractic services that were billed to GEICO through Allied Health.

206.    As set forth in Exhibit "1", Allied Health, D'Agostini, and Greene typically billed the chiropractic services to GEICO under CPT codes 97012, 97110, 97112, 97124, 98941, 98943, and electrical stimulation under Health Care Common Procedure Coding System ("HCCPCS") code G0283.

207.    Gaccione, Johnson, Holsten, or Nettis purported to perform virtually all of the chiropractic services that were billed to GEICO through Clinton Street.

208.    As set forth in Exhibit "2", Clinton Street, Gaccione, Johnson, Holsten, and Nettis typically billed the chiropractic services to GEICO under CPT codes 98941 and 98943.

209.    D'Agostini, Greene, or Fogarty purported to perform virtually all of the chiropractic services that were billed to GEICO through Bound Brook.

210.    As set forth in Exhibit "3", Bound Brook, D'Agostini, Greene, and Fogarty typically billed the chiropractic services to GEICO under CPT codes 97012, 97110, 97112, 97124, 98941, 98943, and electrical stimulation under Health Care Common Procedure Coding System ("HCCPCS") code G0283.

211.    In the claims for chiropractic services identified in Exhibits "1" – "3", the charges for chiropractic services were fraudulent in that the chiropractic services were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the phony results of the ersatz initial and follow-up examinations.

212.     As set forth above, to the extent that the Insureds in the claims identified Exhibits "1" – "3" suffered any healthcare problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary soft tissue injuries such as sprains and strains.

213.     The vast majority of soft tissue injuries such as sprains and strains resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to begin demonstrating at regular intervals why continued treatment is necessary beyond the four-week mark.

214.     The Care Paths are designed to avoid the continuation of treatment and therapy, week after week, over many months, without any observable improvement. See 30 N.J.R. 4401(a).

215.     Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis knew that – unless they could create a false basis to provide long-term, medically unnecessary chiropractic services to the Insureds in the claims identified in Exhibits "1" – "3" - their ability to provide such long-term, medically unnecessary treatments would be limited by the Care Paths.

216.     Accordingly, Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis used the phony, fabricated "diagnoses" provided during their fraudulent initial and follow-up examinations as a false basis to bill for months and months of medically unnecessary chiropractic treatment in gross deviation from the Care Paths.

217.     Towards that end, at the conclusion of virtually every purported follow-up examination in the claims identified in Exhibits "1" – "3", the examining chiropractor would

refer the Insureds back to Allied Health, Bound Brook, and Clinton Street for additional, medically unnecessary chiropractic "treatments".

218.    In keeping with the fact that these referrals for continued chiropractic "treatments" were not predicated on medical necessity, Allied Health, Bound Brook, and Clinton Street's own records frequently indicated that the previous, extensive chiropractic "treatments" that the Insureds had received had not been effective in resolving their purported complaints. For example:

(i)    On March 16, 2013, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and did not complain of any pain at the scene. In keeping with the fact that CM was not seriously injured, he did not visit any hospital following the minor accident. To the extent that CM was injured at all in the accident, the injuries were minor soft tissue injuries that did not require four months of chiropractic treatment. Even so, following purported follow-up examinations of CM by Gaccione on April 19, 2013, May 20, 2013, and June 20, 2013, Gaccione and Clinton Street routinely directed that CM continue to receive chiropractic treatment at Clinton Street, despite the fact that the large amount of chiropractic services CM previously had received supposedly had not resolved his purported symptoms. As a result of the medically unnecessary chiropractic directives by Gaccione and Clinton Street, CM received four months of purported chiropractic "treatment" at Clinton Street.

(ii)    On August 30, 2013, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured and did not complain of any pain at the scene. In keeping with the fact that MH was not seriously injured, she did not visit any hospital following the minor accident. To the extent that MH was injured at all in the minor accident, the injuries were minor soft tissue injuries that did not require five months of chiropractic treatment. Even so, following purported follow-up examinations of MH by Gaccione on October 31, 2013 and February 4, 2014, Gaccione and Clinton Street routinely directed that MH continue to receive chiropractic treatment at Clinton Street, despite the fact that the large amount of chiropractic services MH previously had received supposedly had not resolved her purported symptoms. As a result of the medically unnecessary chiropractic directives by Gaccione and Clinton Street, MH received five months of purported chiropractic "treatment" at Clinton Street.

(iii)     On October 7, 2013, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured, he did not visit any hospital following the minor accident. To the extent that AR was injured at all in the minor accident, the injuries were minor soft tissue injuries that did not require four months of chiropractic treatment. Even so, following purported follow-up examinations of AR by Gaccione on December 26, 2013, Gaccione and Clinton Street routinely directed that AR continue to receive chiropractic treatment at Clinton Street, despite the fact that the large amount of chiropractic services AR previously had received supposedly had not resolved his purported symptoms. As a result of the medically unnecessary chiropractic directives by Gaccione and Clinton Street, AR received four months of purported chiropractic "treatment" at Clinton Street.

(iv)     On November 27, 2013, an Insured named GH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that GH was not injured and did not complain of any pain. In keeping with the fact that GH was not seriously injured, he did not visit any hospital following the accident. To the extent that GH was injured at all in the accident, the injuries were minor soft tissue injuries that did not require seven months of chiropractic treatment. Even so, following purported follow-up examinations of GH by Greene on January 2, 2014, February 4, 2014, March 3, 2014, and April 2, 2014, Greene, D'Agostini, and Allied Health routinely directed that GH continue to receive chiropractic treatment at Allied Health, despite the fact that the large amount of chiropractic services GH previously had received supposedly had not resolved his purported symptoms. As a result of the medically unnecessary chiropractic directives by Greene, D'Agostini, and Allied Health, GH received seven months of purported chiropractic "treatment" at Allied Health.

(v)     On May 20, 2014, an Insured named HR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HR's vehicle was drivable following the accident. The police report further indicated that HR was not injured and did not complain of any pain. In keeping with the fact that HR was not seriously injured, he did not visit any hospital following the minor accident. To the extent that HR was injured at all in the minor accident, the injuries were minor soft tissue injuries that did not require seven months of chiropractic treatment. Even so, following purported follow-up examinations of HR by Greene on July 2, 2014, August 4, 2014, September 3, 2014, and September 29, 2014, Greene, D'Agostini, and Allied Health routinely directed that HR continue to receive chiropractic treatment at Allied Health, despite the fact that the large amount of chiropractic services HR previously had received supposedly had not resolved his purported symptoms. As

116

a result of the medically unnecessary chiropractic directives by Greene, D'Agostini, and Allied Health, HR received seven months of purported chiropractic "treatment" at Allied Health.

(vi)     On August 15, 2014, an Insured named CR was involved in an automobile accident. The contemporaneous police report indicated that CR's vehicle was drivable following the accident. The police report further indicated that CR was not injured and did not complain of any pain at the scene. In keeping with the fact that CR was not seriously injured, he did not visit any hospital following the accident. To the extent that CR was injured at all in the accident, the injuries were minor soft tissue injuries that did not require five months of chiropractic treatment. Even so, following purported follow-up examinations of CR by Johnson on October 16, 2014, November 17, 2014, and January 2, 2015, Johnson, Gaccione, and Clinton Street routinely directed that CR continue to receive chiropractic treatment at Clinton Street, despite the fact that the large amount of chiropractic services CR previously had received supposedly had not resolved his purported symptoms. As a result of the medically unnecessary chiropractic directives by Johnson, Gaccione, and Clinton Street, CR received five months of purported chiropractic "treatment" at Clinton Street.

(vii)    On August 29, 2014, an Insured named DC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DC's vehicle was drivable following the accident. The police report further indicated that DC was not injured and did not complain of any pain at the scene. In keeping with the fact that DC was not seriously injured, he did not visit any hospital following the minor accident. To the extent that DC was injured at all in the minor accident, the injuries were minor soft tissue injuries that did not require four months of chiropractic treatment. Even so, following purported follow-up examinations of DC by Johnson on October 20, 2014, November 20, 2014, December 22, 2014, and January 23, 2015, Johnson, Gaccione, and Clinton Street routinely directed that DC continue to receive chiropractic treatment at Clinton Street, despite the fact that the large amount of chiropractic services DC previously had received supposedly had not resolved his purported symptoms. As a result of the medically unnecessary chiropractic directives by Johnson, Gaccione, and Clinton Street, DC received four months of purported chiropractic "treatment" at Clinton Street.

(viii)   On November 25, 2014, an Insured named VG was involved in an automobile accident. The contemporaneous police report indicated that, although VG complained of back pain, he refused medical attention at the scene. In keeping with the fact that VG was not seriously injured, he did not visit any hospital following the accident. To the extent that VG was injured at all in the accident, the injuries were minor soft tissue injuries that did not require eight months of chiropractic treatment. Even so, following purported follow-up examinations of VG by Greene on January 16, 2015, February 17, 2015, March 16, 2015, April 13, 2015, and May 12, 2015, Greene, D'Agostini, and Allied Health routinely

directed that VG continue to receive chiropractic treatment at Allied Health, despite the fact that the large amount of chiropractic services VG previously had received supposedly had not resolved his purported symptoms. As a result of the medically unnecessary chiropractic directives by Greene, D'Agostini, and Allied Health, VG received eight months of purported chiropractic "treatment" at Allied Health.

(ix)    On December 4, 2014, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that LP's vehicle was drivable following the accident. The police report further indicated that LP was not injured and did not complain of any pain. In keeping with the fact that LP was not seriously injured, he did not visit any hospital following the minor accident. To the extent that LP was injured at all in the minor accident, the injuries were minor soft tissue injuries that did not require eight months of chiropractic treatment. Even so, following purported follow-up examinations of LP by Greene on January 14, 2015, February 11, 2015, March 9, 2015, April 7, 2015, and May 8, 2015, Greene, D'Agostini, and Allied Health routinely directed that LP continue to receive chiropractic treatment at Allied Health, despite the fact that the large amount of chiropractic services LP previously had received supposedly had not resolved his purported symptoms. As a result of the medically unnecessary chiropractic directives by Greene, D'Agostini, and Allied Health, LP received eight months of purported chiropractic "treatment" at Allied Health.

(x)    On January 10, 2015, an Insured named AV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AV's vehicle was drivable following the accident. The police report further indicated that AV was not injured and did not complain of any pain at the scene. In keeping with the fact that AV was not seriously injured, she did not visit any hospital following the accident. To the extent that AV was injured at all in the minor accident, the injuries were minor soft tissue injuries that did not require six months of chiropractic treatment. Even so, following purported follow-up examinations of AV by Fogarty on February 12, 2015, March 13, 2015, April 13, 2015, May 14, 2015, and June 17, 2015, Fogarty, D'Agostini, and Bound Brook routinely directed that AV continue to receive chiropractic treatment at Bound Brook, despite the fact that the large amount of chiropractic services AV previously had received supposedly had not resolved her purported symptoms. As a result of the medically unnecessary chiropractic directives by Fogarty, D'Agostini, and Bound Brook, AV received six months of purported chiropractic "treatment" at Bound Brook.

(xi)    On January 10, 2015, an Insured named GV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GV's vehicle was drivable following the accident. The police report further indicated that GV was not injured and did not complain of any pain at the scene. In keeping with the fact that GV was not

seriously injured, she did not visit any hospital following the accident. To the extent that GV was injured at all in the minor accident, the injuries were minor soft tissue injuries that did not require six months of chiropractic treatment. Even so, following purported follow-up examinations of GV by Fogarty on February 12, 2015, March 13, 2015, April 13, 2015, May 14, 2015, and June 17, 2015, Fogarty, D'Agostini, and Bound Brook continue to received that GV continue to receive chiropractic treatment at Bound Brook, despite the fact that the large amount of chiropractic services GV previously had received supposedly had not resolved her purported symptoms. As a result of the medically unnecessary chiropractic directives by Fogarty, D'Agostini, and Bound Brook, GV received six months of purported chiropractic "treatment" at Bound Brook.

(xii)   On July 18, 2015, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that JL's vehicle was drivable following the accident. The police report further indicated that, although JL complained of neck pain, he refused medical attention at the scene. In keeping with the fact that JL was not seriously injured, he did not visit any hospital following the accident. To the extent that JL was injured at all in the accident, the injuries were minor soft tissue injuries that did not require five months of chiropractic treatment. Even so, following purported follow-up examinations of JL by Greene on August 17, 2015, September 14, 2015, October 14, 2015, and December 9, 2015, Greene, D'Agostini, and Allied Health routinely directed that JL continue to receive chiropractic treatment at Allied Health, despite the fact that the large amount of chiropractic services JL previously had received supposedly had not resolved his purported symptoms. As a result of the medically unnecessary chiropractic directives by Greene, D'Agostini, and Allied Health, JL received five months of purported chiropractic "treatment" at Allied Health.

(xiii)  On January 15, 2016, an Insured named OI was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that OI's vehicle was drivable following the accident. The police report further indicated that OI was not injured and did not complain of any pain. In keeping with the fact that OI was not seriously injured, he did not visit any hospital following the minor accident. To the extent that OI was injured at all in the minor accident, the injuries were minor soft tissue injuries that did not require eight months of chiropractic treatment. Even so, following purported follow-up examinations of OI by Greene on February 29, 2016, March 28, 2016, April 25, 2016, and May 25, 2016, Greene, D'Agostini, and Allied Health routinely directed that OI continue to receive chiropractic treatment at Allied Health, despite the fact that the large amount of chiropractic services OI previously had received supposedly had not resolved her purported symptoms. As a result of the medically unnecessary chiropractic directives by Greene, D'Agostini, and Allied Health, OI received eight months of purported chiropractic "treatment" at Allied Health.

(xiv)   On January 22, 2016, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and did not complain of any pain at the scene. In keeping with the fact that CM was not seriously injured, she did not visit any hospital following the minor accident. To the extent that CM was injured at all in the minor accident, the injuries were minor soft tissue injuries that did not require eight months of chiropractic treatment. Even so, following purported follow-up examinations of CM by Fogarty on April 7, 2016, May 11, 2016, June 14, 2016, July 15, 2016, September 23, 2016, and October 21, 2016, Fogarty, D'Agostini, and Bound Brook routinely directed that CM continue to receive chiropractic treatment at Bound Brook, despite the fact that the large amount of chiropractic services CM previously had received supposedly had not resolved her purported symptoms. As a result of the medically unnecessary chiropractic directives by Fogarty, D'Agostini, and Bound Brook, CM received eight months of purported chiropractic "treatment" at Bound Brook.

(xv)   On February 2, 2016, an Insured named LA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that LA's vehicle was drivable following the accident. The police report further indicated that LA was not injured and did not complain of any pain at the scene. In keeping with the fact that LA was not seriously injured, she did not visit any hospital following the accident. To the extent that LA was injured at all in the accident, the injuries were minor soft tissue injuries that did not require eight months of chiropractic treatment. Even so, following purported follow-up examinations of LA by Fogarty on March 8, 2016, April 20, 2016, May 20, 2016, June 23, 2016, July 21, 2016, and August 22, 2016, Fogarty, D'Agostini, and Bound Brook routinely directed that LA continue to receive chiropractic treatment at Bound Brook, despite the fact that the large amount of chiropractic services LA previously had received supposedly had not resolved her purported symptoms. As a result of the medically unnecessary chiropractic directives by Fogarty, D'Agostini, and Bound Brook, LA received eight months of purported chiropractic "treatment" at Bound Brook.

(xvi)   On February 14, 2016, an Insured named IL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that IL's vehicle was drivable following the accident. The police report further indicated that IL was not injured and did not complain of any pain at the scene. In keeping with the fact that IL was not seriously injured, IL did not visit any hospital emergency room following the accident. To the extent that IL was injured at all in the minor accident, the injuries were minor soft tissue injuries that did not require more than six months of chiropractic treatment. Even so, following purported follow-up examinations of IL by Greene on March 23, 2016, April 25, 2016, May 24, 2016, July 8, 2016, and August 15, 2016, Greene, D'Agostini, and Allied Health routinely directed that IL

120

continue to receive chiropractic treatment at Allied Health, despite the fact that the large amount of chiropractic services IL previously had received supposedly had not resolved her purported symptoms. As a result of the medically unnecessary chiropractic directives by Greene, D'Agostini, and Allied Health, IL received more than six months of purported chiropractic "treatment" at Allied Health.

(xvii)   On February 14, 2016, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured and did not complain of any pain at the scene. In keeping with the fact that JP was not seriously injured, JP did not visit any hospital emergency room following the accident. To the extent that JP was injured at all in the minor accident, the injuries were minor soft tissue injuries that did not require six months of chiropractic treatment. Even so, following purported follow-up examinations of JP by Greene on March 19, 2016, April 18, 2016, May 17, 2016, June 20, 2016, and July 19, 2016, Greene, D'Agostini, and Allied Health routinely directed that JP continue to receive chiropractic treatment at Allied Health, despite the fact that the large amount of chiropractic services JP previously had received supposedly had not resolved her purported symptoms. As a result of the medically unnecessary chiropractic directives by Greene, D'Agostini, and Allied Health, JP received six months of purported chiropractic "treatment" at Allied Health.

(xviii)   On February 26, 2016, an Insured named NF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact rear-end collision, and that NF's vehicle was drivable following the accident. The police report further indicated that NF was not injured and did not complain of any pain at the scene. To the extent that NF was injured at all in the minor accident, the injuries were minor soft tissue injuries that did not require six months of chiropractic treatment. Even so, following purported follow-up examinations of NF by Greene on April 6, 2016, May 4, 2016, June 3, 2016, July 5, 2016, and August 6, 2016, Greene, D'Agostini, and Allied Health routinely directed that NF continue to receive chiropractic treatment at Allied Health, despite the fact that the large amount of chiropractic services NF previously had received supposedly had not resolved his purported symptoms. As a result of the medically unnecessary chiropractic directives by Greene, D'Agostini, and Allied Health, NF received six months of purported chiropractic "treatment" at Allied Health.

(xix)   On May 20, 2016, an Insured named ML was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that ML's vehicle was drivable following the accident. The police report further indicated that ML was not injured and did not complain of any pain at the scene. In keeping with the fact that ML was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that ML

121

was injured at all in the minor accident, the injuries were minor soft tissue injuries that did not require five months of chiropractic treatment. Even so, following purported follow-up examinations of ML by Greene on June 22, 2016, July 22, 2016, August 25, 2016, and September 22, 2016, Greene, D'Agostini, and Allied Health routinely directed that ML continue to receive chiropractic treatment at Allied Health, despite the fact that the large amount of chiropractic services ML previously had received supposedly had not resolved his purported symptoms. As a result of the medically unnecessary chiropractic directives by Greene, D'Agostini, and Allied Health, ML received five months of purported chiropractic "treatment" at Allied Health.

(xx)    On September 12, 2016, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that JD's vehicle was drivable following the accident. The police report further indicated that JD was not injured and did not complain of any pain at the scene. In keeping with the fact that JD was not seriously injured, she did not visit any hospital following the accident. To the extent that JD was injured at all in the accident, the injuries were minor soft tissue injuries that did not require five months of chiropractic treatment. Even so, following purported follow-up examinations of JD by Fogarty on October 28, 2016, November 28, 2016, January 30, 2017, and March 1, 2017, Fogarty, D'Agostini, and Bound Brook routinely directed that JD continue to receive chiropractic treatment at Bound Brook, despite the fact that the large amount of chiropractic services JD previously had received supposedly had not resolved her purported symptoms. As a result of the medically unnecessary chiropractic directives by Fogarty, D'Agostini, and Bound Brook, JD received five months of purported chiropractic "treatment" at Bound Brook.

219.    These are only representative examples. In virtually all of the claims for chiropractic services that are identified in Exhibits "1" – "3", Allied Health, Bound Brook, D'Agostini, Greene, Fogarty, Clinton Street, Gaccione, Johnson, Holsten, and Nettis used the phony "diagnoses" provided to the Insureds at the conclusion of the putative initial and follow-up examinations as a false basis to bill for months and months of medically unnecessary chiropractic treatment in gross deviation from the Care Paths.

220.    As set forth above, the Care Paths – which generally require healthcare providers to provide some objective justification for the medical necessity of continued healthcare services at the four-week, eight-week, and 13-week mark – are designed to avoid the continuation of

treatment and therapy, week after week, over many months and years, without any observable improvement. See 30 N.J.R. 4401(a).

221.    The Defendants' fraudulent scheme enabled them to bill for months of medically unnecessary chiropractic services per Insured, without regard for the Insureds' true circumstances or presentment.

**F.    The Fraudulent Charges for MUA Services**

222.    As set forth in Exhibits "1" and "2", based upon the fraudulent, pre-determined diagnoses they purported to provide virtually every Insured at the conclusion of their putative initial and follow-up examinations, Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione purported to subject many Insureds to chiropractic manipulation under anesthesia ("MUA").

223.    Either D'Agostini or Greene purported to perform virtually all of the MUA services that were billed to GEICO through Allied Health.

224.    As set forth in Exhibit "1", Allied Health, D'Agostini, and Greene then billed the putative MUA services to GEICO under CPT codes 22505, 23700, 27194, and 27275. The resulting amount billed to GEICO depended on the role Allied Health, D'Agostini, and Greene purported to perform during the MUA services. For example:

(i)      in many cases, either D'Agostini or Greene purported to be the "Attending Physician" performing the MUA procedure. In such instances, Allied Health, D'Agostini, and Greene typically submitted combined charges of at least $3,100.00 for the putative MUA; and

(ii)     in many other cases, either D'Agostini or Greene purported to be the "Co-Attending Physician", often purporting to assist Clinton Street and Gaccione in their provision of MUA services. In such instances, Allied Health, D'Agostini, and Greene typically submitted combined charges of at least $326.80 for the putative MUA.

225.     Gaccione purported to perform virtually all of the MUA services that were billed to GEICO through Clinton Street.

226.     As set forth in Exhibit "2", Clinton Street and Gaccione then billed the putative MUA services to GEICO under CPT codes 22505, 23700, 27194, and 27275, generally resulting in combined charges of at least $3,500.00.

227.     Like the charges for the other Fraudulent Services, the charges for the MUA services were fraudulent in that the MUA services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' pre-determined treatment protocol in order to maximize the potential charges they could submit, rather than to treat or otherwise benefit the Insureds.

**1.      The Illegal Self-Referrals for MUA Services**

228.     As set forth above, the Codey Law provides – in substance – that a "practitioner" may not refer a patient to a "healthcare service" in which the practitioner has a "significant beneficial interest". See N.J.S.A. 45:9–22.5.

229.     However – and again, as set forth above – the Codey Law's restrictions on patient referrals do not apply to:

> medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office … .

See id.

230.     What is more, pursuant to the ASC Exception described above, the Codey Law's restrictions on patient referrals also do not apply to "ambulatory surgery or procedures requiring anesthesia performed at a surgical practice registered with the Department of Health . . . or at an ambulatory care facility licensed by the Department of Health to perform surgical and related

services or lithotripsy services", provided that – among other things – the practitioner who provided the referral "personally performs the procedure". See id.

231. D'Agostini, Greene, Fogarty, Gaccione, Johnson, Holsten, and Nettis – as licensed chiropractors – were "practitioners" as defined by the Codey Law. See N.J.S.A. 45:9–22.4.

232. Allied Health, Bound Brook, and Clinton Street were "healthcare services", in that they were "business entit[ies] which provide[d] on an inpatient or outpatient basis: … diagnosis or treatment of human disease or dysfunction … ." Id.

233. In the context of the Codey Law, D'Agostini – who owned Allied Health and Bound Brook – had a "significant beneficial interest" in both Allied Health and Bound Brook. Id.

234. In the context of the Codey Law, Greene was D'Agostini's employee at Allied Health and Bound Brook.

235. In the context of the Codey Law, Fogarty was D'Agostini's employee at Bound Brook.

236. In the context of the Codey Law, Gaccione – who owned Clinton Street – had a "significant beneficial interest" in Clinton Street.

237. In the context of the Codey Law, Johnson, Holsten, and Nettis were Gaccione's employees at Clinton Street.

238. In the context of the Codey Law, virtually all of the MUA services in the claims identified in Exhibits "1" and "2" were performed at various ambulatory surgical facilities – including McBride Surgical Center, Clifton Surgery Center, and AP Surgical Center – all of which were "licensed by the Department of Health and Senior Services to perform surgical and related services." Id.

239.    In virtually every claim for MUA services identified in Exhibit "1", D'Agostini, Greene, or Fogarty would examine the Insured at Allied Health or Bound Brook's offices, and then self-refer the Insured to Allied Health for the pertinent MUA services, which were performed at an ambulatory surgical facility, rather than at Allied Heath's offices.

240.    Similarly, in virtually every claim for MUA services identified in Exhibit "2", Gaccione, Johnson, Holsten, or Nettis would examine the Insured at Clinton Street's offices, and then self-refer the Insured to Clinton Street for the pertinent MUA services, which were performed at an ambulatory surgical facility, rather than at Clinton Street's offices.

241.    As a result, in virtually every claim for MUA services identified in Exhibits "1" and "2", the Codey Law exception for "medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office" did not apply.

242.    What is more, and as outlined above, the ASC Exception to the Codey Law does not apply unless, among other things, "the practitioner who provided the referral personally performs the procedure."

243.    Even so, in many of the claims for MUA services identified in Exhibits "1" and "2", practitioners other than those who provided the referral purported to perform the resulting MUA services at the various ambulatory surgery facilities.

244.    For example:

(i)    On or about April 24, 2014, D'Agostini self-referred an Insured named GH to Allied Health for MUA services. The MUA services were performed on April 27, 2014 at Clifton Surgery Center by Greene, and therefore did not qualify for the ASC Exception, as they were not personally performed by the practitioner who provided the referral. Even so, D'Agostini, Greene, and Allied Health billed GEICO $699.03 for the MUA services, which were the product of an illegal self-referral.

(ii)     On or about July 18, 2014, D'Agostini self-referred an Insured named ER from Bound Brook to Allied Health for MUA services. The MUA services were performed on November 22, 2013 at Clifton Surgery Center by Greene, and therefore did not qualify for the ASC Exception, as they were not personally performed by the practitioner who provided the referral. Even so, Gaccione, Greene, and Allied Health billed GEICO $1,066.40 for the MUA services, which were the product of an illegal self-referral.

(iii)    On or about July 18, 2014, Fogarty – at D'Agostini's direction – self-referred an Insured named AR from Bound Brook to Allied Health for MUA services. The MUA services were performed on July 26, 2014 at Clifton Surgery Center by D'Agostini and Greene, and therefore did not qualify for the ASC Exception, as they were not personally performed by the practitioner who provided the referral. Even so, Gaccione, Greene, and Allied Health billed GEICO $5,394.00 for the MUA services, which were the product of an illegal self-referral.

(iv)     On or about July 25, 2014, Fogarty – at D'Agostini's direction – self-referred an Insured named LH from Bound Brook to Allied Health for MUA services. The MUA services were performed on July 26, 2014 at Clifton Surgery Center by Greene, and therefore did not qualify for the ASC Exception, as they were not personally performed by the practitioner who provided the referral. Even so, Gaccione, Greene, and Allied Health billed GEICO $1,066.40 for the MUA services, which were the product of an illegal self-referral.

(v)      On or about October 30, 2014, Johnson – at Gaccione's direction – self-referred an Insured named PP to Clinton Street for MUA services. The MUA services were performed on November 16, 2014 at New Horizon Surgical Center by Gaccione, and therefore did not qualify for the ASC Exception, as they were not personally performed by the practitioner who provided the referral. Even so, Gaccione and Clinton Street billed GEICO $4,328.00 for the MUA services, which were the product of an illegal self-referral.

(vi)     On or about April 13, 2015, Nettis – at Gaccione's direction – self-referred an Insured named OC to Clinton Street for MUA services. The MUA services were performed on April 15, 2015 at McBride Surgical Center by Gaccione, and therefore did not qualify for the ASC Exception, as they were not personally performed by the practitioner who provided the referral. Even so, Gaccione and Clinton Street billed GEICO $4,328.00 for the MUA services, which were the product of an illegal self-referral.

(vii)    On or about April 14, 2015, Nettis – at Gaccione's direction – self-referred an Insured named AR to Clinton Street for MUA services. The MUA services were performed on April 16, 2015 at McBride Surgical Center by Gaccione, and therefore did not qualify for the ASC Exception, as they were not personally performed by the practitioner who provided the referral. Even so, Gaccione and

127

Clinton Street billed GEICO $4,328.00 for the MUA services, which were the product of an illegal self-referral.

(viii) On or about May 12, 2015, Nettis – at Gaccione's direction – self-referred an Insured named AU to Clinton Street for MUA services. The MUA services were performed on May 20, 2015 at McBride Surgical Center by Gaccione, and therefore did not qualify for the ASC Exception, as they were not personally performed by the practitioner who provided the referral. Even so, Gaccione and Clinton Street billed GEICO $4,324.54 for the MUA services, which were the product of an illegal self-referral.

(ix) On or about May 12, 2015, Nettis – at Gaccione's direction – self-referred an Insured named KL to Clinton Street for MUA services. The MUA services were performed on May 20, 2015 at McBride Surgical Center by Gaccione, and therefore did not qualify for the ASC Exception, as they were not personally performed by the practitioner who provided the referral. Even so, Gaccione and Clinton Street billed GEICO $4,324.54 for the MUA services, which were the product of an illegal self-referral.

(x) On or about July 13, 2015, Holsten – at Gaccione's direction – self-referred an Insured named NJ to Clinton Street for MUA services. The MUA services were performed on July 15, 2015 at McBride Surgical Center by Gaccione, and therefore did not qualify for the ASC Exception, as they were not personally performed by the practitioner who provided the referral. Even so, Gaccione and Clinton Street billed GEICO $4,324.54 for the MUA services, which were the product of an illegal self-referral.

(xi) On or about April 22, 2016, Holsten – at Gaccione's direction – self-referred an Insured named ST to Clinton Street for MUA services. The MUA services were performed on April 27, 2016 at McBride Surgical Center by Gaccione, and therefore did not qualify for the ASC Exception, as they were not personally performed by the practitioner who provided the referral. Even so, Gaccione and Clinton Street billed GEICO $4,324.54 for the MUA services, which were the product of an illegal self-referral.

## 2.     The Medically-Unnecessary MUA Services

245.    MUA involves a series of mobilization, stretching, and traction procedures performed on a patient's musculoskeletal system, while the patient is under sedation.

246.    Anesthesia is purportedly used to reduce pain, spasms, and muscle guarding that otherwise might occur in an unsedated patient.

247.    MUA is a moderately accepted treatment for a limited set of isolated joint conditions, such as arthrofibrosis of the knee and adhesive capsulitis, as well as to reduce displaced fractures.

248.    By contrast, there is a dearth of quality supportive scientific evidence for the use of MUA on most other areas of the body, including the spine, hip, and shoulder. There are no randomized controlled trials or published cohort studies on management of specific diagnoses of the spine, hip, or shoulder via MUA.

249.    Virtually no reliable evidence exists showing the long-term benefits of MUA.

250.    As set forth in Exhibits "1" and "2", virtually every Insured who purportedly received MUA services from Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione supposedly had their spine, hip, and/or shoulder manipulated.

251.    Given the lack of quality scientific evidence supporting the use of MUA on the spine, hip, or shoulder, the MUA services purportedly provided by Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione to GEICO Insureds plainly were not medically necessary.

252.    As set forth above, virtually all of the Insured in the claims identified in Exhibits "1" - 3" were involved in relatively minor "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

253.    The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to begin demonstrating at regular intervals why continued treatment is necessary beyond the four-week mark.

254.    Procedures requiring anesthesia – including MUA – involve a level of risk to the patient that is not present in conservative forms of treatment that do not require anesthesia.

255. Even so, Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione routinely provided medically MUA services to Insureds who had been involved in very minor accidents – and who had not suffered any injury more serious than a sprain or strain – months after the underlying accidents, long after the Insureds' minor sprains and strains had resolved.

256. For example:

(i)     On March 16, 2013, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and did not complain of any pain at the scene. In keeping with the fact that CM was not seriously injured, he did not visit any hospital following the minor accident. To the extent that CM experienced any injuries at all as the result of the minor accident, the injuries were minor soft tissue injuries and had resolved within two or three months of the accident. Even so, Gaccione and Clinton Street purported to provide CM with medically unnecessary MUA services on July 12, 2013, July 13, 2013, and July 14, 2013 – four months after CM's minor accident and long after any legitimate symptoms CM experienced as the result of the minor accident had resolved.

(ii)    On October 7, 2013, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured, he did not visit any hospital following the minor accident. To the extent that AR experienced any injuries at all as the result of the minor accident, the injuries were minor soft tissue injuries and had resolved within two or three months of the accident. Even so, Gaccione, Clinton Street, Greene, D'Agostini, and Allied Health purported to provide AR with medically unnecessary MUA services – with Gaccione serving as the putative "Attending Physician" and Greene as the putative "Co-Attending Physician" - on April 25, 2014, April 26, 2014, and April 27, 2014. The MUA services were purportedly provided more than six months after AR's minor accident, long after any legitimate symptoms AR experienced as the result of the minor accident had resolved.

(iii)   On October 24, 2013, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not

seriously injured, he did not visit any hospital following the accident. To the extent that JR experienced any injuries at all as the result of the minor accident, the injuries were minor soft tissue injuries and had resolved within two or three months of the accident. Even so, Gaccione and Clinton Street purported to provide JR with medically unnecessary MUA services on March 21, 2014 and March 23, 2014 – four months after JR's minor accident and long after any legitimate symptoms JR experienced had resolved.

(iv)    On November 27, 2013, an Insured named GH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that GH was not injured and did not complain of any pain. In keeping with the fact that GH was not seriously injured, he did not visit any hospital following the accident. To the extent that GH experienced any injuries at all as the result of the accident, the injuries were minor soft tissue injuries and had resolved within two or three months of the accident. Even so, Gaccione, Clinton Street, Greene, D'Agostini, and Allied Health – with Gaccione serving as the putative "Attending Physician" and Greene as the putative "Co-Attending Physician" - on April 27, 2014. The medically-unnecessary MUA services were purportedly provided six months after GH's accident, long after any legitimate symptoms GH experienced had resolved.

(v)    On May 20, 2014, an Insured named HR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HR's vehicle was drivable following the accident. The police report further indicated that HR was not injured and did not complain of any pain. In keeping with the fact that HR was not seriously injured, he did not visit any hospital following the minor accident. To the extent that HR experienced any injuries at all as the result of the minor accident, the injuries were minor soft tissue injuries and had resolved within two or three months of the accident. Even so, Gaccione, Clinton Street, Greene, D'Agostini, and Allied Health purported to provide PP with medically unnecessary MUA services – with Gaccione serving as the putative "Attending Physician" and Greene as the putative "Co-Attending Physician" - on October 25, 2014 and October 26, 2014. The MUA services were purportedly provided more than five months after HR's minor accident, long after any legitimate symptoms HR experienced as the result of the minor accident had resolved.

(vi)    On June 4, 2014, an Insured named PP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PP's vehicle was drivable following the accident. The police report further indicated that PP was not injured and did not complain of any pain at the scene. To the extent that PP experienced any injuries at all as the result of the minor accident, the injuries were minor soft tissue injuries and had resolved within two or three months of the accident. Even so, Gaccione, Clinton Street, Greene, D'Agostini, and Allied Health purported to provide PP with medically unnecessary MUA services – with Gaccione serving as the

131

putative "Attending Physician" and Greene as the putative "Co-Attending Physician" - on November 14, 2014, November 15, 2014, and November 16, 2014. The MUA services were purportedly provided more than five months after PP's minor accident, long after any legitimate symptoms PP experienced as the result of the minor accident had resolved.

(vii) On November 25, 2014, an Insured named VG was involved in an automobile accident. The contemporaneous police report indicated that, although VG complained of back pain, he refused medical attention at the scene. In keeping with the fact that VG was not seriously injured, he did not visit any hospital following the accident. To the extent that VG experienced any injuries at all as the result of the accident, the injuries were minor soft tissue injuries and had resolved within two or three months of the accident. Even so, D'Agostini, Greene, and Allied Health purported to provide VG with medically unnecessary MUA services on May 31, 2015 – more than six months after VG's minor accident and long after any legitimate symptoms VG experienced had resolved.

(viii) On December 4, 2014, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that LP's vehicle was drivable following the accident. The police report further indicated that LP was not injured and did not complain of any pain. In keeping with the fact that LP was not seriously injured, he did not visit any hospital following the minor accident. To the extent that LP experienced any injuries at all as the result of the minor accident, the injuries were minor soft tissue injuries and had resolved within two or three months of the accident. Even so, D'Agostini, Greene, and Allied Health purported to provide LP with medically unnecessary MUA services on May 30, 2015 and May 31, 2015 – more than six months after LP's minor accident and long after any legitimate symptoms LP experienced had resolved.

(ix) On January 15, 2016, an Insured named OI was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that OI's vehicle was drivable following the accident. The police report further indicated that OI was not injured and did not complain of any pain. In keeping with the fact that OI was not seriously injured, he did not visit any hospital following the minor accident. To the extent that OI experienced any injuries at all as the result of the minor accident, the injuries were minor soft tissue injuries and had resolved within two or three months of the accident. Even so, D'Agostini, Greene, and Allied Health purported to provide OI with medically unnecessary MUA services on August 5, 2016, August 6, 2016, August 7, 2016, and August 8, 2016 – more than six months after OI's minor accident and long after any legitimate symptoms OI experienced had resolved.

257. As set forth above, it is highly improbable that any two Insureds involved in any one of the automobile accidents in the claims identified in Exhibits "1" – "3" would suffer

substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

258.    It is even more improbable – to the point of impossibility – that this would occur over and over again.

259.    Even so, in keeping with the fact that Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione provided their purported MUA services pursuant to a pre-determined, fraudulent treatment and billing protocol designed to maximize their billing, rather than to treat or otherwise benefit the Insureds who were subjected to them, Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione frequently purported to provide a substantially identical course of MUA services to two or more Insureds who were involved in the same underlying accident.

260.    For example:

(i)     On September 5, 2013, two Insureds – TC and AH – were involved in the same automobile accident. TC and AH were different ages, in different physical condition, and experienced the impact different positions in the vehicle. Even so, Gaccione, Clinton Street, Greene, D'Agostini, and Allied Health purported to provide substantially identical MUA to both TC and AH on March 22, 2014.

(ii)    On November 11, 2013, two Insureds – LH and AR – were involved in the same automobile accident. LH and AR were different ages, different sexes, in different physical condition, and experienced the impact different positions in the vehicle. Even so, Gaccione, Clinton Street, Greene, D'Agostini, and Allied Health purported to provide substantially identical MUA to both LH and AR on May 9, 2013 and May 14, 2013.

(iii)   On June 22, 2014, two Insureds – RP and RM – were involved in the same automobile accident. RP and RM were different ages, in different physical condition, and experienced the impact different positions in the vehicle. Even so, Greene, D'Agostini, and Allied Health purported to provide substantially identical MUA to both RP and RM on April 25, 2015, April 26, 2015, May 29, 2015, and May 30, 2015.

(iv)    On December 2, 2014, two Insureds – KL and AA – were involved in the same automobile accident. KL and AA were different ages, in different physical

condition, and experienced the impact different positions in the vehicle. Even so, Gaccione and Clinton Street purported to provide substantially identical MUA to both KL and AA on May 20, 2015 and May 21, 2015.

(v)    On June 29, 2015, two Insureds – RG and EH – were involved in the same automobile accident. RG and EH were different ages, in different physical condition, and experienced the impact different positions in the vehicle. Even so, Gaccione, Clinton Street, Greene, D'Agostini, and Allied Health purported to provide substantially identical MUA to both RG and EH on December 6, 2015 and January 16, 2016.

(vi)    On October 3, 2015, two Insureds – JH and SH– were involved in the same automobile accident. JH and SH were different ages, different sexes, in different physical condition, and experienced the impact different positions in the vehicle. Even so, Greene, D'Agostini, and Allied Health purported to provide substantially identical MUA to both JH and SH on March 5, 2016 and March 6, 2016.

**3.    The Fraudulent Charges for Serial MUA**

261.    In further keeping with the fact that Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione provided their purported MUA services pursuant to a pre-determined, fraudulent treatment and billing protocol designed to maximize their billing, rather than to treat or otherwise benefit the Insureds who were subjected to them, Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione used pre-printed, boilerplate forms to report the results of their putative MUA services. These pre-printed, boilerplate forms contained virtually identical language from one MUA "procedure" to the next.

262.    The National Academy of Manipulation Under Anesthesia Physicians ("NAMUAP") has adopted guidelines for the optimal use and provision of MUA services (the "NAMUAP Guidelines").

263.    According to the NAMUAP Guidelines, serial MUA services – i.e., MUA services provided to a single patient on multiple dates of service – are medically necessary only under certain limited circumstances.

264.    Specifically, according to the NAMUAP Guidelines, if a patient regains 80% of

134

more of their biomechanical function following the first day's MUA services, further serial MUA is usually unnecessary.

265.    By contrast, according to the NAMUAP Guidelines, if patient regains between 50% and 70% of their biomechanical function following a single MUA session, a second or even third day of serial MUA services could be medically indicated.

266.    As practitioners regularly purporting to provide MUA services, Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione were well-aware of the NAMUAP Guidelines.

267.    Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione knew that, pursuant to the NAMUAP Guidelines, they needed to create the appearance that – following their first round of MUA – the Insureds experienced between a 50% and 70% improvement of their biomechanical functionality in order to justify a second and third session of serial MUA services.

268.    In order to create the false appearance the Insureds in the claims for MUA services identified in Exhibits "1" and "2" had improved biomechanical functionality, Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione purported to test the Insureds' range of motion following their provision of the MUA services.

269.    The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion". Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

270.    A range of motion test consists of a measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint.  In a range of motion test, the chiropractor asks the patient to move his or her joints at various angles, or the chiropractor moves the joints. The

chiropractor then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

271.    At the conclusion of their putative MUA services, Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione purported to measure the pertinent Insured's range of motion, ostensibly to ascertain: (i) the effectiveness of the completed MUA services; and (ii) the need for additional MUA services.

272.    Each time Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione purported to perform range of motion testing, they purported to note the progression of the Insureds' improvement. Then, Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione used the results of their range of motion testing to justify additional MUA services.

273.    At the conclusion of Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione's pre-printed, boilerplate MUA "reports", Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione purported to indicate the Insured's putative "improvement" as the result of the MUA services.

274.    It is simply impossible that all of the Insureds who purportedly were provided with MUA services in the claims identified in Exhibits "1" and "2" would have their range of motion improve at an identical rate.

275.    Moreover, it is simply impossible that the rate of range of motion improvement for Insureds purported to have been provided with MUA services in the claims identified in Exhibits "1" and "2" would, "coincidentally", be the identical rates of improvement referenced in the NAMUAP Guidelines.

276.    However, in keeping with the fact that the MUA services were fraudulent and medically unnecessary, Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione simply

fabricated the results of their range of motion "testing" to comport with the NAMUAP Guidelines.

277.     Specifically, Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione made the following false notations to create the phony impression that the serial MUA services were medically necessary:

(i)     following the first day of MUA services: "Patient has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA"; and

(ii)     following the second day of MUA services: "Patient has regained approximately 70% of ROM in spine & ext. Proceed to 3rd MUA".

278.     Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione made these identical notations at the conclusion of virtually every first and second MUA report they submitted to GEICO attendant to the bills for MUA services in order to create the false appearance that: (i) the completed MUA services had been of some medical utility; and (ii) the subsequent MUA services were medically necessary.

279.     For example:

(i)     On July 12, 2013, Clinton Street and Gaccione purported to provide MUA services to an Insured named CM. Following the MUA services, Clinton Street and Gaccione generated a phony, boilerplate post-MUA "report", in which they falsely reported that "Pt. has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA". Then, pursuant to their phony finding of the Insured's "improvement", Clinton Street and Gaccione again purported to provide MUA services to CM the next day, July 13, 2013. What is more, following the second day of MUA services, Clinton Street and Gaccione generated a second phony, boilerplate post-MUA "report", in which they falsely reported that "Pt. has regained approximately 70% of ROM in spine & ext. Proceed to 3rd MUA". Then, pursuant to their phony finding of the Insured's further "improvement", Clinton Street and Gaccione again purported to provide MUA services to CM the next day, July 14, 2013.

(ii)     On November 22, 2013, Clinton Street and Gaccione purported to provide MUA services to an Insured named ER. Following the MUA services, A Clinton Street and Gaccione generated a phony, boilerplate post-MUA "report", in which they falsely reported that "Pt. has regained approximately 50% of ROM in spine & ext.

Proceed to 2nd MUA". Then, pursuant to their phony finding of the Insured's "improvement", Clinton Street and Gaccione again purported to provide MUA services to ER the next day, November 23, 2013. What is more, following the second day of MUA services, Clinton Street and Gaccione generated a second phony, boilerplate post-MUA "report", in which they falsely reported that "Pt. has regained approximately 70% of ROM in spine & ext. Proceed to 3rd MUA". Then, pursuant to their phony finding of the Insured's further "improvement", Clinton Street and Gaccione again purported to provide MUA services to ER the next day, November 24, 2013.

(iii)   On January 17, 2014, Clinton Street and Gaccione purported to provide MUA services to an Insured named MA. Following the MUA services, Clinton Street and Gaccione generated a phony, boilerplate post-MUA "report", in which they falsely reported that "Pt. has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA". Then, pursuant to their phony finding of the Insured's "improvement", Clinton Street and Gaccione again purported to provide MUA services to MA the next day, January 18, 2014. What is more, following the second day of MUA services, Clinton Street and Gaccione generated a second phony, boilerplate post-MUA "report", in which they falsely reported that "Pt. has regained approximately 70% of ROM in spine & ext. Proceed to 3rd MUA". Then, pursuant to their phony finding of the Insured's further "improvement", Clinton Street and Gaccione again purported to provide MUA services to MA the next day, January 19, 2014.

(iv)   On April 25, 2014, Clinton Street and Gaccione purported to provide MUA services to an Insured named AR. Following the MUA services, Clinton Street and Gaccione generated a phony, boilerplate post-MUA "report", in which they falsely reported that "Pt. has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA". Then, pursuant to their phony finding of the Insured's "improvement", Clinton Street and Gaccione again purported to provide MUA services to AR the next day, April 26, 2014. What is more, following the second day of MUA services, Clinton Street and Gaccione generated a second phony, boilerplate post-MUA "report", in which they falsely reported that "Pt. has regained approximately 70% of ROM in spine & ext. Proceed to 3rd MUA". Then, pursuant to their phony finding of the Insured's further "improvement", Clinton Street and Gaccione again purported to provide MUA services to AR the next day, April 27, 2014.

(v)   On May 16, 2014, Clinton Street and Gaccione purported to provide MUA services to an Insured named CR. Following the MUA services, Clinton Street and Gaccione generated a phony, boilerplate post-MUA "report", in which they falsely reported that "Pt. has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA". Then, pursuant to their phony finding of the Insured's "improvement", Clinton Street and Gaccione again purported to provide MUA services to CR the next day, May 17, 2014. What is more, following the second day of MUA services, Clinton Street and Gaccione generated a second phony,

boilerplate post-MUA "report", in which they falsely reported that "<u>Pt. has regained approximately 70% of ROM in spine & ext. Proceed to 3rd MUA</u>". Then, pursuant to their phony finding of the Insured's further "improvement", Clinton Street and Gaccione again purported to provide MUA services to CR the next day, May 18, 2014.

(vi) On July 26, 2014, Clinton Street and Gaccione purported to provide MUA services to an Insured named LH. Following the MUA services, Clinton Street and Gaccione generated a phony, boilerplate post-MUA "report", in which they falsely reported that "<u>Pt. has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA</u>". Then, pursuant to their phony finding of the Insured's "improvement", Clinton Street and Gaccione again purported to provide MUA services to LH the next day, July 27, 2014.

(vii) On October 25, 2014, Clinton Street and Gaccione purported to provide MUA services to an Insured named HR. Following the MUA services, Clinton Street and Gaccione generated a phony, boilerplate post-MUA "report", in which they falsely reported that "<u>Pt. has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA</u>". Then, pursuant to their phony finding of the Insured's "improvement", Clinton Street and Gaccione again purported to provide MUA services to HR the next day, October 26, 2014.

(viii) On November 14, 2014, Clinton Street and Gaccione purported to provide MUA services to an Insured named PP. Following the MUA services, Clinton Street and Gaccione generated a phony, boilerplate post-MUA "report", in which they falsely reported that "<u>Pt. has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA</u>". Then, pursuant to their phony finding of the Insured's "improvement", Clinton Street and Gaccione again purported to provide MUA services to PP the next day, November 15, 2014. What is more, following the second day of MUA services, Clinton Street and Gaccione generated a second phony, boilerplate post-MUA "report", in which they falsely reported that "<u>Pt. has regained approximately 70% of ROM in spine & ext. Proceed to 3rd MUA</u>". Then, pursuant to their phony finding of the Insured's further "improvement", Clinton Street and Gaccione again purported to provide MUA services to PP the next day, November 16, 2014.

(ix) On April 25, 2015, Allied Health, D'Agostini, and Greene purported to provide MUA services to an Insured named RP. Following the MUA services, Allied Health, D'Agostini, and Greene generated a phony, boilerplate post-MUA "report", in which they falsely reported that "<u>Patient has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA</u>". Then, pursuant to their phony finding of the Insured's "improvement", Allied Health, D'Agostini, and Greene again purported to provide MUA services to RP the next day, April 26, 2015.

(x) On May 29, 2015, Allied Health, D'Agostini, and Greene purported to provide MUA services to an Insured named RM. Following the MUA services, Allied

Health, D'Agostini, and Greene generated a phony, boilerplate post-MUA "report", in which they falsely reported that "Patient has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA". Then, pursuant to their phony finding of the Insured's "improvement", Allied Health, D'Agostini, and Greene again purported to provide MUA services to RM the next day, May 30, 2015.

(xi)    On May 30, 2015, Allied Health, D'Agostini, and Greene purported to provide MUA services to an Insured named LP. Following the MUA services, Allied Health, D'Agostini, and Greene generated a phony, boilerplate post-MUA "report", in which they falsely reported that "Patient has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA". Then, pursuant to their phony finding of the Insured's "improvement", Allied Health, D'Agostini, and Greene again purported to provide MUA services to LP the next day, May 31, 2015.

(xii)   On June 27, 2015, Allied Health, D'Agostini, and Greene purported to provide MUA services to an Insured named LN. Following the MUA services, Allied Health, D'Agostini, and Greene generated a phony, boilerplate post-MUA "report", in which they falsely reported that "Patient has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA". Then, pursuant to their phony finding of the Insured's "improvement", Allied Health, D'Agostini, and Greene again purported to provide MUA services to LN the next day, June 28, 2015.

(xiii)  On November 7, 2015, Allied Health, D'Agostini, and Greene purported to provide MUA services to an Insured named OD. Following the MUA services, Allied Health, D'Agostini, and Greene generated a phony, boilerplate post-MUA "report", in which they falsely reported that "Patient has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA". Then, pursuant to their phony finding of the Insured's "improvement", Allied Health, D'Agostini, and Greene again purported to provide MUA services to OD the next day, November 8, 2015.

(xiv)   On November 7, 2015, Allied Health, D'Agostini, and Greene purported to provide MUA services to an Insured named MH. Following the MUA services, Allied Health, D'Agostini, and Greene generated a phony, boilerplate post-MUA "report", in which they falsely reported that "Patient has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA". Then, pursuant to their phony finding of the Insured's "improvement", Allied Health, D'Agostini, and Greene again purported to provide MUA services to MH the next day, November 8, 2015.

(xv)    On December 5, 2015, Allied Health, D'Agostini, and Greene purported to provide MUA services to an Insured named RG. Following the MUA services, Allied Health, D'Agostini, and Greene generated a phony, boilerplate post-MUA "report", in which they falsely reported that "Patient has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA". Then, pursuant to their phony finding of the Insured's "improvement", Allied Health, D'Agostini, and Greene again purported to provide MUA services to RG the next day, December 6, 2015.

(xvi)     On December 9, 2015, Clinton Street and Gaccione purported to provide MUA services to an Insured named MS. Following the MUA services, Clinton Street and Gaccione generated a phony, boilerplate post-MUA "report", in which they falsely reported that "Pt. has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA". Then, pursuant to their phony finding of the Insured's "improvement", Clinton Street and Gaccione again purported to provide MUA services to Soto the next day, December 10, 2015. What is more, following the second day of MUA services, Clinton Street and Gaccione generated a second phony, boilerplate post-MUA "report", in which they falsely reported that "Pt. has regained approximately 70% of ROM in spine & ext. Proceed to 3rd MUA". Then, pursuant to their phony finding of the Insured's further "improvement", Clinton Street and Gaccione again purported to provide MUA services to Soto the next day, December 11, 2015.

(xvii)    On March 5, 2016, Allied Health, D'Agostini, and Greene purported to provide MUA services to an Insured named SH. Following the MUA services, Allied Health, D'Agostini, and Greene generated a phony, boilerplate post-MUA "report", in which they falsely reported that "Patient has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA". Then, pursuant to their phony finding of the Insured's "improvement", Allied Health, D'Agostini, and Greene again purported to provide MUA services to SH the next day, March 6, 2016.

(xviii)   On March 5, 2016, Allied Health, D'Agostini, and Greene purported to provide MUA services to an Insured named JH. Following the MUA services, Allied Health, D'Agostini, and Greene generated a phony, boilerplate post-MUA "report", in which they falsely reported that "Patient has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA". Then, pursuant to their phony finding of the Insured's "improvement", Allied Health, D'Agostini, and Greene again purported to provide MUA services to SH the next day, March 6, 2016.

(xix)     On April 27, 2016, Clinton Street and Gaccione purported to provide MUA services to an Insured named ST. Following the MUA services, Clinton Street and Gaccione generated a phony, boilerplate post-MUA "report", in which they falsely reported that "Pt. has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA". Then, pursuant to their phony finding of the Insured's "improvement", Clinton Street and Gaccione again purported to provide MUA services to ST the next day, April 28, 2016. What is more, following the second day of MUA services, Clinton Street and Gaccione generated a second phony, boilerplate post-MUA "report", in which they falsely reported that "Pt. has regained approximately 70% of ROM in spine & ext. Proceed to 3rd MUA". Then, pursuant to their phony finding of the Insured's further "improvement", Clinton Street and Gaccione again purported to provide MUA services to ST the next day, April 29, 2016.

(xx)      On August 5, 2016, Allied Health, D'Agostini, and Greene purported to provide MUA services to an Insured named OI. Following the MUA services, Allied

141

Health, D'Agostini, and Greene generated a phony, boilerplate post-MUA "report", in which they falsely reported that "Patient has regained approximately 50% of ROM in spine & ext. Proceed to 2nd MUA". Then, pursuant to their phony finding of the Insured's "improvement", Allied Health, D'Agostini, and Greene again purported to provide MUA services to OI the next day, August 6, 2016. What is more, following the second day of MUA services, Allied Health, D'Agostini, and Greene generated a second phony, boilerplate post-MUA "report", in which they falsely reported that "Patient has regained approximately 70% of ROM in spine & ext. Proceed to 3rd MUA". Then, pursuant to their phony finding of the Insured's further "improvement", Allied Health, D'Agostini, and Greene again purported to provide MUA services to OI the next day, August 7, 2016.

280.    These are only representative examples. In virtually all of the claims for MUA services identified in Exhibits "1" and "2", Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione falsely reported that the Insureds had regained: (i) approximately 50% of their range of motion following the first round of MUA services; and (ii) approximately 70% of their range of motion following the second round of MUA services, the exact percentages referenced in the NAMUAP Guidelines.

281.    In keeping with the fact that the range of motion improvement measurements reported by Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione were fraudulent, the measurements were virtually always contravened by other contemporaneous range of motion measurements included in  Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione's own records, stemming from examinations purportedly conducted in the days immediately preceding Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione's purported provision of MUA services.

282.    In fact, and in further keeping with the fact that the range of motion improvement measurements were simply fabricated to justify additional MUA services, the range of motion improvement measurements reported by Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione often bore no relation at all to the measurements reported in Allied Health, D'Agostini,

Greene, Clinton Street, and Gaccione's own records.

283. For example:

(i)     On July 8, 2013, Gaccione and Clinton Street purported to measure the cervical and lumbar spine range of motion of an Insured named CM. Then, following MUA services purportedly provided to CM on July 12, 2013, Gaccione and Clinton Street purported to measure CM's cervical and lumbar spine range of motion. Specifically, Gaccione and Clinton Street reported the following data:

| Area Measured | July 8, 2013 Pre-MUA Measurement | July 12, 2013 Post-MUA Measurement | Actual % Change |
|---|---|---|---|
| Cervical – Flex. | 43 | 52 | + 20.93% |
| Cervical – Ext. | 49 | 62 | + 26.53% |
| Cervical – Left Lat. Flex. | 27 | 36 | + 33.33% |
| Cervical – Right Lat. Flex. | 28 | 37 | + 32.14% |
| Left Rot. | 49 | 65 | + 32.65% |
| Right Rot. | 48 | 64 | + 33.33% |
| Lumbar – Flex. | 33 | 47 | + 42.42% |
| Lumbar – Ext. | 16 | 21 | + 31.25% |
| Left Lat. Flex. | 17 | 21 | + 23.52% |
| Right Lat. Flex. | 17 | 21 | + 23.52% |
| Left Rot. | 19 | 25 | + 31.57% |
| Right Rot. | 19 | 25 | + 31.57% |
| | | | Avg. % Change: 30.23% |

Even so, at the conclusion of their July 12, 2013 post-MUA examination report, Gaccione and Clinton Street falsely reported that CM had "regained approximately 50% improvement with ROM in spine and ext. Proceed to 2nd MUA".

(ii)    On November 15, 2013, Gaccione and Clinton Street purported to measure the cervical and lumbar spine range of motion of an Insured named ER. Then, following MUA services purportedly provided to ER on November 22, 2013, Gaccione and Clinton Street purported to measure ER's cervical and lumbar spine range of motion. Specifically, Gaccione and Clinton Street reported the following data:

| Area Measured | Nov. 15, 2013 Pre-MUA Measurement | Nov. 22, 2013 Post-MUA Measurement | Actual % Change |
|---|---|---|---|
| Cervical – Flex. | 44 | 52 | + 18.18% |

143

| Cervical – Ext. | 30 | 53 | + 76.66% |
|---|---|---|---|
| Cervical – Left Lat. Flex. | 19 | 32 | + 68.42% |
| Cervical – Right Lat. Flex. | 22 | 34 | + 54.54% |
| Left Rot. | 60 | 70 | + 16.66% |
| Right Rot. | 60 | 70 | + 16.66% |
| Lumbar – Flex. | 42 | 51 | + 21.42% |
| Lumbar – Ext. | 20 | 23 | + 15% |
| Left Lat. Flex. | 20 | 23 | + 15% |
| Right Lat. Flex. | 20 | 23 | + 15% |
| Left Rot. | 18 | 24 | + 33.33% |
| Right Rot. | 19 | 25 | + 31.57% |
| | | | **Avg. % Change: 31.87%** |

Even so, at the conclusion of their November 22, 2013 post-MUA examination report, Gaccione and Clinton Street falsely reported that ER had "regained approximately 50% improvement with ROM in spine and ext. Proceed to 2nd MUA".

(iii)    On January 13, 2014, Greene, D'Agostini, and Allied Health purported to measure the cervical and lumbar spine range of motion of an Insured named MA. Then, following MUA services purportedly provided to MA through Clinton Street on January 17, 2014, Gaccione and Clinton Street purported to measure MA's cervical and lumbar spine range of motion. Specifically, Gaccione and Clinton Street reported the following data:

| Area Measured | Jan. 13, 2014 Pre-MUA Measurement | Jan. 17, 2014 Post-MUA Measurement | Actual % Change |
|---|---|---|---|
| Cervical – Flex. | 47 | 54 | + 14.89% |
| Cervical – Ext. | 35 | 55 | + 57.14% |
| Cervical – Left Lat. Flex. | 22 | 34 | + 54.54% |
| Cervical – Right Lat. Flex. | 25 | 35 | + 40% |
| Left Rot. | 68 | 74 | + 8.82% |
| Right Rot. | 67 | 74 | + 10.44% |
| Lumbar – Flex. | 45 | 53 | + 17.77% |
| Lumbar – Ext. | 20 | 23 | + 15% |
| Left Lat. Flex. | 22 | 24 | + 9% |
| Right Lat. Flex. | 20 | 23 | + 15% |
| Left Rot. | 24 | 27 | + 12.5% |
| Right Rot. | 22 | 26 | + 18.18% |

144

| | | | Avg. % Change: 22.77% |
|---|---|---|---|

Even so, at the conclusion of their January 17, 2014 post-MUA examination report, Gaccione and Clinton Street falsely reported that MA had "regained approximately 50% improvement with ROM in spine and ext. Proceed to 2nd MUA".

(iv) On July 14, 2014, Gaccione and Clinton Street purported to measure the cervical and lumbar spine range of motion of an Insured named LH. Then, following MUA services purportedly provided to LH on July 26, 2014, Gaccione and Clinton Street purported to measure LH's cervical and lumbar spine range of motion. Specifically, Gaccione and Clinton Street reported the following data:

| Area Measured | July 14, 2014 Pre-MUA Measurement | July 26, 2014 Post-MUA Measurement | Actual % Change |
|---|---|---|---|
| Cervical – Flex. | 49 | 54 | + 10.2% |
| Cervical – Ext. | 38 | 57 | + 50% |
| Cervical – Left Lat. Flex. | 25 | 35 | + 40% |
| Cervical – Right Lat. Flex. | 25 | 35 | + 40% |
| Left Rot. | 65 | 73 | + 12.3% |
| Right Rot. | 65 | 73 | + 12.3% |
| Lumbar – Flex. | 54 | 57 | + 5.55% |
| Lumbar – Ext. | 25 | 25 | + 0% |
| Left Lat. Flex. | 22 | 24 | + 9% |
| Right Lat. Flex. | 21 | 23 | + 9.52% |
| Left Rot. | 22 | 26 | + 18.18% |
| Right Rot. | 23 | 27 | + 17.39% |
| | | | Avg. % Change: 18.7% |

Even so, at the conclusion of their July 26, 2014 post-MUA examination report, Gaccione and Clinton Street falsely reported that LH had "regained approximately 50% improvement with ROM in spine and ext. Proceed to 2nd MUA".

(v) On October 16, 2014, Greene, D'Agostini, and Allied Health purported to measure the cervical and lumbar spine range of motion of an Insured named HR. Then, following MUA services purportedly provided to HR through Clinton Street on October 25, 2014, Gaccione and Clinton Street purported to measure HR's cervical and lumbar spine range of motion. Specifically, Gaccione and Clinton Street reported the following data:

145

| Area Measured | Oct. 16, 2014 Pre-MUA Measurement | Oct. 25, 2014 Post-MUA Measurement | Actual % Change |
|---|---|---|---|
| Cervical – Flex. | 40 | 50 | + 25% |
| Cervical – Ext. | 29 | 52 | + 79.31% |
| Cervical – Left Lat. Flex. | 40 | 43 | + 7.5% |
| Cervical – Right Lat. Flex. | 40 | 43 | + 7.5% |
| Left Rot. | 66 | 73 | + 10.6% |
| Right Rot. | 65 | 73 | + 12.3% |
| Lumbar – Flex. | 35 | 48 | + 37.14% |
| Lumbar – Ext. | 20 | 23 | + 15% |
| Left Lat. Flex. | 22 | 24 | + 9% |
| Right Lat. Flex. | 20 | 23 | + 15% |
| Left Rot. | 22 | 27 | + 22.72% |
| Right Rot. | 23 | 26 | + 13.04% |
| | | | Avg. % Change: 21% |

Even so, at the conclusion of their October 25, 2014 post-MUA examination report, Gaccione and Clinton Street falsely reported that HR had "regained approximately 50% improvement with ROM in spine and ext. Proceed to 2nd MUA".

(vi)     On November 10, 2014, Gaccione and Clinton Street purported to measure the cervical and lumbar spine range of motion of an Insured named PP. Then, following MUA services purportedly provided to PP on November 14, 2014, Gaccione and Clinton Street purported to measure PP's cervical and lumbar spine range of motion. Specifically, Gaccione and Clinton Street reported the following data:

| Area Measured | Nov. 10, 2014 Pre-MUA Measurement | Nov. 14, 2014 Post-MUA Measurement | Actual % Change |
|---|---|---|---|
| Cervical – Flex. | 45 | 53 | + 17.77% |
| Cervical – Ext. | 49 | 62 | + 26.53% |
| Cervical – Left Lat. Flex. | 23 | 34 | + 47.82% |
| Cervical – Right Lat. Flex. | 23 | 34 | + 47.82% |
| Left Rot. | 51 | 66 | + 29.41% |
| Right Rot. | 51 | 66 | + 29.41% |
| Lumbar – Flex. | 37 | 49 | + 32.43% |
| Lumbar – Ext. | 18 | 22 | + 22.22% |
| Left Lat. Flex. | 18 | 22 | + 22.22% |

146

| Right Lat. Flex. | 18 | 22 | + 22.22% |
| Left Rot. | 19 | 25 | + 31.57% |
| Right Rot. | 19 | 25 | + 31.57% |
| | | | **Avg. % Change: 30%** |

Even so, at the conclusion of their November 14, 2014 post-MUA examination report, Gaccione and Clinton Street falsely reported that PP had "regained approximately 50% improvement with ROM in spine and ext. Proceed to 2ⁿᵈ MUA".

(vii)   On April 16, 2015, Greene, D'Agostini, and Allied Health purported to measure the cervical and lumbar spine range of motion of an Insured named RP. Then, following MUA services purportedly provided to RP on April 25, 2015, Greene, D'Agostini, and Allied Health purported to measure RP's cervical and lumbar spine range of motion. Specifically, Greene, D'Agostini, and Allied Health reported the following data:

| Area Measured | Apr. 16, 2015 Pre-MUA Measurement | Apr. 25, 2015 Post-MUA Measurement | Actual % Change |
| --- | --- | --- | --- |
| Cervical – Flex. | 48 | 54 | + 12.5% |
| Cervical – Ext. | 39 | 57 | + 46.15% |
| Cervical – Left Lat. Flex. | 40 | 43 | + 7.5% |
| Cervical – Right Lat. Flex. | 40 | 43 | + 7.5% |
| Left Rot. | 70 | 75 | + 7.14% |
| Right Rot. | 70 | 75 | + 7.14% |
| Lumbar – Flex. | 55 | 58 | + 5.45% |
| Lumbar – Ext. | 20 | 23 | + 15% |
| Left Lat. Bend | 22 | 24 | + 9% |
| Right Lat. Bend | 20 | 23 | + 15% |
| Left Rot. | 25 | 28 | + 12% |
| Right Rot. | 24 | 27 | + 12.5% |
| | | | **Avg. % Change: 13%** |

Even so, at the conclusion of their April 25, 2015 post-MUA examination report, Greene, D'Agostini, and Allied Health falsely reported that RP had "regained approximately 50% improvement with ROM in spine and ext. Proceed to 2ⁿᵈ MUA".

(viii)   On May 19, 2015, Greene, D'Agostini, and Allied Health purported to measure the cervical and lumbar spine range of motion of an Insured named RM. Then, following MUA services purportedly provided to RM on May 30, 2015, Greene, D'Agostini, and Allied Health purported to measure RM's cervical and lumbar spine range of motion. Specifically, Greene, D'Agostini, and Allied Health

147

reported the following data:

| Area Measured | May 19, 2015 Pre-MUA Measurement | May 30, 2015 Post-MUA Measurement | Actual % Change |
|---|---|---|---|
| Cervical – Flex. | 43 | 52 | + 20.93% |
| Cervical – Ext. | 48 | 62 | + 29.16 % |
| Cervical – Left Lat. Flex. | 40 | 43 | + 7.5% |
| Cervical – Right Lat. Flex. | 40 | 43 | + 7.5% |
| Left Rot. | 70 | 75 | + 7.14% |
| Right Rot. | 70 | 75 | + 7.14% |
| Lumbar – Flex. | 52 | 56 | + 7.69% |
| Lumbar – Ext. | 20 | 23 | + 15% |
| Left Lat. Bend | 20 | 23 | + 15% |
| Right Lat. Bend | 20 | 23 | + 15% |
| Left Rot. | 24 | 27 | + 12.5% |
| Right Rot. | 22 | 26 | + 18.18% |
| | | | Avg. % Change: 13.56% |

Even so, at the conclusion of their May 30, 2015 post-MUA examination report, Greene, D'Agostini, and Allied Health falsely reported that RM had "regained approximately 50% improvement with ROM in spine and ext. Proceed to 2nd MUA".

(ix)    On May 19, 2015, Greene, D'Agostini, and Allied Health purported to measure the cervical and lumbar spine range of motion of an Insured named LP. Then, following MUA services purportedly provided to LP on May 30, 2015, Greene, D'Agostini, and Allied Health purported to measure LP's cervical and lumbar spine range of motion. Specifically, Greene, D'Agostini, and Allied Health reported the following data:

| Area Measured | May 19, 2015 Pre-MUA Measurement | May 30, 2015 Post-MUA Measurement | Actual % Change |
|---|---|---|---|
| Cervical – Flex. | 52 | 56 | + 7.69% |
| Cervical – Ext. | 55 | 65 | + 18.18 % |
| Cervical – Left Lat. Flex. | 40 | 43 | + 7.5% |
| Cervical – Right Lat. Flex. | 43 | 44 | + 2.32% |
| Left Rot. | 72 | 76 | + 5.55% |
| Right Rot. | 72 | 76 | + 5.55% |
| Lumbar – Flex. | 50 | 55 | + 10% |

| | | | |
|---|---|---|---|
| Lumbar – Ext. | 22 | 24 | + 9% |
| Left Lat. Bend | 20 | 23 | + 15% |
| Right Lat. Bend | 24 | 25 | + 4.16% |
| Left Rot. | 25 | 28 | + 12% |
| Right Rot. | 25 | 28 | + 12% |
| | | | **Avg. % Change: 9%** |

Even so, at the conclusion of their May 30, 2015 post-MUA examination report, Greene, D'Agostini, and Allied Health falsely reported that LP had "regained approximately 50% improvement with ROM in spine and ext. Proceed to 2nd MUA".

(x)     On June 18, 2015, Greene, D'Agostini, and Allied Health purported to measure the cervical and lumbar spine range of motion of an Insured named LN. Then, following MUA services purportedly provided to LN on June 27, 2015, Greene, D'Agostini, and Allied Health purported to measure LN's cervical and lumbar spine range of motion. Specifically, Greene, D'Agostini, and Allied Health reported the following data:

| Area Measured | June 18, 2015 Pre-MUA Measurement | June 27, 2015 Post-MUA Measurement | Actual % Change |
|---|---|---|---|
| Cervical – Flex. | 45 | 53 | + 17.77% |
| Cervical – Ext. | 55 | 65 | + 18.18% |
| Cervical – Left Lat. Flex. | 37 | 41 | + 10.81% |
| Cervical – Right Lat. Flex. | 40 | 43 | + 7.5% |
| Left Rot. | 60 | 70 | + 16.66% |
| Right Rot. | 57 | 69 | + 21.05% |
| Lumbar – Flex. | 48 | 54 | + 12.5% |
| Lumbar – Ext. | 22 | 24 | + 9% |
| Left Lat. Bend | 23 | 24 | + 4.34% |
| Right Lat. Bend | 21 | 23 | + 9.52% |
| Left Rot. | 25 | 28 | + 12% |
| Right Rot. | 25 | 28 | + 12% |
| | | | **Avg. % Change: 12.61%** |

Even so, at the conclusion of their June 27, 2015 post-MUA examination report, Greene, D'Agostini, and Allied Health falsely reported that LN had "regained approximately 50% improvement with ROM in spine and ext. Proceed to 2nd MUA".

(xi)     On October 28, 2015, Greene, D'Agostini, and Allied Health purported to measure the cervical and lumbar spine range of motion of an Insured named MH.

149

Then, following MUA services purportedly provided to MH on November 7, 2015, Greene, D'Agostini, and Allied Health purported to measure MH's cervical and lumbar spine range of motion. Specifically, Greene, D'Agostini, and Allied Health reported the following data:

| Area Measured | Oct. 28, 2015 Pre-MUA Measurement | Nov. 7, 2015 Post-MUA Measurement | Actual % Change |
|---|---|---|---|
| Cervical – Flex. | 42 | 51 | + 21.42% |
| Cervical – Ext. | 37 | 56 | + 51.35% |
| Cervical – Left Lat. Flex. | 27 | 36 | + 33.33% |
| Cervical – Right Lat. Flex. | 27 | 36 | + 33.33% |
| Left Rot. | 42 | 61 | + 45.23% |
| Right Rot. | 40 | 60 | + 50% |
| Lumbar – Flex. | 30 | 45 | + 50% |
| Lumbar – Ext. | 20 | 23 | + 15% |
| Left Lat. Bend | 20 | 23 | + 15% |
| Right Lat. Bend | 20 | 23 | + 15% |
| Left Rot. | 20 | 25 | + 25% |
| Right Rot. | 20 | 25 | + 25% |
| | | | Avg. % Change: 31.64% |

Even so, at the conclusion of their December 5, 2015 post-MUA examination report, Greene, D'Agostini, and Allied Health falsely reported that MH had "regained approximately 50% improvement with ROM in spine and ext. Proceed to 2nd MUA".

(xii) On October 28, 2015, Greene, D'Agostini, and Allied Health purported to measure the cervical and lumbar spine range of motion of an Insured named OD. Then, following MUA services purportedly provided to OD on November 7, 2015, Greene, D'Agostini, and Allied Health purported to measure OD's cervical and lumbar spine range of motion. Specifically, Greene, D'Agostini, and Allied Health reported the following data:

| Area Measured | Oct. 28, 2015 Pre-MUA Measurement | Nov. 7, 2015 Post-MUA Measurement | Actual % Change |
|---|---|---|---|
| Cervical – Flex. | 36 | 48 | + 33.33% |
| Cervical – Ext. | 37 | 56 | + 51.35% |
| Cervical – Left Lat. Flex. | 33 | 39 | + 18.18% |
| Cervical – Right Lat. Flex. | 35 | 40 | + 14.28% |

150

| | | | + 44.18% |
|---|---|---|---|
| Left Rot. | 43 | 62 | + 44.18% |
| Right Rot. | 55 | 68 | + 23.63% |
| Lumbar – Flex. | 50 | 55 | + 10% |
| Lumbar – Ext. | 20 | 23 | + 15% |
| Left Lat. Bend | 20 | 24 | + 20% |
| Right Lat. Bend | 23 | 23 | + 0% |
| Left Rot. | 23 | 27 | + 17.39% |
| Right Rot. | 24 | 27 | + 12.5% |
| | | | **Avg. % Change: 21.65%** |

Even so, at the conclusion of their November 7, 2015 post-MUA examination report, Greene, D'Agostini, and Allied Health falsely reported that OD had "regained approximately 50% improvement with ROM in spine and ext. Proceed to 2nd MUA".

(xiii) On November 24, 2015, Greene, D'Agostini, and Allied Health purported to measure the cervical and lumbar spine range of motion of an Insured named RG. Then, following MUA services purportedly provided to RG on December 5, 2015, Greene, D'Agostini, and Allied Health purported to measure RG's cervical and lumbar spine range of motion. Specifically, Greene, D'Agostini, and Allied Health reported the following data:

| Area Measured | Nov. 24, 2015 Pre-MUA Measurement | Dec. 5, 2015 Post-MUA Measurement | Actual % Change |
|---|---|---|---|
| Cervical – Flex. | 38 | 49 | + 28.94% |
| Cervical – Ext. | 40 | 58 | + 45% |
| Cervical – Left Lat. Flex. | 32 | 38 | + 18.75% |
| Cervical – Right Lat. Flex. | 30 | 43 | + 43.33% |
| Left Rot. | 40 | 60 | + 50% |
| Right Rot. | 55 | 68 | + 23.63% |
| Lumbar – Flex. | 45 | 53 | + 17.77% |
| Lumbar – Ext. | 22 | 24 | + 9% |
| Left Lat. Bend | 23 | 24 | + 4.34% |
| Right Lat. Bend | 25 | 25 | + 0% |
| Left Rot. | 22 | 26 | + 18.18% |
| Right Rot. | 26 | 28 | + 7.69% |
| | | | **Avg. % Change: 22.22%** |

Even so, at the conclusion of their December 5, 2015 post-MUA examination report, Greene, D'Agostini, and Allied Health falsely reported that RG had "regained approximately 50% improvement with ROM in spine and ext. Proceed

151

to 2nd MUA".

(xiv)  On March 28, 2016, Holsten, Gaccione, and Clinton Street purported to measure the cervical and lumbar spine range of motion of an Insured named ST. Then, following MUA services purportedly provided to ST on April 27, 2016, Gaccione and Clinton Street purported to measure ST's cervical and lumbar spine range of motion. Specifically, Holsten, Gaccione, and Clinton Street reported the following data:

| Area Measured | Mar. 28, 2016 Pre-MUA Measurement | Apr. 27, 2016 Post-MUA Measurement | Actual % Change |
|---|---|---|---|
| Cervical – Flex. | 50 | 55 | + 10% |
| Cervical – Ext. | 45 | 60 | + 33.33% |
| Cervical – Right Lat. Flex. | 35 | 40 | + 14.28% |
| Cervical – Left Lat. Flex. | 35 | 40 | + 14.28% |
| Right Rot. | 65 | 72 | + 10.76% |
| Left Rot. | 65 | 72 | + 10.76% |
| Lumbar – Flex. | 35 | 47 | + 34.28% |
| Lumbar – Ext. | 15 | 20 | + 33.33% |
| Right Lat. Flex. | 15 | 20 | + 33.33% |
| Left Lat. Flex. | 15 | 20 | + 33.33% |
| Right Rot. | 14 | 22 | + 57.14% |
| Left Rot. | 13 | 21 | + 61.53% |
| | | | Avg. % Change: 29% |

Even so, at the conclusion of their April 27, 2016 post-MUA examination report, Gaccione and Clinton Street falsely reported that ST had "regained approximately 50% improvement with ROM in spine and ext. Proceed to 2nd MUA".

284.    These are only representative examples. In virtually every claim for MUA services identified in Exhibits "1" and "2", Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione simply fabricated the percentage of range of motion improvements experienced by Insureds following the putative MUA services without any regard to the Insureds' actual levels of improvement.

285.    Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione routinely falsified these range of motion data in order to create a false justification for the subsequent

medically unnecessary MUA services purportedly provided to the Insureds.

286.    Pursuant to N.J.A.C. 13:44E-2.2, chiropractors and chiropractic practices such as Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione are required to create and maintain patient records, bills, and claim forms that accurately reflect the care or services rendered.

287.    Chiropractors and chiropractic practices that fail to create and maintain patient records, bills, and claim forms that accurately reflect the care or services rendered are in violation of applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and are ineligible to collect PIP Benefits.

288.    As a result of their pervasive creation, maintenance, and submission of false and fraudulent records regarding their purported MUA procedures, Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione never were eligible to collect PIP Benefits.

**4.    The Fraudulent Billing for Multiple Units of Spinal MUA**

289.    As set forth above, N.J.A.C. 11:3-29.4(g)(13) provides that MUA services billed under CPT code 22505 may only be reported once for any and all regions manipulated on a given date of service.

290.    Even so, in order to increase the amount of fraudulent billing they could submit to GEICO and other insurers, Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione routinely submitted multiple charges under CPT code 22505 per Insured, per date of service, supposedly represented manipulation of the Insureds' cervical, lumbar, and thoracic spines.

291.    Pursuant to the Fee Schedule that was in effect after January 4, 2013, the maximum reimbursable amount for MUA services under CPT code 22505 was $214.24.

292.     In the claims for MUA services identified in Exhibit "1", Allied Health, D'Agostini, and Greene, routinely submitted three discrete charges under CPT code 22505 per Insured, per date of service, typically resulting in a total charge of:

(i)      at least $645.00, in the cases in which D'Agostini or Greene purported to be the "Attending Physician"; and/or

(ii)     between $118.80 and $128.52, in the cases in which D'Agostini or Greene purported to be the "Co-Attending Physician".

293.     Similarly, in the claims for MUA services identified in Exhibit "2", Clinton Street and Gaccione routinely submitted three discrete charges under CPT code 22505 per Insured, per date of service, typically resulting in a total charge of at least $642.72.

294.     For example:

(i)      Clinton Street and Gaccione submitted three charges under CPT code 22505 for a total charge of $643.50 for MUA services supposedly provided to an Insured named JR on March 21, 2013.

(ii)     Clinton Street and Gaccione submitted three charges under CPT code 22505 for a total charge of $643.50 for MUA services supposedly provided to an Insured named JR on March 23, 2013.

(iii)    Clinton Street and Gaccione submitted three charges under CPT code 22505 for a total charge of $643.50 for MUA services supposedly provided to an Insured named CM on July 12, 2013.

(iv)     Clinton Street and Gaccione submitted three charges under CPT code 22505 for a total charge of $643.50 for MUA services supposedly provided to an Insured named TS on September 27, 2013.

(v)      Clinton Street and Gaccione submitted three charges under CPT code 22505 for a total charge of $643.50 for MUA services supposedly provided to an Insured named KM on October 25, 2013 and, concomitantly, Allied Health, D'Agostini, and Greene submitted three additional charges under CPT code 22505, for a total charge of $118.80 for MUA services supposedly provided to KM on October 25, 2013, ostensibly for the services of a "Co-Attendant Physician".

(vi)     Clinton Street and Gaccione submitted three charges under CPT code 22505 for a total charge of $643.50 for MUA services supposedly provided to an Insured named KM on October 26, 2013. Concomitantly, Allied Health, D'Agostini, and

Greene submitted three additional charges under CPT code 22505, for a total charge of $118.80 for MUA services supposedly provided to KM on October 26, 2013, ostensibly for the services of a "Co-Attendant Physician".

(vii)   Clinton Street and Gaccione submitted three charges under CPT code 22505 for a total charge of $643.50 for MUA services supposedly provided to an Insured named TC on March 22, 2014. Concomitantly, Allied Health, D'Agostini, and Greene submitted three additional charges under CPT code 22505, for a total charge of $118.80 for MUA services supposedly provided to TC on March 22, 2014, ostensibly for the services of a "Co-Attendant Physician".

(viii)  Clinton Street and Gaccione submitted three charges under CPT code 22505 for a total charge of $643.50 for MUA services supposedly provided to an Insured named AR on April 25, 2014. Concomitantly, Allied Health, D'Agostini, and Greene submitted three additional charges under CPT code 22505, for a total charge of $118.80 for MUA services supposedly provided to AR on April 25, 2014, ostensibly for the services of a "Co-Attendant Physician".

(ix)    Clinton Street and Gaccione submitted three charges under CPT code 22505 for a total charge of $643.50 for MUA services supposedly provided to an Insured named AR on April 26, 2014. Concomitantly, Allied Health, D'Agostini, and Greene submitted three additional charges under CPT code 22505, for a total charge of $118.80 for MUA services supposedly provided to AR on April 26, 2014, ostensibly for the services of a "Co-Attendant Physician".

(x)     Clinton Street and Gaccione submitted three charges under CPT code 22505 for a total charge of $643.50 for MUA services supposedly provided to an Insured named AR on April 27, 2014. Concomitantly, Allied Health, D'Agostini, and Greene submitted three additional charges under CPT code 22505, for a total charge of $118.80 for MUA services supposedly provided to AR on April 27, 2014, ostensibly for the services of a "Co-Attendant Physician".

(xi)    Clinton Street and Gaccione submitted three charges under CPT code 22505 for a total charge of $643.50 for MUA services supposedly provided to an Insured named GH on April 27, 2014 and, concomitantly, Allied Health, D'Agostini, and Greene submitted three additional charges under CPT code 22505, for a total charge of $118.80 for MUA services supposedly provided to GH on April 27, 2014, ostensibly for the services of a "Co-Attendant Physician" who purportedly participated in the procedures.

(xii)   Clinton Street and Gaccione submitted three charges under CPT code 22505 for a total charge of $643.50 for MUA services supposedly provided to an Insured named MP on January 17, 2015. Concomitantly, Allied Health, D'Agostini, and Greene submitted three additional charges under CPT code 22505, for a total charge of $128.52 for MUA services supposedly provided to MP on January 17, 2015, ostensibly for the services of a "Co-Attendant Physician".

155

(xiii)   Clinton Street and Gaccione submitted three charges under CPT code 22505 for a total charge of $643.50 for MUA services supposedly provided to an Insured named MP on January 18, 2015. Concomitantly, Allied Health, D'Agostini, and Greene submitted three additional charges under CPT code 22505, for a total charge of $128.52 for MUA services supposedly provided to MP on January 18, 2015, ostensibly for the services of a "Co-Attendant Physician".

(xiv)   Allied Health, D'Agostini, and Greene submitted three charges under CPT code 22505 for a total charge of $645.00 for MUA services supposedly provided to an Insured named RO on April 24, 2015. Concomitantly, Allied Health and D'Agostini submitted three additional charges under CPT code 22505, for a total charge of $128.53, or MUA services supposedly provided to RO on April 24, 2015, ostensibly for the services of a "Co-Attendant Physician".

(xv)    Allied Health, D'Agostini, and Greene submitted three charges under CPT code 22505 for a total charge of $645.00 for MUA services supposedly provided to an Insured named RO on April 26, 2015. Concomitantly, Allied Health and D'Agostini submitted three additional charges under CPT code 22505, for a total charge of $128.53, or MUA services supposedly provided to RO on April 26, 2015, ostensibly for the services of a "Co-Attendant Physician".

(xvi)   Clinton Street and Gaccione submitted three charges under CPT code 22505 for a total charge of $642.72 for MUA services supposedly provided to an Insured named AU on May 20, 2015.

(xvii)  Clinton Street and Gaccione submitted three charges under CPT code 22505 for a total charge of $642.72 for MUA services supposedly provided to an Insured named AU on May 21, 2015.

(xviii) Allied Health, D'Agostini, and Greene submitted three charges under CPT code 22505 for a total charge of $645.00 for MUA services supposedly provided to an Insured named LC on May 30, 2015. Concomitantly, Allied Health and D'Agostini submitted three additional charges under CPT code 22505, for a total charge of $128.53, or MUA services supposedly provided to LC on May 30, 2015, ostensibly for the services of a "Co-Attendant Physician".

(xix)   Allied Health, D'Agostini, and Greene submitted three charges under CPT code 22505 for a total charge of $645.00 for MUA services supposedly provided to an Insured named VG on May 31, 2015. Concomitantly, Allied Health and D'Agostini submitted three additional charges under CPT code 22505, for a total charge of $128.53, or MUA services supposedly provided to Garcia Moreno on May 31, 2015, ostensibly for the services of a "Co-Attendant Physician".

(xx)    Allied Health, D'Agostini, and Greene submitted three charges under CPT code 22505 for a total charge of $645.00 for MUA services supposedly provided to an

Insured named LC on May 31, 2015. Concomitantly, Allied Health and D'Agostini submitted three additional charges under CPT code 22505, for a total charge of $128.53, or MUA services supposedly provided to LC on May 31, 2015, ostensibly for the services of a "Co-Attendant Physician".

(xxi) Clinton Street and Gaccione submitted three charges under CPT code 22505 for a total charge of $642.72 for MUA services supposedly provided to an Insured named NJ on July 16, 2015.

(xxii) Allied Health, D'Agostini, and Greene submitted three charges under CPT code 22505 for a total charge of $645.00 for MUA services supposedly provided to an Insured named RG on December 5, 2015. Concomitantly, Allied Health and D'Agostini submitted three additional charges under CPT code 22505, for a total charge of $128.53, or MUA services supposedly provided to RG on December 5, 2015, ostensibly for the services of a "Co-Attendant Physician".

(xxiii) Allied Health, D'Agostini, and Greene submitted three charges under CPT code 22505 for a total charge of $645.00 for MUA services supposedly provided to an Insured named RG on December 6, 2015. Concomitantly, Allied Health and D'Agostini submitted three additional charges under CPT code 22505, for a total charge of $128.53, or MUA services supposedly provided to RG on December 6, 2015, ostensibly for the services of a "Co-Attendant Physician".

(xxiv) Allied Health, D'Agostini, and Greene submitted three charges under CPT code 22505 for a total charge of $645.00 for MUA services supposedly provided to an Insured named EH on January 16, 2016. Concomitantly, Allied Health and D'Agostini submitted three additional charges under CPT code 22505, for a total charge of $128.53, or MUA services supposedly provided to EH on January 16, 2016, ostensibly for the services of a "Co-Attendant Physician".

(xxv) Allied Health, D'Agostini, and Greene submitted three charges under CPT code 22505 for a total charge of $645.00 for MUA services supposedly provided to an Insured named EH on January 16, 2016. Concomitantly, Allied Health and D'Agostini submitted three additional charges under CPT code 22505, for a total charge of $128.53, or MUA services supposedly provided to EH on January 16, 2016, ostensibly for the services of a "Co-Attendant Physician".

295. By falsely representing that they were entitled to reimbursement for multiple charges under CPT code 22505 per Insured, per date of service, Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione increased their already-fraudulent billing by hundreds of dollars per Insured, per date of service.

296.     Each such instance of unlawful, multiple charges under CPT code 22505 constituted a separate violation of N.J.A.C. 11:3-29.4(g)(13), N.J.S.A. § 39:6A-4.6, and N.J.A.C. 11:3-29.6.

**5.     The Fraudulent Billing for Non-Existent Pelvic Ring Injuries**

297.     To the limited extent that MUA ever is medically necessary, the Fee Schedule places limits on the amounts that healthcare providers can bill for MUA.

298.     For instance, pursuant to the Fee Schedule that was in effect after January 4, 2013, the maximum reimbursable amount for spinal MUA services under CPT code 22505 was $214.24.

299.     Pursuant to the Fee Schedule that was in effect after January 4, 2013, the maximum reimbursable amount for shoulder MUA services under CPT code 23700 was $470.07.

300.     Pursuant to the Fee Schedule that was in effect after January 4, 2013, the maximum reimbursable amount for hip MUA services under CPT code 27275 was $323.19.

301.     Against this backdrop, and in an attempt to maximize the fraudulent billing they could submit to GEICO for their medically unnecessary MUA services, Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione routinely falsely represented that the purported MUA services involved a procedure billable under CPT code 27194.

302.     Pursuant to the Fee Schedule and the CPT Assistant, CPT code 27194 is the code used to bill for the treatment of "pelvic ring fracture, dislocation, diastasis or subluxation".

303.     Pursuant to the Fee Schedule that was in effect after January 4, 2013, the maximum reimbursable amount under CPT code 27194 was $2,095.30, in keeping with the fact that "pelvic ring fracture, dislocation, diastasis or subluxation" are serious problems that are difficult and time-consuming to properly treat.

304.     Not a single one of the Insureds in the claims for MUA services identified in Exhibits "1" and "2" suffered from any pelvic ring fracture, dislocation, diastasis, or subluxation or – indeed – any other injury to their respective pelvic rings.

305.     Even so, and as set forth in Exhibits "1" and "2", Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione routinely billed for their purported MUA services using CPT code 27194, and thereby falsely represented that the Insureds suffered from, and they treated, some sort of pelvic ring fracture, dislocation, diastasis, or subluxation.

306.     In keeping with the fact that none of the Insureds who purportedly received MUA services in the claims identified in Exhibits "1" and "2" actually suffered from any injury to their pelvic rings, and in keeping with the fact that none of those Insureds actually received any services from the Defendants that were billable under CPT code 27194, none of the MUA treatment notes generated by or on behalf of Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione actually reflected any legitimate pelvic ring fracture, dislocation, diastasis, or subluxation.

307.     Allied Health, D'Agostini, Greene, Clinton Street, and Gaccione's use of CPT code 27194 to bill for their putative MUA services constituted a deliberate misrepresentation of the service that was provided, so as to maximize the amount of fraudulent billing that they could submit for each purported MUA procedure.

## III.     The Fraudulent Billing Submitted to GEICO

308.     To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of HCFA-1500 forms and treatment reports through Allied Health, Bound Brook, and Clinton Street to GEICO, containing thousands of fraudulent charges, seeking payment for the Fraudulent Services for which they were not entitled to receive payment.

309.     The HCFA-1500 forms and treatment reports were false and misleading, and in violation of the Insurance Fraud Prevention Act, in the following material respects:

(i)      The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were eligible to receive PIP reimbursement. In fact, the Defendants were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were not eligible to receive PIP reimbursement because: (a) they were engaged in an illegal self-referral scheme; (b) they purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) they routinely violated N.J.S.A. § 39:6A-4.6(c) and N.J.A.C. 11:3-29.6 by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(ii)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were eligible for PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were not eligible for PIP reimbursement, because: (a) they were provided, to the extent that they were provided at all, pursuant to an illegal self-referral scheme; (b) they were medically unnecessary, and in many cases illusory; and (c) they routinely were billed in violation of N.J.S.A. § 39:6A-4.6(c) and N.J.A.C. 11:3-29.6.

(iii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed in the first instance. In fact, the Fraudulent Services frequently were not performed at all and, to the extent

160

that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment, referral, and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to it.

(iv)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

## IV.    <u>GEICO's Justifiable Reliance</u>

310.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submit, or cause to be submitted, to GEICO.

311.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

312.    For instance, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent, pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to it.

313.    Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

314.    In addition, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were performed, to the extent that they are performed at all, pursuant to illegal self-referral arrangements between and among the Defendants.

315.    The Defendants hired law firms to pursue collection of the fraudulent charges

161

from GEICO and other insurers. These law firms routinely filed expensive and time-consuming arbitration and litigation against GEICO and other insurers if the charges were not promptly paid in full.

316.    GEICO is under statutory and contractual obligations to promptly and fairly process claims.  The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $3,380,000.00.

317.    Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
#### Against Allied Health, D'Agostini, and Greene
#### (Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))

318.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 317 above.

319.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "1", Allied Health, D'Agostini, and Greene knowingly submitted or caused to be submitted HCFA-1500 forms and treatment reports to GEICO that were false and misleading in the following material respects:

(i)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Allied Health, D'Agostini, and Greene uniformly misrepresented to GEICO that Allied Health, D'Agostini, and Greene were in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were eligible to receive PIP reimbursement. In fact, Allied Health, D'Agostini, and Greene were not in compliance with all applicable

162

statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were not eligible to receive PIP reimbursement because: (a) they were engaged in an illegal self-referral scheme; (b) they purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) they routinely violated N.J.S.A. § 39:6A-4.6(c) and N.J.A.C. 11:3-29.6 by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(ii)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Allied Health, D'Agostini, and Greene uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were not eligible to receive PIP reimbursement, because: (a) they were provided, to the extent that they were provided at all, pursuant to an illegal self-referral scheme; (b) they were medically unnecessary, and in many cases illusory; and (c) they routinely were billed in violation of N.J.S.A. § 39:6A-4.6(c) and N.J.A.C. 11:3-29.6.

(iii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Allied Health, D'Agostini, and Greene uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment, referral, and billing protocol designed solely to financially enrich Allied Health, D'Agostini, and Greene, not to benefit the Insureds who supposedly were subjected to it.

(iv)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Allied Health, D'Agostini, and Greene misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

320.     Allied Health, D'Agostini, and Greene's systemic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33-A-7.

321.     As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $2,200,000.00, but is

also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

### SECOND CAUSE OF ACTION
### Against Clinton Street, Gaccione, Johnson, Holsten, and Nettis
### (Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))

322.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 321 above.

323.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "2", Clinton Street, Gaccione, Johnson, Holsten, and Nettis knowingly submitted or caused to be submitted HCFA-1500 forms and treatment reports to GEICO that were false and misleading in the following material respects:

(v)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Clinton Street, Gaccione, Johnson, Holsten, and Nettis uniformly misrepresented to GEICO that Clinton Street, Gaccione, Johnson, Holsten, and Nettis were in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were eligible to receive PIP reimbursement. In fact, Clinton Street, Gaccione, Johnson, Holsten, and Nettis were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were not eligible to receive PIP reimbursement because: (a) they were engaged in an illegal self-referral scheme; (b) they purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) they routinely violated N.J.S.A. § 39:6A-4.6(c) and N.J.A.C. 11:3-29.6 by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(vi)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Clinton Street, Gaccione, Johnson, Holsten, and Nettis uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare

164

practice in New Jersey, and therefore were not eligible to receive PIP reimbursement, because: (a) they were provided, to the extent that they were provided at all, pursuant to an illegal self-referral scheme; (b) they were medically unnecessary, and in many cases illusory; and (c) they routinely were billed in violation of N.J.S.A. § 39:6A-4.6(c) and N.J.A.C. 11:3-29.6.

(vii)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Clinton Street, Gaccione, Johnson, Holsten, and Nettis uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment, referral, and billing protocol designed solely to financially enrich Bound Brook, D'Agostini, Greene, and Fogarty, not to benefit the Insureds who supposedly were subjected to it.

(viii)  The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Clinton Street, Gaccione, Johnson, Holsten, and Nettis misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

324.   Clinton Street, Gaccione, Johnson, Holsten, and Nettis's systemic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33-A-7.

325.   As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $720,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

## THIRD CAUSE OF ACTION
### Against Bound Brook, D'Agostini, Greene, and Fogarty
### (Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))

326.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 325 above.

327.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "3", Bound Brook, D'Agostini, Greene, and Fogarty knowingly submitted or caused to be submitted HCFA-1500 forms and treatment reports to GEICO that were false and misleading in the following material respects:

(ix)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Bound Brook, D'Agostini, Greene, and Fogarty uniformly misrepresented to GEICO that Bound Brook, D'Agostini, Greene, and Fogarty were in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were eligible to receive PIP reimbursement. In fact, Bound Brook, D'Agostini, Greene, and Fogarty were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were not eligible to receive PIP reimbursement because: (a) they were engaged in an illegal self-referral scheme; (b) they purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) they routinely violated N.J.S.A. § 39:6A-4.6(c) and N.J.A.C. 11:3-29.6 by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(x)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Bound Brook, D'Agostini, Greene, and Fogarty uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were not eligible to receive PIP reimbursement, because: (a) they were provided, to the extent that they were provided at all, pursuant to an illegal self-referral scheme; (b) they were medically unnecessary, and in many cases illusory; and (c) they routinely were billed in violation of N.J.S.A. § 39:6A-4.6(c) and N.J.A.C. 11:3-29.6.

(xi)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Bound Brook, D'Agostini, Greene, and Fogarty uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment, referral, and billing protocol designed solely to financially enrich Bound Brook, D'Agostini, Greene, and Fogarty, not to benefit the Insureds who supposedly were subjected

166

to it.

(xii)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Bound Brook, D'Agostini, Greene, and Fogarty misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

328.   Bound Brook, D'Agostini, Greene, and Fogarty's systemic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33-A-7.

329.   As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $460,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

## FOURTH CAUSE OF ACTION
### Against D'Agostini
### (Violation of RICO, 18 U.S.C. § 1962(c))

330.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 329 above.

331.   Allied Health is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

332.   D'Agostini knowingly conducted and/or participated, directly or indirectly, in the conduct of Allied Health through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Allied Health was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the

billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (v) neither Allied Health nor the underlying services were in compliance with New Jersey law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

333.    Allied Health's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which D'Agostini operates Allied Health inasmuch as Allied Health is not engaged in a legitimate medical practice and acts of mail fraud therefore are essential in order for Allied Health to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Allied Health continues to attempt collection on the fraudulent billing submitted through New Jersey to the present day.

334.    Allied Health is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Allied Health in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

335.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,200,000.00 based upon the fraudulent charges representing payments made by GEICO to Allied Health.

336.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against D'Agostini, Greene, Bound Brook, Fogarty, Clinton Street, and Gaccione
### (Violation of RICO, 18 U.S.C. § 1962(d))

337.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 336 above.

338.     Allied Health is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

339.     D'Agostini, Greene, Bound Brook, Fogarty, Clinton Street, and Gaccione are employed by or associated with the Allied Health enterprise.

340.     D'Agostini, Greene, Bound Brook, Fogarty, Clinton Street, and Gaccione knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Allied Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Allied Health was not eligible to receive under the New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich

the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (v) neither Allied Health nor the underlying services were in compliance with New Jersey law. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

341.    D'Agostini, Greene, Bound Brook, Fogarty, Clinton Street, and Gaccione knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

342.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,200,000.00 pursuant to the fraudulent bills submitted through Allied Health.

343.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### SIXTH CAUSE OF ACTION
**Against Allied Health, D'Agostini, and Greene**
**(Common Law Fraud)**

344.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 343 above.

345.    Allied Health, D'Agostini, and Greene intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO

in the course of their submission of thousands of fraudulent charges through Allied Health seeking payment for the Fraudulent Services.

346. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; (iii) in many claims, concealment of the fact that the Fraudulent Services were performed, to the extent that they were performed at all, pursuant to the Defendants' illegal referral scheme; and (iv) in every claim, concealment of the fact that neither Allied Health nor the Fraudulent Services were eligible to receive no-fault reimbursement.

347. Allied Health, D'Agostini, and Greene intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Allied Health that were not compensable under New Jersey's No-Fault Laws.

348. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,200,000.00 pursuant to the fraudulent bills submitted by Allied Health, D'Agostini, and Greene through Allied Health.

349. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

350. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### Against Bound Brook, Fogarty, Clinton Street, and Gaccione
### (Aiding and Abetting Fraud)

351.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 350 above.

352.    Bound Brook, Fogarty, Clinton Street, and Gaccione knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Allied Health, Bound Brook, Fogarty, Clinton Street, and Gaccione.

353.    The acts of Bound Brook, Fogarty, Clinton Street, and Gaccione in furtherance of the fraudulent scheme include knowingly referring Insureds to Allied Health for treatment in exchange for unlawful compensation, despite the Insureds' lack of any actual injuries arising from any automobile accidents and the lack of any medical reason for the Fraudulent Services, and falsely diagnosing Insureds with continuing injuries in order to create a false basis for continued treatment by Allied Health, D'Agostini, and Greene.

354.    The conduct of Bound Brook, Fogarty, Clinton Street, and Gaccione in furtherance of the fraudulent scheme was significant and material. The conduct of Bound Brook, Fogarty, Clinton Street, and Gaccione was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Allied Health, D'Agostini, and Greene to obtain payments from GEICO and from other insurers.

355.    Bound Brook, Fogarty, Clinton Street, and Gaccione aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Allied Health for medically unnecessary Fraudulent Services or illusory services that were not compensable under New Jersey's No-Fault Laws, because they sought to continue profiting through the fraudulent scheme.

172

356.     The conduct of Bound Brook, Fogarty, Clinton Street, and Gaccione caused GEICO to pay more than $2,200,000.00 pursuant to the fraudulent bills submitted by D'Agostini and Greene through Allied Health.

357.     Bound Brook, Fogarty, Clinton Street, and Gaccione's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

358.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Gaccione
### (Violation of RICO, 18 U.S.C. § 1962(c))

359.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 358 above.

360.     Clinton Street is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

361.     Gaccione knowingly has conducted and/or participated, directly or indirectly, in the conduct of Clinton Street's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Clinton Street was not eligible to receive under the New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants;

(iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (v) neither Clinton Street nor the underlying services were in compliance with New Jersey law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

362.    Clinton Street's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Gaccione operates Clinton Street, insofar as Clinton Street is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Clinton Street to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Clinton Street to the present day.

363.    Clinton Street is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Clinton Street in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

364.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $720,000.00 pursuant to the fraudulent bills submitted through Clinton Street.

365.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
**Against Gaccione, Johnson, Holsten, Nettis, Allied Health, D'Agostini, and Greene
(Violation of RICO, 18 U.S.C. § 1962(d))**

366.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 365 above.

367.     Clinton Street is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

368.     Gaccione, Johnson, Holsten, Nettis, Allied Health, D'Agostini, and Greene are employed by or associated with the Clinton Street enterprise.

369.     Gaccione, Johnson, Holsten, Nettis, Allied Health, D'Agostini, and Greene knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Clinton Street's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Clinton Street was not eligible to receive under the New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (v) neither

Clinton Street nor the underlying services were in compliance with New Jersey law. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

370.     Gaccione, Johnson, Holsten, Nettis, Allied Health, D'Agostini, and Greene knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

371.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $720,000.00 pursuant to the fraudulent bills submitted through Clinton Street.

372.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### TENTH CAUSE OF ACTION
**Against Clinton Street, Gaccione, Johnson, Holsten, and Nettis**
**(Common Law Fraud)**

373.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 372 above.

374.     Clinton Street, Gaccione, Johnson, Holsten, and Nettis intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Clinton Street seeking payment for the Fraudulent Services.

375.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; (iii) in many claims, concealment of the fact that the Fraudulent Services were performed, to the extent that they were performed at all, pursuant to the Defendants' illegal referral scheme; and (iv) in every claim, concealment of the fact that neither Clinton Street nor the Fraudulent Services were eligible to receive no-fault reimbursement.

376.    Clinton Street, Gaccione, Johnson, Holsten, and Nettis intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Clinton Street that were not compensable under New Jersey's No-Fault Laws.

377.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $720,000.00 pursuant to the fraudulent bills submitted by Gaccione, Johnson, Holsten, and Nettis through Clinton Street.

378.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

379.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against Allied Health, D'Agostini, and Greene
### (Aiding and Abetting Fraud)

380.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 379 above.

381.     Allied Health, D'Agostini, and Greene knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Clinton Street, Gaccione, Johnson, Holsten, and Nettis. The acts of Allied Health, D'Agostini, and Greene in furtherance of the fraudulent scheme include knowingly referring Insureds to Clinton Street for treatment in exchange for compensation, despite the Insureds' lack of any actual injuries arising from any automobile accidents and the lack of any medical reason for the Fraudulent Services, and falsely diagnosing Insureds with continuing injuries in order to create a false basis for continued treatment at Clinton Street.

382.     The conduct of Allied Health, D'Agostini, and Greene in furtherance of the fraudulent scheme is significant and material. The conduct of Allied Health, D'Agostini, and Greene is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Clinton Street, Gaccione, Johnson, Holsten, and Nettis to obtain payments from GEICO and from other insurers.

383.     Allied Health, D'Agostini, and Greene aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Clinton Street, Gaccione, Johnson, Holsten, and Nettis for medically unnecessary Fraudulent Services or illusory services that were not compensable under New Jersey's No-Fault Laws, because they sought to continue profiting through the fraudulent scheme.

178

384.     The conduct of Allied Health, D'Agostini, and Greene caused GEICO to pay more than $720,000.00 pursuant to the fraudulent bills submitted by Gaccione, Johnson, Holsten, and Nettis through Clinton Street.

385.     Allied Health, D'Agostini, and Greene's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

386.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWELFTH CAUSE OF ACTION**
**Against D'Agostini**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

387.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 386 above.

388.     Bound Brook is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

389.     D'Agostini knowingly has conducted and/or participated, directly or indirectly, in the conduct of Bound Brook's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Bound Brook was not eligible to receive under the New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants;

(iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (v) neither Bound Brook nor the underlying services were in compliance with New Jersey law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

390.    Bound Brook's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which D'Agostini operates Bound Brook, insofar as Bound Brook is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Bound Brook to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Bound Brook to the present day.

391.    Bound Brook is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Bound Brook in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

392.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $460,000.00 pursuant to the fraudulent bills submitted through Bound Brook.

393.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
### Against Allied Health, D'Agostini, Greene, and Fogarty
### (Violation of RICO, 18 U.S.C. § 1962(d))

394.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 393 above.

395.     Bound Brook is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

396.     Allied Health, D'Agostini, Greene, and Fogarty are employed by or associated with the Bound Brook enterprise.

397.     Allied Health, D'Agostini, Greene, and Fogarty knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Bound Brook's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Bound Brook was not eligible to receive under the New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (v) neither Bound Brook nor the underlying services were in

compliance with New Jersey law. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

398.    Allied Health, D'Agostini, Greene, and Fogarty knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

399.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $460,000.00 pursuant to the fraudulent bills submitted through Bound Brook.

400.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### FOURTEENTH CAUSE OF ACTION
**Against Bound Brook, D'Agostini, Greene, and Fogarty**
**(Common Law Fraud)**

401.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 400 above.

402.    Bound Brook, D'Agostini, Greene, and Fogarty intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Bound Brook seeking payment for the Fraudulent Services.

403.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in many claims, the representation that the

Fraudulent Services were provided in the first instance, when in fact they were not; (iii) in many claims, concealment of the fact that the Fraudulent Services were performed, to the extent that they were performed at all, pursuant to the Defendants' illegal referral scheme; and (iv) in every claim, concealment of the fact that neither Bound Brook nor the Fraudulent Services were eligible to receive no-fault reimbursement.

404.    Bound Brook, D'Agostini, Greene, and Fogarty intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Bound Brook that were not compensable under New Jersey's No-Fault Laws.

405.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $460,000.00 pursuant to the fraudulent bills submitted by D'Agostini, Greene, and Fogarty through Bound Brook.

406.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

407.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTEENTH CAUSE OF ACTION
**Against all Defendants**
**(Unjust Enrichment)**

408.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 407 above.

409.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

410.     When GEICO paid the bills and charges submitted or caused to be submitted by the Defendants through Allied Health, Bound Brook, and Clinton Street for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

411.     The Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

412.     The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

413.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $3,380,000.00.

## **JURY DEMAND**

414.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against Allied Health, D'Agostini, and Greene, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $2,200,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of

the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

B.      On the Second Cause of Action against Clinton Street, Gaccione, Johnson, Holsten, and Nettis, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $720,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

C.      On the Third Cause of Action against Bound Brook, D'Agostini, Greene, and Fogarty, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $460,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

D.      On the Fourth Cause of Action against D'Agostini, for compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,200,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.      On the Fifth Cause of Action against D'Agostini, Greene, Bound Brook, Fogarty, Clinton Street, and Gaccione, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,200,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F.     On the Sixth Cause of Action against Allied Health, D'Agostini, and Greene, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,200,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.     On the Seventh Cause of Action against Bound Brook, Fogarty, Clinton Street, and Gaccione, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,200,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

H.     On the Eighth Cause of Action against Gaccione, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $720,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.     On the Ninth Cause of Action against Gaccione, Johnson, Holsten, Nettis, Allied Health, D'Agostini, and Greene, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $720,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.     On the Tenth Cause of Action against Clinton Street, Gaccione, Johnson, Holsten, and Nettis, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $720,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.     On the Eleventh Cause of Action against Allied Health, D'Agostini, and Greene, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $720,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

L.    On the Twelfth Cause of Action against D'Agostini, for compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $460,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.    On the Thirteenth Cause of Action against Allied Health, D'Agostini, Greene, and Fogarty, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $460,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.    On the Fourteenth Cause of Action against Bound Brook, D'Agostini, Greene, and Fogarty, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $460,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.    On the Fifteenth Cause of Action against all Defendants, more than $3,380,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:      Hackensack, New Jersey
            February 2, 2018
                              RIVKIN RADLER LLP


                    By:     */s/ John Robertelli*
                            John Robertelli, Esq.
                            Gene Y. Kang, Esq.
                            Christopher Casa, Esq.
                            Max Gershenoff, Esq. (admitted *pro hac vice*)
                            Barry I. Levy, Esq. (to be
                            admitted *pro hac vice*)
                            Steven T. Henesy, Esq. (to be
                            admitted *pro hac vice*)
                            21 Main Street, Suite 158

187

Court Plaza South, West Wing
Hackensack, New Jersey 07601
(201) 287-2460